# EXHIBIT 1

v.

# LEASE AGREEMENT

*by and between*

## Metrocrest Hospital Authority
## and
## SANA Healthcare Carrollton, LLC

# **TABLE OF CONTENTS**

**Page**

**RECITALS** ................................................................................................................ 1
ARTICLE I DEFINITIONS ......................................................................................... 1
1.1.    **Certain Definitions** ...................................................................................... 1
1.2.    **Construction** .............................................................................................. 15
1.3.    **Additional Definitions** ............................................................................. 15
ARTICLE II .......................................................................................................... 16
DEMISE; LEASE TERM; .......................................................................................... 16
ACCEPTANCE OF THE LEASED PREMISES; DISCLAIMER OF WARRANTIES ................. 16
2.1.    **Demise of the Leased Premises** ................................................................. 16
2.2.    **Lease Term** ............................................................................................... 16
2.3.    **Renewal Term** ........................................................................................... 16
2.4.    **Reporting Requirements** ........................................................................... 16
2.5.    **Assignment** ............................................................................................... 17
2.6.    **Property Repairs** ....................................................................................... 17
2.7.    **Condition of Assets.**  Landlord shall deliver the Property "as is" and "where-is". ...... 17
2.8.    **Acceptance of the Leased Premises by Tenant** ......................................... 17
2.9.    **Waiver of Express and/or Implied Warranties; Disclaimer as to Physical Condition and Operations** ......................................................................... 17
ARTICLE III .......................................................................................................... 19
TRANSITION OF POSSESSION OF THE LEASED ......................................................... 19
PREMISES ON THE EFFECTIVE DATE ....................................................................... 19
3.1.    **Baylor Medical Center at Carrollton Transition** ....................................... 19
ARTICLE IV USE, GUARANTEE AND OPTION ......................................................... 19
4.1.    **Use** ........................................................................................................... 19
4.2.    **Guarantee** ................................................................................................. 19
4.3.    **Purchase Option** ....................................................................................... 19
ARTICLE V RENT .................................................................................................. 20
5.1.    **Base Rent, Escalation and Renewal.** ......................................................... 20
5.2.    20
5.3.    20
5.4.    20
5.5.    20
ARTICLE VI CAPITAL ADDITIONS AND IMPROVEMENTS ......................................... 22
6.1.    **Certain Definitions** ................................................................................... 22
6.2.    **Capital Additions and Improvements to the Leased Premises.** .................. 22
6.3.    **Construction Contracts.** ............................................................................ 23
6.4.    **Compliance with Laws; Construction Requirements.** ................................ 24
6.5.    **Surety Bonds.** ........................................................................................... 24
6.6.    **Improvements as Part of the Leased Premises.** ......................................... 24
6.7.    **Legal Restrictions on Landlord.** ............................................................... 24
ARTICLE VII ANNUAL CAPITAL EXPENDITURES; MAINTENANCE AND REPAIR OBLIGATIONS; RENOVATIONS; ALTERATIONS AND ADDITIONS ................................. 25



**7.1.**    **Certain Definitions.**..............................................................................................25
**7.2.**    **Annual Capital Expenditures.**..........................................................................26
**7.3.**    **Tenant's Covenants Regarding Maintenance, Repair, Renovation and
        Alteration of the Leased Premises.**..................................................................28
**7.4.**    **Maintenance Contracts.**.....................................................................................28
**7.5.**    **Third-Party Consultants.**....................................................................................29
**7.6.**    **Remodeling, Renovation, Alteration and Additions.**...................................30
**7.7.**    **Municipal and Governmental Permits.**............................................................30
**7.8.**    **Title: Investment Tax Credit.**............................................................................31
            ARTICLE VIII EQUIPMENT; EQUIPMENT PURCHASES ...............................31
**8.1.**    **Certain Definitions.**.............................................................................................31
**8.2.**    **Maintenance of Equipment**................................................................................32
**8.3.**    **New or Replacement Equipment.**......................................................................32
**8.4.**    **Reimbursement Equipment.**...............................................................................33
**8.5.**    **Removal of Equipment from Leased Premises**.................................................36
            ARTICLE IX PROPERTY AND CASUALTY INSURANCE ................................37
**9.1.**    **Insurance Coverage.**............................................................................................37
**9.2.**    **Insurance Policy Requirements.**........................................................................39
**9.3.**    **Tenant's Business Interruption Insurance.**......................................................41
**9.4.**    **Consent of Landlord to Cancellation.**..............................................................41
**9.5.**    **Beneficiaries of Insurance Policies.**.................................................................41
**9.6.**    **Failure to Maintain Insurance.**..........................................................................42
**9.7.**    **Non-Waiver of Tenant's Liability.**.....................................................................42
**9.8.**    **Reports on Insurance Claims.**............................................................................42
**9.9.**    **Self-Insurance**......................................................................................................42
            ARTICLE X DAMAGE AND RECONSTRUCTION ..........................................43
**10.1.** **Notice of Casualty.**..............................................................................................43
**10.2.** **Reconstruction in the Event of Damage or Destruction.**...............................43
**10.3.** **Insurance Proceeds.**............................................................................................43
**10.4.** **Scope of Repairs.**................................................................................................44
**10.5.** **Non-Abatement of Rent.**....................................................................................44
            ARTICLE XI OPERATING COVENANTS OF TENANT; COMPLIANCE WITH
            GOVERNMENTAL REGULATIONS; PERMITS; OTHER COVENANTS ................44
**11.1.** **Operating Covenants.**.........................................................................................44
**11.2.** **Compliance with Governmental Regulations.**.................................................47
**11.3.** **Required Permits; License; Accreditation; Physician Licensing.**..................48
**11.4.** **Contest of Liens.**.................................................................................................50
**11.5.** **Additional Information.**.......................................................................................50
            ARTICLE XII REPRESENTATIONS AND WARRANTIES OF TENANT .................50
**12.1.** **Tenant's Representations and Warranties.**......................................................50
            ARTICLE XIII REPRESENTATIONS AND WARRANTIES OF LANDLORD ...........51
**13.1.** **Landlord's Representations and Warranties.**..................................................51
            ARTICLE XIV COVENANTS OF LANDLORD; LANDLORD'S RIGHTS ................53
**14.1.** **Landlord Covenants.**..........................................................................................53
**14.2.** **Landlord Rights.**.................................................................................................53
            ARTICLE XV LANDLORD BOARD REPRESENTATION .................................55



ARTICLE XVI FINANCIAL REPORTING ............................................................ 55
16.1. Certain Definitions. ........................................................................................ 55
16.2. Books and Records ......................................................................................... 56
16.3. Financial Reports. .......................................................................................... 56
16.4. Review of and Use by Landlord of the Financial Reports. ......................... 57
16.5. Feasibility Studies. ......................................................................................... 57
16.6. Confidential Information. .............................................................................. 57
16.7. Public Information Act Issues. ...................................................................... 59
16.8. Selection of Counsel. ...................................................................................... 61
ARTICLE XVII MECHANICS AND MATERIALMENS LIENS ............................ 62
17.1. Mechanics Liens and Materialmen's Liens. ................................................ 62
17.2. NOTICE. .......................................................................................................... 62
ARTICLE XVIII HAZARDOUS SUBSTANCES ..................................................... 63
18.1. Certain Definitions. ........................................................................................ 63
18.2. Tenant's Covenants Regarding Operations and Compliance. .................... 65
18.3. Exceptions to Prohibited Activities and Conditions. .................................. 67
18.4. Notices. ............................................................................................................. 67
18.5. Environmental Inspections ........................................................................... 68
18.6. Remediation. ................................................................................................... 68
18.7. Cooperation. .................................................................................................... 68
18.8. Legal Proceedings. .......................................................................................... 69
ARTICLE XIX CONDEMNATION ......................................................................... 69
19.1. Definitions. ...................................................................................................... 69
19.2. Parties Rights and Obligations. .................................................................... 70
19.3. Notice of Condemnation ................................................................................. 70
19.4. Total Taking. .................................................................................................... 70
19.5. Allocation of Award. ....................................................................................... 70
19.6. Partial Permanent Taking. ............................................................................ 71
19.7. Temporary Taking. .......................................................................................... 71
ARTICLE XX EVENTS OF DEFAULT AND REMEDIES ...................................... 72
20.1. Definitions ....................................................................................................... 72
20.2. Tenant Default. ............................................................................................... 72
20.3. Landlord Default. ............................................................................................ 75
20.4. Remedies Cumulative. .................................................................................... 76
20.5. No Implied Waiver .......................................................................................... 77
20.6. Delay Not to Constitute Waiver .................................................................... 77
ARTICLE XXI SURRENDER UPON LEASE TERMINATION ............................. 77
21.1. Certain Definitions. ........................................................................................ 77
21.2. Surrender of Possession Upon Termination. ............................................... 82
21.3. Payments Upon Surrender. ............................................................................ 83
21.4. Transition Procedures. ................................................................................... 85
21.5. Transfer of Assets at Lease Termination ..................................................... 86
21.6. Retained Assets and Liabilities .................................................................... 87
21.7. Assumption of Certain Liabilities by Landlord ........................................... 87
21.8. Transitional Arrangements. ........................................................................... 87
21.9. Defense of Claims; Landlord's and Tenant's Cooperation. ....................... 90



21.10.   Third Party Consents.................................................................... 91
21.11.   Landlord's Cost Reports................................................................ 91
21.12.   Confidentiality........................................................................... 92
21.13.   Changes in Laws and Procedures................................................. 92
         ARTICLE XXII HOLDING OVER ................................................... 92
22.1.  Certain Definitions....................................................................... 92
22.2.  Holding Over............................................................................... 92
22.3.  Certain Limitations...................................................................... 93
         ARTICLE XXIII INDEMNIFICATION ............................................. 94
23.1.  Tenant's Indemnity Covenants...................................................... 94
23.2.  Counsel....................................................................................... 95
23.3.  Settlement of Claims.................................................................... 96
23.4.  Additional Obligations................................................................. 96
23.5.  Term of Indemnity....................................................................... 96
23.6.  Non-Waiver; Remedies Cumulative............................................... 96
23.7.  Landlord's Indemnity................................................................... 97
23.8.  Certain Limitations...................................................................... 97
         ARTICLE XXIV TRANSFER AND ASSIGNMENT ............................ 98
24.1.  Certain Definitions....................................................................... 98
24.2.  Landlord's Transfer Right............................................................. 98
24.3.  Tenant's Transfer of the Leasehold Estate...................................... 99
24.4.  Maintenance of Existence........................................................... 100
24.5.  Dissolution or Liquidation.......................................................... 100
24.6.  Change of Control of the Parent.................................................. 100
         ARTICLE XXV RESOLUTION OF CERTAIN DISPUTES ................. 101
25.1.  Disputes Subject to Dispute Resolution Procedures...................... 101
25.2.  Certain Definitions..................................................................... 102
25.3.  Dispute Resolution Procedure..................................................... 102
         ARTICLE XXVI FORCE MAJEURE .............................................. 104
26.1.  Force Majeure........................................................................... 104
26.2.  Effect of Force Majeure.............................................................. 105
         ARTICLE XXVII MISCELLANEOUS ............................................ 105
27.1.  Performance of Defaulting Party's Obligations............................. 105
27.2.  Partial Invalidity........................................................................ 105
27.3.  No Personal Recourse Against Landlord; Indemnification. ............ 105
27.4.  Amendments to Law................................................................... 106
27.5.  Governing Law........................................................................... 106
27.6.  Entire Lease; Amendments.......................................................... 106
27.7.  Notices...................................................................................... 106
27.8.  Counterparts.............................................................................. 107
27.9.  Headings.................................................................................... 107
27.10.   Name of the Leased Premises ................................................... 108
27.11.   Statutory References ................................................................ 108
27.12.   Public Purpose Sole Reason for This Transaction....................... 108
27.13.   Exhibits................................................................................... 108



# LEASE AGREEMENT BY AND BETWEEN
## METROCREST HOSPITAL AUTHORITY AND
## SANA HEALTHCARE CARROLLTON, LLC

**THIS LEASE AGREEMENT (**this **"Lease"**)**, dated as of October 20, 2019, and effective as of February 29, 2020, by and between **METROCREST HOSPITAL AUTHORITY** (f/k/a The Farmers Branch Hospital Authority), a Texas municipal hospital authority, as Lessor ("**Landlord**"), and **SANA HEALTHCARE CARROLLTON, LLC**, a Nevada limited liability company, as lessee ("**Tenant**").

### RECITALS

Landlord is the owner of the Leased Premises, as defined below. Landlord desires to lease to Tenant, and Tenant desires to lease from Landlord and thereafter operate the Leased Premises in a manner consistent with the terms and provisions hereof.

**NOW, THEREFORE**, Landlord and Tenant, in consideration of the foregoing recitals, the rental hereinafter reserved and the agreements, conditions, and covenants hereinafter contained, each intending to be legally bound, covenant and agree as follows:

## ARTICLE I
### DEFINITIONS

**1.1. Certain Definitions.**    In this Lease and any supplement hereto (except as otherwise expressly provided or unless the context otherwise requires) the following terms shall have the meanings specified below:

**1.1.1. "Absolute Net Lease"** is defined in Section 5.5.5.

**1.1.2. "Affiliate" or "affiliate"** shall mean, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person.  The term "control" (including the terms "controlled by" or "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

**1.1.3. "Approval of" or "Approved by"** a Person shall mean the written consent or approval of the matter in question by an authorized officer of the Person, which consent or approval shall be obtained before the taking of the action for which it is required hereunder.

**1.1.4. "Assignment"** shall mean the rights identified in Section 2.5.

**1.1.5. "Base Rent"** is defined in Section 5.5.1.

**1.1.6. "Base Rent Escalation"** is defined in Section 5.5.2.



**1.1.7.** "**Base Rent for Renewal Term**" is defined in Section 5.5.3.

**1.1.8.** "**Building Systems**" shall mean all:

(a)    chillers and condenser pumps, cooling towers, boilers, generators and switch gear;

(b)    footings and foundations, columns, piles or other installations below the surface of the Leased Premises;

(c)    plumbing systems, electrical systems, heating, ventilating, air-conditioning systems and structural systems constituting a portion of or located within the Improvements;

(d)    sprinkler systems, fire and theft protection equipment, built-in oxygen and vacuum systems;

(e)    utility lines, fire alarm systems, including initiating devices, smoke detectors, duct detectors, heat detectors and sprinkler systems;

(f)    sanitary sewers, utility pipes, conduits and lines;

(g)    medical air compressors, vacuum compressors, roof systems, the emergency electrical generators within the Leased Premises and related automatic transfer switches, and elevators; and

(h)    replacements, modifications, alterations and additions thereto, subject to such depletions, re-supplies, substitutions, and replacements as occur and are made in the normal course of business, or as may be required to be made or installed by Tenant in accordance with the terms and provisions hereof, during the period ending on the Lease Termination Date.

**1.1.9.** "**Business Day**" shall mean a day that is not a Saturday, a Sunday, a legal holiday or a day on which banks are required or permitted by law or other governmental action to close in the City.

**1.1.10.** "**Capital Improvements**" is defined in Section 2.2.1.

**1.1.11.** "**Certified Public Accountant**" shall mean a Person who shall be Independent, actively engaged in the business of public accounting and duly certified as a certified public accountant, who is experienced in hospital industry accounting practices and procedures.

**1.1.12.** "**City**" shall mean the City of Carrollton, Texas.

**1.1.13.** "**Condition of Assets**" is defined in Section 2.7.

**1.1.14.** "**Confidentiality Agreement**" is defined in Section 16.1.3.



**1.1.15. "Communication Equipment"** shall mean telephone systems, intercoms and related communication equipment.

**1.1.16. "Computer Equipment"** shall mean mainframe computers, personal computers, hardware, printers, scanners, facsimile machines, copiers and Xerox machines together with software or source codes utilized in connection with the Leased Premises and relating to any computer, scanner, copier or similar equipment associated with or employed in the operation of the Leased Premises.

**1.1.17. "Contracts"** shall mean all commitments, contracts, leases, subleases and agreements which affect the Leased Premises or the operation of any thereof, to which the operator of the Leased Premises is a party or by which it, the Leased Premises or any portion thereof are bound, which are in effect from time to time, including, without limitation: (a) physician agreements, (b) agreements with health maintenance organizations, preferred provider organizations or other alternative delivery systems, (c) joint venture or partnership agreements, (d) employment contracts or any other contracts, agreements or commitments to or with individual employees or agents relating to the Leased Premises, (e) contracts or commitments materially affecting ownership of, title to, use of or any interest in real estate, (f) Maintenance Agreements, (g) agreements with municipalities, (h) collective bargaining agreements or other contracts or commitments to or with any labor unions, labor organizations or other employee representatives or groups of employees relating to the Leased Premises, (i) loan agreements, bonds, mortgages, liens or other security agreements, (j) patent licensing agreements or any other agreements, licenses or commitments with respect to patents, patent applications, trademarks, trade names, service marks, technical assistance, copyrights or other like terms affecting the Leased Premises, (k) agreements or contracts covering or relating to Data Processing Materials, and (l) contracts or commitments, whether in the ordinary course of business or not, which involve future payments, performance of services or delivery of goods or materials, to or by the operator of the Leased Premises. The term "**Contracts**" shall expressly exclude Equipment Leases.

**1.1.18. "Cost Reports"** shall mean all cost and other reports filed pursuant to the requirements of the Government Payment Programs for payment or reimbursement of amounts due from them.

**1.1.19. "Data Processing Materials"** shall mean all agreements, licenses or commitments relating to data processing programs, software or source codes utilized in connection with the Leased Premises or relating to any computer, scanner, copier or similar equipment associated with or employed in the operation of the Leased Premises, to the extent not included within the definition of Computer Equipment.

**1.1.20. "Dispute Resolution Procedures"** shall mean the dispute resolution procedures set forth in Article XXV hereof.

**1.1.21. "Effective Date"** shall mean January 1, 2020.

**1.1.22. "Equipment"** shall mean:



**(a)**    any and all Communications Equipment, Computer Equipment and Medical Equipment, of any nature, and all components thereof used or usable in connection with any part of the Leased Premises, and all other similar equipment necessary or required in connection with the operation of the Leased Premises, together with, where the context requires,

**(b)**    all replacements, modifications, alterations and additions thereto, subject to such depletions, re-supplies, substitutions, and replacements as occur and are made in the normal course of business, or as may be required to be made or installed by Tenant in accordance with the terms and provisions hereof, during the period commencing on the Effective Date and ending on the Lease Termination Date.

The term "**Equipment**" shall specifically exclude any item included within the definition of or any component of items included within the definition of Building Systems, Data Processing Materials (except to the extent included in a category set forth in subparagraph (a) above), FF&E, Improvements, Inventory, Personal Property and any other similar items of personal property used in the operation of the Leased Premises.

**1.1.23.** "**Equipment Leases**" shall mean any and all leases, rental agreements, conditional sales contracts or other agreements for the use of any of the Equipment hereafter entered into by Tenant.

**1.1.24.** "**Event of Default**" shall mean either a Tenant Default or a Landlord Default, as defined in Article XX, as the context requires.

**1.1.25.** "**FF&E**" shall mean all non-moveable equipment (other than Medical Equipment), machinery, fixtures, and other articles of similar property required for or incidental to the use of the Leased Premises, including all components thereof, all of which is now and hereafter permanently affixed to, attached to or incorporated into the Improvements, and now or hereafter used or usable in connection with any part of the Leased Premises, including, without limitation:

**(a)**    fixtures, machinery, furnaces, boilers and heaters, providing heating, plumbing, lighting, ventilating, security, refrigerating, exhaust, incineration, air and water pollution control, waste disposal, air-cooling and air-conditioning systems and apparatus;

**(b)**    engines, motors, compressors, dynamos, elevators, fittings, piping, connections, conduits and ducts;

**(c)**    partitions, doors and hardware, equipment, awnings, shades, screens and blinds, asphalt, vinyl, composition and other floor, wall and ceiling coverings, and similar apparatus;

**(d)**    gas, sewer, and water facilities and other related improvements;



(e)    all other similar facilities or amenities necessary or required in connection with the operation of the Leased Premises; and

(f)    all replacements, modifications, alterations and additions thereto, subject to such depletions, re-supplies, substitutions, and replacements as occur and are made in the normal course of business, or as may be required to be made or installed by Tenant in accordance with the terms and provisions hereof, during the period ending on the Lease Termination Date.

1.1.26. **"GAAP"** shall mean at any time, generally accepted accounting principles as then in effect in the United States, applied on a consistent basis and applicable in the preparation of financial statements of hospitals, operated by for-profit or not-for-profit entities, as the case requires, including without limitation those promulgated by the Financial Accounting Standards Board or such other body recognized as authoritative by the American Institute of Certified Public Accountants.

1.1.27. **"Governmental Authorities"** shall mean and include (a) the United States of America and any department of or corporation, agency or instrumentality heretofore or hereafter created, designated or established by the United States of America, (b) the State of Texas, any political subdivision thereof and any department of or corporation, agency or instrumentality heretofore or hereafter created, designated or established by the State of Texas, (c) the City, Dallas County or Denton County, Texas and any department of or corporation, agency or instrumentality heretofore or hereafter created, designated or established by the City, Dallas County or Denton County, Texas, (d) any other public or private body (other than Landlord), whether federal, state or local or otherwise having regulatory jurisdiction and authority over Tenant, the Leased Premises, or hospital rates, including accrediting organizations, and (e) any district, department or other political division or subdivision of any of the foregoing, and any court or political subdivision, agency, or instrumentality having or exercising jurisdiction over Landlord, Tenant or the Leased Premises.

1.1.28. **"Governmental Regulations"** shall mean any and all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, orders, decrees and injunctions, building and fire codes, zoning ordinances, restrictions, restrictive covenants, judgments, health and environmental laws and regulations and any and all other laws, requirements, standards and regulations of appropriate supervising boards of fire underwriters and other matters of all Governmental Authorities or courts of competent jurisdiction having jurisdiction over the Leased Premises, or affecting either the Leased Premises or the maintenance, construction, use, operation or alteration thereof (whether by Tenant or otherwise), now or hereafter enacted and in force, including:

(a)    all laws, rules or regulations pertaining to the environment, occupational health and safety and public health, safety or welfare;



**(b)**  any laws, rules or regulations that may (i) require the making of Repairs, modifications or alterations in or to the Leased Premises or (ii) in any way adversely affect the use and enjoyment thereof; and all Permits necessary or appropriate to operate the Leased Premises and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Tenant (other than encumbrances hereafter created by Landlord without the consent of Tenant), at any time in force affecting the Leased Premises;

**(c)**  any such laws relating to (i) providing medical services or otherwise relating to any hospital or other health care facility; (ii) practicing medicine; (iii) providing any product or service with respect to any of the activities described in clauses (i) or (ii); or (iv) receiving or the right to participate with any Payor or receive payments for any of the activities described in clauses (i) or (ii), including but not limited to the Stark Law (42 U.S.C. §§1395nn and 1396b), the Medicare and Medicaid Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the False Claim Act (including 31 U.S.C. §§ 3729 et seq. and 18 U.S.C. §§ 2371, 666, 3013, and 3571) and any state or local statute similarly directed, and prohibitions against fee splitting, together with all amendments thereto; and

**(d)**  any and all regulations promulgated by the Centers for Medicine and Medicaid Services or by the Office of Inspector General of the Department of Health and Human Services.

**1.1.29. "Government Payment Programs"** shall mean federal and state Medicare, Medicaid and CHAMPUS, and similar or successor programs with or for the benefit of Governmental Authorities.

**1.1.30. "Hospital"** shall mean, where the context requires, collectively, (a) the Carrollton Hospital, (b) the Imaging Center, and (c) all parking areas  identified in the Parking Lease hereto.

**1.1.31. "Imaging Center"** shall mean the Outpatient Radiology and Imaging Center located on Tract B, together with all parking areas  identified in the Parking Lease attached hereto.

**1.1.32. "Impositions"** shall mean, collectively, to the extent first arising during the Lease Term:

**(a)**  all taxes (including, without limitation, all ad valorem, sales and use, occupancy, single business, gross receipts, transaction privilege, rent or similar taxes as the same relate to or are imposed upon Tenant or Landlord or Tenant's Business conducted upon the Leased Premises);

**(b)**  assessments (including, without limitation, all assessments for public improvements or benefit, whether or not commenced or completed prior to the Effective Date and whether or not to be completed within the Lease Term);

**(c)**  ground rents, water, sewer or other rents and charges;



(d)    excise, tax inspection, authorization and similar fees; and

(e)    all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Leased Premises or the business conducted thereon by Tenant (including all interest and penalties thereon caused by any failure in payment by Tenant), which at any time prior to, during or with respect to the Lease Term hereof may be assessed or imposed on or with respect to or be a lien upon (x) this Lease, (y) the Leased Premises, or any part thereof or any therefrom or any estate, right, title or interest therein, or (z) any occupancy, operation, use or possession of, or sales from, or activity conducted on or in connection with the Leased Premises, or the leasing or use of the Leased Premises or any part thereof by Tenant.

1.1.33. "**Improvements**" shall mean all buildings, structures, and other improvements of every kind now or hereafter located on the Land, including, but not limited to:

(a)    the Building Systems;

(b)    the roofs, foundation, exterior walls, all glass, including windows of glass or plate glass, window mullions and gaskets;

(c)    interior walls, cabinets, millwork, paneling, and other finish work;

(d)    the structural or load bearing or core elements of the Improvements;

(e)    mechanical rooms, patient rooms, storage rooms, operating rooms, office space, bathrooms, hallways, stairwells, building stairs, fire towers, elevator shafts, flues, vents, stacks, pipe shafts, and vertical ducts;

(f)    all finished floors and floor coverings, dock boards, dock levelers, and/or dock bumpers, overhead truck doors;

(g)    down spouts of roof gutters attached to the exterior of the Improvements;

(h)    construction work in progress, and any other related buildings or other improvements and fixtures thereon; and

(i)    all replacements, modifications, alterations and additions thereto, subject to such depletions, re-supplies, substitutions, and replacements as occur and are made in the normal course of business, or as may be required to be made or installed by Tenant in accordance with the terms and provisions hereof, during the period ending on the Lease Termination Date.



**1.1.34. "[I]ncluding," "inclusive of"** and other words or phrases of similar import shall be construed as if followed by the phrase **"without limitation**."

**1.1.35. "Independent"** shall mean with respect to any Person, a Person:

**(a)**   who is not a member of Landlord's Board, or any board of directors of Tenant or Tenant's direct or indirect parents or subsidiaries, or an officer or employee of Landlord or an officer, director or employee of Tenant, or Tenant's direct or indirect parents or subsidiaries, or

**(b)**   which is a partnership, corporation, limited liability company, or association having no partner, director, officer, member or substantial stockholder who is a member of Landlord's Board, or any board of directors of Tenant or Tenant's direct or indirect parents or subsidiaries;

provided, however, that the fact that such Person is retained regularly by or transacts business with Landlord or Tenant or their respective Affiliates shall not, in and of itself, make such Person a Person who or which is not Independent within the meaning of this definition.

**1.1.36. "Inventory"** shall mean all inventories or supplies owned or purchased by Tenant to be used in connection with the operation of the Leased Premises, including, but not limited to, linens, pharmaceuticals, intravenous fluid, disposable surgical supplies, dressings, and bandages, imaging and other diagnostic solutions and supplies, china, glassware and other non-depreciable personal property, office supplies, cleaning supplies, uniforms, laundry and valet supplies, engineering supplies, fuel, stationery, soap, matches, toilet and facial tissues, and such other supplies as are consumed customarily on a recurring basis in the operation of the Leased Premises, together with food and beverages that are to be served to patients, guests, invitees, staff or Employees of the Leased Premises, subject to such depletions, re-supplies, substitutions, and replacements as occur and are made in the normal course of business during the period from and after the Effective Date through the Lease Termination Date.

**1.1.37. "JC"** shall mean the Joint Commission (formally known as the Joint Commission on Accreditation).

**1.1.38. "Land"** shall mean **Tracts A, B** and **C**, together with all and singular the benefits, rights, privileges, easements, tenements, hereditaments, and appurtenances owned by Landlord pertaining to such real property.

**1.1.39. "Landlord"** shall mean **Metrocrest Hospital Authority**, a Texas municipal hospital authority.

**1.1.40. "Landlord Board Member"** shall mean those Persons chosen by Landlord and who serve as a member of the Tenant Board, as contemplated by the provisions hereof.



**1.1.41. "Landlord Indemnified Party"** shall mean Landlord, any Affiliate of Landlord, the officers, directors, stockholders, partners, members, employees, agents and representatives of any of the foregoing Persons and of any stockholder, partner, member, agent, or representative of any of the foregoing Persons, and the respective heirs, personal representatives, successors and assigns of any such officer, director, partner, stockholder, employee, agent or representative.

**1.1.42. ""Landlord's Board"** shall mean the governing body of Landlord.

**1.1.43. "Landlord's Knowledge"** shall be construed, by imputation or otherwise, to refer to and shall include only the current actual knowledge, if any, of Charles B. Heath (or any individual subsequently in the position of President of the Landlord) and the Chief Financial Officer of Landlord (or his or her successor), and shall impose upon Landlord no additional duty to make any further inquiry of any other Person as to the accuracy of the representations and warranties set forth herein.

**1.1.44. "Landlord's Service Area"** shall mean the areas within Dallas, Denton and Collin Counties, Texas, which area may change from time to time during the Lease Term, but which at all times shall mean the geographic boundaries from which seventy-five percent (75%) of patients of the Leased Premises are derived, as determined by patient origin studies by zip code area for a period of twenty-four (24) months preceding the study in question, excluding patients originating from outside of the State of Texas.

**1.1.45. "Landlord's Representatives"** shall mean Landlord's officers, agents, representatives, employees, accountants, affiliates, attorneys, lenders and all Persons who may be engaged in or participate in giving financial advice to Landlord.

**1.1.46. "Lease Agreement," "Lease," or "Agreement"** shall mean this Lease Agreement, between Landlord and Tenant. Words such as **"herein," "hereinafter," "hereof," "hereto," "hereby"** and **"hereunder,"** when used with reference to this Lease, refer to this Lease as a whole, unless the context otherwise requires.

**1.1.47. "Leasehold Estate"** shall mean the interest of Tenant under this Lease in and to the Leased Premises, and the rights and benefits of Tenant arising under this Lease.

**1.1.48. "Lease Term"** shall mean five (5) years beginning January 1, 2020 and ending December 31, 2025. Notwithstanding the foregoing, Tenant may extend the Term of this Lease for up to one (1) extension period of five (5) years (**"Renewal Period"**), upon all of the terms set forth in this Lease. Tenant may do so only if a Tenant Default shall not exist under this Lease at the time of any such election, and by giving Landlord notice of each such election (**"Extension Notice"**) not later than eighteen (18) months prior to the expiration of the then current Term.



**1.1.49. "Lease Termination Date"** shall mean the last day of the Lease Term, whether by expiration of the Lease Term or by reason of earlier termination by Landlord or Tenant pursuant to the terms and conditions hereof.

**1.1.50. "Lease Year"** shall mean, other than the initial Lease Year, any twelve (12) month period from January 1 to the following December 31 during the Lease Term; provided that the initial Lease Year shall be the period beginning on the Effective Date and ending on December 31, 2020 and the final Lease Year shall be the period beginning on January 1 of that Lease Year and ending on the Lease Termination Date. To the extent any computation or other provision hereof provides for an action to be taken on a Lease Year basis, an appropriate proration or other adjustment shall be made, if the context requires, in respect of the initial and final Lease Years to reflect that such periods are less than full twelve (12) month periods.[1]

**1.1.51. "Lease Year Month"** shall mean the calendar months beginning January 1 of each Lease Year.

**1.1.52. "Leased Premises"** shall mean and include, collectively:

**(a)**  the Land,
**(b)**  the Improvements,
**(c)**  the FF&E,
**(d)**  the Personal Property,
**(e)**  the Existing Equipment,
**(f)**  the Existing Data Processing Materials,
**(g)**  the Existing Permits,
**(h)**  the Existing Records,
**(i)**  the Trade Name
**(j)**  the Existing Warranties

which constitute any portion of the Hospital, and which shall include, without limitation, all items of tangible and intangible property located on the Leased Premises and owned by Landlord, together with

**(k)**  all Improvements, FF&E, Personal Property, Equipment, Data Processing Materials, Permits, Records, Trade Names and Warranties which hereafter become part of any of the foregoing, or are erected, constructed or situated thereon or therein and all rights, powers, easements, licenses and rights of way appurtenant thereto; provided that, the Tenant Equipment shall not constitute part of the Leased Premises.

**1.1.53. "Maintenance Contracts"** shall mean those Contracts hereafter entered into by and between Tenant and any unrelated third-party vendors, which have been Approved by Landlord, to the extent that such approval is required by the provisions

---

[1]  Under the Prior Lease, a "Lease Year" extended from October 1 to the following September 30. In this Amended and Restated Lease, a Lease Year is co-extensive with the calendar year, and this explains the extension of the initial Lease Year to December 31, 2009.



hereof, providing for maintenance services for Equipment and applicable components of FF&E and Building Systems.

1.1.54. **"Medical Equipment"** shall mean medical equipment of all kinds (including equipment that serves patient care and life safety concerns, such as diagnostic and monitoring equipment), including medical equipment which constitutes fixtures, furniture, such as beds, chairs, couches, chests, night stands and bedside tables located in individual patient rooms and furniture located in meeting and/or board rooms, offices and waiting areas, and appliances, such as refrigerators and microwaves used in connection with the delivery of patient care; but shall specifically exclude art work, draperies, accessories and like property.

1.1.55. **"MHA Representative"** shall mean the President of Landlord, or such other individual appointed by Landlord's Board in his or her place.

1.1.56. **"Net Revenues"** shall mean for any Lease Year or partial Lease Year all net patient revenues, subject to an allowance for doubtful accounts (as determined in accordance with GAAP), from the operation, ownership or leasing of the Leased Premises by Tenant plus additional revenues which shall include (a) cafeteria revenue, parking revenue, vending machine revenue, sundry sales and other similar items of operating income, and (b) subject to the exclusions set forth in the succeeding sentence, all other operating revenue of any kind or character which has accrued for the benefit of Tenant for the applicable period. The term **"Net Revenues"** shall not include revenues which are classified as non-operating revenue items, including, but not limited to, gifts, grants, and bequests, capital investments from investors, transfers from Landlord, interest earnings, net insurance or condemnation proceeds utilized in the repair or rebuilding of the Leased Premises or other similar non-operating items.

1.1.57. **"Net Revenues Statement"** shall mean a certified statement issued by Tenant and to be delivered by Tenant to Landlord setting forth the actual Net Revenues for the period in question, to be delivered to Landlord by Tenant in the manner herein set forth.

1.1.58. **"Non-Reimbursement Equipment"** shall mean all Equipment which is a part of the Leased Premises as of the Effective Date, which does not constitute Landlord Reimbursement Equipment.

1.1.59. **"Operating Expenses"** shall mean all expenses incurred by Tenant during the Lease Term in the operation of the Leased Premises in the ordinary course of business, as determined in accordance with GAAP.

1.1.60. **"Operational Information"** shall mean and include, with respect to the operations of the Leased Premises:

(a)    patient information for the period in question with comparable information for the prior Lease Year, including:



        **(i)**    patient volume (both inpatient and outpatient),

        **(ii)**    patient days to include acute care, specialty care and long-term care and average length of stay (in days),

        **(iii)**    emergency room visits,

        **(iv)**    outpatient surgeries and outpatient revenue as a percent of total gross revenue, and

        **(v)**    patient mix numbers and sources of patient revenues, presented as a percent of gross patient revenue (Medicare, Medicaid, HMO, PPO and Other);

    **(b)**    facilities and employee information, including:

        **(i)**    number of employees,

        **(ii)**    licensed and staffed beds to include acute care, specialty care and long-term care, and

        **(iii)**    range of services provided at the Leased Premises, and

    **(c)**    a statement or description of:

        **(i)**    whether any material union activity is present at the Leased Premises, or collective bargaining agreements are in force;

        **(ii)**    any litigation that materially impacts Tenant or the operation of the Leased Premises;

        **(iii)**    changes in the senior management positions of the CEO, COO and CFO of Tenant;

        **(iv)**    material changes in Tenant's liability insurance coverage; and

        **(v)**    any administrative proceeding that would materially affect the licensing and accreditation of the Leased Premises.

    **1.1.61. "Operational Statements"** shall mean the statements delivered to Landlord which contain Operational Information as contemplated by the provisions hereof and which contain Tenant's certification that such Operational Information is true and correct in all material respects.

    **1.1.62. "Parking Agreement"** shall mean that certain Parking Agreement which shall govern Tenant's parking rights in certain surface parking lots which lay adjacent to the Carrollton Hospital, a copy of which is attached hereto as **Exhibit "A"** and made a part hereof for all purposes.



**1.1.63. "Payor"** shall mean Medicare, Medicaid, CHAMPUS, and medically indigent assistance programs, Indian Health Service, Blue Cross, Blue Shield or any other third party payor, including but not limited to, an insurance company, health maintenance organization, preferred provider organization, peer review organization, or any other managed care program or health care provider, or any Person or other intermediary or carrier acting for or on behalf of such payor.

**1.1.64. "Permits"** shall mean all:

    **(a)**    licenses, permits, franchises, certifications, authorizations, approvals, building permits, certificates of occupancy, and entitlements issued, approved or granted by any Governmental Authority and relating to the operation, ownership, or maintenance of the Leased Premises or any part thereof;

    **(b)**    any approval, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority or any other Person;

    **(c)**    all existing licenses, certifications, authorizations, approvals, easements, and rights-of-way affecting the Leased Premises; and

    **(d)**    the Required Permits.

**1.1.65. "Permitted Title Exceptions"** shall mean the encumbrances, restrictions, reservations, exceptions, easements, rights of way, and covenants running with the Land and the Improvements more particularly described on **Exhibit "B"** attached hereto and made a part hereof for all purposes, including this Lease.

**1.1.66. "Person"** shall mean and include individuals, corporations, general and limited partnerships, stock companies or associations, joint ventures, associations, limited liability companies, companies, trusts, banks, trust companies, land trusts, business trusts, or other entities and governments and agencies and any unincorporated organization, a governmental body or a political subdivision, a municipality, a municipal authority or any other group or organization of individuals.

    **(a)**

**1.1.67. "Primary Intended Use"** shall mean the use and occupancy of the Leased Premises for the operation of general acute care community hospitals, medical surgical facilities, imaging center, and other health care functions and activities or hospital-related activities, and for such other lawful uses as may be necessary or incidental to such use or uses.

**1.1.68. "Renewal Term"** shall mean the term of this Lease.



**1.1.69. "<u>Rent</u>"** shall mean the aggregate of (a) the Base Rent, (b) the Additional Payments, together with (c) any and all additional sums due and payable by Tenant hereunder.

**1.1.70. "<u>Repair</u>"** shall mean the making of or any repair made to the Leased Premises which is "expensed" as opposed to "capitalized" under GAAP and which expressly excludes any Capital Additions or Additional Capital Expenditures.

**1.1.71. "<u>Required Permits</u>"** shall mean:

    **(a)**    the State of Texas acute care licenses,

    **(b)**    JC Accreditations,

    **(c)**    the Medicare certifications and the Medicaid certifications, and

    **(d)**    such other licenses, accreditations or certifications which are (i) required by applicable law in effect from time to time, or (ii) consistently maintained by other operators of hospital facilities comparable to the Leased Premises located within Landlord's Service Area and which are material to the operation of the Leased Premises, in lieu of and in replacement of the licenses, accreditations and certifications referred to in clauses (a) - (c) to the extent that one (1) or more of the licenses, accreditations and certifications referred to in clauses (a) - (c) are no longer issued or available for issuance.

**1.1.72. "<u>Security Deposit</u>"** is defined in Section 5.5.4.

**1.1.73. "<u>Service Lines</u>"** shall mean the followings lines of service to be offered at the Carrollton Hospital, subject to the terms of this Lease:

    **(a)**    Pediatrics;

    **(b)**    Obstetrics;

    **(c)**    Gynecology;

    **(d)**    Orthopedics;

    **(e)**    Emergency Room Services; and

    **(f)**    General Surgery.

**1.1.74. "<u>Tenant Board</u>"** shall mean the governing board of Tenant.

**1.1.75. "<u>Tenant Equipment</u>"** shall mean any Equipment purchased or leased by Tenant subsequent to the Effective Date and over the Lease Term, in replacement of or which augments or which is in addition to the Existing Equipment, which is paid for by Tenant whether through proceeds of financing or with cash.

**1.1.76. "<u>Tenant's Auditor</u>"** shall mean a nationally or regionally recognized firm of Independent Certified Public Accountants that audits Tenant's Audited Financial Statements and is ranked within the top ten (10) accounting firms on a national basis (ranking by size).

**1.1.77. "<u>Tenant's Business</u>"** shall mean owning the Leasehold Estate and managing and operating the Leased Premises during the Lease Term.



**1.1.78. "Tract A"** shall mean that certain tract of real property described on **Exhibit "C"** attached hereto and made a part hereof for all purposes, upon which the Carrollton Hospital is located.

**1.1.79. "Tract B"** shall mean that certain tract of real property described on **Exhibit "C"** attached hereto and made a part hereof for all purposes, upon which the Imaging Center is located.

**1.1.80. "Tract C"** shall mean that certain tract of real property described on **Exhibit "C"** attached hereto and made a part hereof for all purposes, upon which the employee parking lot is located.

**1.1.81. "Trade Name"** shall mean **"Carrollton Regional Hospital"** or any other derivative thereof used in connection with the Leased Premises (whether existing or future), as may have been used from time to time by Landlord or its Affiliates in connection with the Leased Premises, and such other trade names as may be approved by Landlord and Tenant pursuant to the terms of this Lease.

**1.1.82. "UCC"** shall mean Articles 1 through 9 of the Texas Business and Commerce Code.

**1.1.83. "Warranties"** shall mean all assignable guaranties and warranties in effect with respect to the Leased Premises, the Improvements, the FF&E, the Equipment or the Personal Property or any portion thereof, which, by their terms, shall survive the Lease Termination Date, including, without limitation, all guaranties and warranties of contractors, materialmen, manufacturers, mechanics, or suppliers who have been engaged by Tenant or Landlord or any of their agents to furnish labor, materials, equipment, or supplies to all or any portion of the Leased Premises, unexpired warranties and maintenance or service agreements relating to or covering the Leased Premises.

**1.2.    Construction**. Whenever the context requires, the gender of all words used in this Lease includes the masculine, feminine, and neuter. Unless otherwise indicated to the contrary, all references to Articles and Sections refer to articles and sections of this Lease, and all references to Exhibits and Schedules are to Exhibits and Schedules attached hereto, each of which is incorporated herein and made a part hereof for all purposes.

**1.3.    Additional Definitions**. Additional terms which are defined in other provisions of this Lease shall have the meanings assigned to such terms in such provisions.



# ARTICLE II
## DEMISE; LEASE TERM;
## ACCEPTANCE OF THE LEASED PREMISES;
## <u>DISCLAIMER OF WARRANTIES</u>

**2.1.** <u>**Demise of the Leased Premises**</u>.

**2.1.1.** <u>**Demise of the Leased Premises**</u>.  Landlord does hereby demise and lease the Leased Premises to Tenant for its operation and use as contemplated hereby and Tenant does hereby lease, hire and take the same from Landlord, TO HAVE AND HOLD the same unto Tenant for the Lease Term, unless sooner terminated in accordance with the terms hereof. Tenant hereby acknowledges receipt of possession of the Leased Premises, as of the Effective Date, and that the obligations of Tenant hereunder (including, without limitation, the obligation to pay Rent) shall commence on the Effective Date.

**2.1.2.** <u>**Parking.**</u>  Of even date herewith Landlord and Tenant have entered into the Parking Agreement, attached hereto as **Exhibit "A"** which shall be coterminous and remain in effect during the Lease Term, unless sooner terminated pursuant to its terms. Landlord represents and warrants that the parking situated on the Leased Premises is sufficient to comply with all codes and other laws and regulations of the City.

**2.2.** <u>**Lease Term**</u>. The term of this Lease shall be five (5) years beginning January 1, 2020 and ending December 31, 2025.

**2.3.** <u>**Renewal Term**</u>. Provided there is no Tenant Default at the time of exercise, Tenant shall have the right to renew the Lease for one (1) additional Term of five (5) years, if Tenant is unable to obtain commercial reasonable financing to exercise the Purchase Option as addressed herein.  Tenant will be required to deliver written notice of its election to exercise this Renewal option on or before June 30, 2024.

**2.4.** <u>**Reporting Requirements**</u>. Tenant shall provide the following financial reports to Landlord:

a.    Within thirty (30) days of the last day of each month, Tenant's *Monthly Income Statement*;

b.    Within forty-five (45) days of the last day of calendar quarter, *Quarterly Consolidated* or *Combined Financial Statements* of Tenant;

c.    Within one-hundred twenty (120) days of the last day of each year, *Annual Consolidated* or *Combined Financial Statements* of Tenant; and

d.    *Annual Operating Budget* of Tenant within thirty (30) days after the first day of the next fiscal year.



**2.5.** **Assignment**. At any time during the Lease Term, Tenant shall have the right to assign the Lease and/or the Purchase Options on the Hospital and the MOBs subject to Landlord's consent, which shall not be unreasonably withheld.

**2.6.** **Property Repairs**. The property has been leased to Baylor Scott & White Carrollton and the condition of the property has been inspected by Tennant. The onl repair identified relates to a roof repair. The Engineers Report on Repairs regarding the roof, pipes and chiller are attached hereto as **Exhibit "D"**. The repairs should be completed prior to the effective date of the Lease and if the roof repair is not completed by the effective date of the Lease, the Landlord shall ensure that the repairs are completed.

**2.7.** **Condition of Assets.** Landlord shall deliver the Property "as is" and "where-is".

**2.8.** **Acceptance of the Leased Premises by Tenant**. Tenant hereby (a) accepts the Leased Premises in their current condition as suitable for the purposes for which they are leased and in an **"AS IS," "WHERE IS"** condition without any representation or warranty by Landlord and with all faults, subject to the state of title as of the Effective Date, to any state of facts which an accurate survey or physical inspection of the Leased Premises may show, and to all applicable Governmental Regulations; (b) acknowledges that it has received, reviewed and accepted the Inspection Reports, and (c) accepts the Leased Premises and every part and appurtenance thereof as being in good and satisfactory condition, subject to the recommendations for repair, maintenance and replacement set forth in the Inspection Reports.

**2.9.** **Waiver of Express and/or Implied Warranties; Disclaimer as to Physical Condition and Operations**.

**(a)** TENANT HEREBY WAIVES ANY IMPLIED OR (EXCEPT AS SET FORTH HEREIN), EXPRESS WARRANTIES OF HABITABILITY, SUITABILITY, MERCHANTABILITY, QUALITY, CONDITION OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE LEASED PREMISES. EXCEPT AS EXPRESSLY PROVIDED FOR HEREIN, LANDLORD SHALL BE UNDER NO OBLIGATION WHATSOEVER TO UNDERTAKE ANY REPAIRS OR MAINTENANCE OF ANY KIND WITH RESPECT TO THE LEASED PREMISES, EXCEPT WITH RESPECT TO THE LANDLORD RETAINED OBLIGATIONS. IN THE EVENT OF ANY DEFECT OR DEFICIENCY OF ANY NATURE IN THE LEASED PREMISES OR ANY FIXTURE OR OTHER ITEM CONSTITUTING A PORTION THEREOF, WHETHER PATENT OR LATENT, LANDLORD SHALL HAVE NO RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO, EXCEPT AS EXPRESSLY SET FORTH IN THIS LEASE.

**(b)** EXCEPT AS EXPRESSLY SET FORTH IN THIS LEASE, IT IS UNDERSTOOD AND AGREED THAT LANDLORD IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE LEASED PREMISES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX



CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, DESIGN OR CONSTRUCTION DEFECTS, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE LEASED PREMISES WITH GOVERNMENTAL REGULATIONS (INCLUDING, WITHOUT LIMITATION, ACCESSIBILITY FOR HANDICAPPED PERSONS), OR ANY OTHER MATTER OR THING REGARDING THE LEASED PREMISES.

(c)    EXCEPT AS EXPRESSLY SET FORTH IN THIS LEASE, TENANT ACKNOWLEDGES AND AGREES THAT LANDLORD HAS LEASED TO TENANT AND TENANT HEREBY LEASES FROM LANDLORD AND TENANT HEREBY ACCEPTS THE LEASED PREMISES "AS IS, WHERE IS, WITH ALL FAULTS."

(d)    TENANT REPRESENTS AND WARRANTS THAT IT HAS NOT RELIED AND WILL NOT RELY ON, AND LANDLORD SHALL NOT BE LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE LEASED PREMISES MADE OR FURNISHED BY LANDLORD OR ITS    REPRESENTATIVES, OR ANY AGENT REPRESENTING OR PURPORTING TO REPRESENT LANDLORD, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, UNLESS SPECIFICALLY SET FORTH IN THIS LEASE.

(e)    EXCEPT AS EXPRESSLY SET FORTH IN THIS LEASE, TENANT ACKNOWLEDGES THAT LANDLORD SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO TENANT OR ANY OF ITS AGENTS, EMPLOYEES, LICENSEES, GUESTS, PATIENTS, SERVANTS, OR INVITEES FOR ANY INJURY OR DAMAGE TO PROPERTY OR PERSON DUE TO THE CONDITION OR DESIGN OF, OR ANY DEFECT IN, THE LEASED PREMISES OR ITS MECHANICAL SYSTEMS AND EQUIPMENT WHICH MAY NOW EXIST OR HEREAFTER OCCUR.

(f)    EXCEPT AS EXPRESSLY SET FORTH IN THIS LEASE, TENANT, FOR ITSELF AND ITS AGENTS, EMPLOYEES, LICENSEES, SERVANTS, AND INVITEES, EXPRESSLY ASSUMES ALL RISKS OF INJURY OR DAMAGE TO PERSON OR PROPERTY, EITHER PROXIMATE OR REMOTE, TO THE EXTENT RESULTING FROM THE CONDITION OF THE LEASED PREMISES.

(g)    Landlord makes no representation or warranty as to the truth, accuracy or completeness of any third-party materials, data or information delivered by Landlord to Tenant in connection with the transaction contemplated hereby, including without limitation any reports and studies prepared by third parties for Landlord which have been provided to Tenant as part of the due diligence materials delivered to or made available to Tenant. Tenant acknowledges and agrees that all materials, data and information delivered by Landlord to Tenant in connection with the transaction contemplated hereby have been  provided to Tenant as a convenience only and that any reliance on or use of such materials, data or information by Tenant shall be at the sole risk of Tenant, except as otherwise expressly stated herein. To Landlord's Knowledge, it is not aware of any fact or circumstance which would make the materials, data and information delivered to Tenant by Landlord inaccurate or misleading in any material respect.



## ARTICLE III
### TRANSITION OF POSSESSION OF THE LEASED PREMISES ON THE EFFECTIVE DATE

**3.1.    Baylor Medical Center at Carrollton Transition**. The Hospital operations will be transferred to SANA pursuant to the Transition Services Agreement and the Operations Transfer Agreement between SANA and **Baylor** Scott&White Carrollton ("BSWC"), whereby the Hospital operations shall be transferred from BSWC to SANA effective as of January 1, 2020.

## ARTICLE IV
### USE, GUARANTEE AND OPTION

**4.1.    Use**. The Leased Premises shall be used only for the Primary Intended Use and for no other purpose and Tenant agrees to use and maintain the Leased Premises in a clean, careful, safe, lawful, and proper manner.

**4.2.    Guarantee**. Sana will guaranty the full, faithful and punctual performance of the conditions of the Lease to be kept and performed by Tenant. Sana's principals shall also guaranty two (2) times the Security Deposit, and such Guaranty shall decrease by twenty percent (20%) for each year of operations during the Lease Term wherein the Hospital has produced EBITDA in excess of two times the Base Rent due for that year. Sana's principals' Guaranty shall not exceed the remaining amount of Base Rent owed by Tenant. The Guarantee shall be executed together with this Lease and is attached hereto as **EXHIBIT "E"**.

**4.3.    Purchase Option** and Right of First Offer. For the right to purchase the Hospital and the four medical office buildings on campus (the "MOBs") at any time during the first three years of the Lease Term (the "Purchase Option"), Tenant shall make a Purchase Option payment upon Lease execution of ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) (the "Purchase Option Payment"). The Purchase Price under the Purchase Option shall be a total of THIRTY ONE MILLION AND NO/100 DOLLARS ($31,000,000.00) (SIXTEEN MILLION AND NO/100 DOLLARS ($16,000,000.00) for the Hospital and FIFTEEN MILLION AND NO/100 DOLLARS ($15,000,000.00) for the MOBs), (collectively the "Purchase Option Purchase Price"). The Purchase Option Payment shall be credited toward the Purchase Option Purchase Price for the Hospital if the Purchase Option for the Hospital is executed. The Purchase Option on the MOBs may only be exercised if the Hospital is also or has previously been purchased, and closing of the purchase under the Purchase Option must take place within three years of the Lease Commencement Date. (1) If the Purchase Option is not consummated within three years of the Lease Commencement Date, unless due to the default of MHA, MHA shall retain the Purchase Option Payment. (2) Tenant will be required to deliver a minimum of three months' prior written notice of its exercise of the Purchase Option. (3) After expiration of the Purchase Option and continuing through the end of the Lease Term, Tenant shall have a right of first offer ("ROFO") to purchase the Hospital and MOBs. Under the ROFO, if Landlord desires to sell the Hospital and the MOBs, Landlord must provide 60-days' notice to Tenant, during which time, Tenant shall have the



right to make a proposal to purchase the Hospital and MOBs from Landlord ("Tenant's Proposal").  For the 30 days post-Tenant proposal, Landlord and Tenant shall negotiate in good faith the terms of such sale, after which time if no agreement on price and terms is reached, Landlord shall be free to sell the Hospital and MOBs to any other party, subject to the Lease remaining in place.  The Purchase Option Agreement shall be executed together with this Lease and is attached hereto as **EXHIBIT "F"**.  Upon the acquisition of the Hospital (and the MOBs, if applicable), this Lease and the Guaranty(s) shall be automatically deemed terminated, the Security Deposit shall be returned to Tenant, and the parties shall be relieved of all obligations and liabilities hereunder (other than those which expressly survive termination hereof.)  The provisions of Article XXI shall not apply.

## ARTICLE V
### RENT

### 5.1.    Base Rent, Escalation and Renewal.

**5.1.1. Base Rent**. The first year total Base Rent payable by Tenant will be NINE HUNDRED SIXTY-THOUSAND AND NO/100 DOLLARS ($960,000.00) per year, payable in equal monthly installments of EIGHTY-THOUSAND AND NO/100 DOLLARS ($80,000.00) beginning on January 1, 2020 and continuing thereafter on the first day of each month until December 31, 2020.  Provided there are no Tenant Defaults under this Lease during the first three (3) months, the monthly payment of Base Rent for said three (3) months is waived.

**5.1.2. Base Rent Escalation**. Beginning in year two (2) on January 1, 2021, Base Rent will escalate at the rate of one-point-five percent (1.5%) each year for years two and three, and two-percent (2%) for each year thereafter until December 31, 2025, calculated as follows:

| Base Year | Base Rent | Monthly Rent Amount |
|-----------|-----------|---------------------|
| 2020 | $960,000.00 | $80,000.00 |
| 2021 | $974,400.00 | $81,200.00 |
| 2022 | $989,016.00 | $82,418.00 |
| 2023 | $1,003,851.00 | $83,654.29 |
| 2024 | $1,023,926.00 | $85,327.32 |
| 2025 | $1,044,404.50 | $87,033.70 |

**5.1.3. Base Rent for Renewal Term**. The Base Rent for years six (6) through ten (10) shall be TWO-MILLION AND NO/100 DOLLARS ($2,000,000.00) per year.  The Rent Escalation for years 6-10 shall be two-percent (2%) per year, calculated as follows:

| Base Year | Base Rent | Monthly Rent Amount | Date Due |
|-----------|-----------|---------------------|----------|
| 2026 | $2,000,000.00 | $166,666.00 | 01/01/25 |
| 2027 | $2,040,000.00 | $170,000.00 | 01/01/26 |
| 2028 | $2,080,800.00 | $173,400.00 | 01/01/27 |
| 2029 | $2,122,416.00 | $176,868.00 | 01/01/28 |
| 2030 | $2,164,864.00 | $180,405.00 | 01/01/29 |



**5.1.4.** **Security Deposit**. Tenant shall pay a security deposit upon the execution of this Lease in the amount of NINE-HUNDRED SIXTY THOUSAND AND NO/100 DOLLARS ($960,000.00). This Security Deposit will be used to cover any uncured defaults under the Lease. The Security Deposit or any balance thereof after permitted deductions hereunder by Landlord shall be returned to Tenant within thirty (30) days following the expiration of the Term or earlier termination of this Lease, provided Tenant has provided notice to Landlord of Tenant's forwarding address as required under Texas Property Code Section 93.009.

**5.1.5.** **Absolute Net Lease**. The Property shall be leased on an absolute net basis whereby Tenant shall be responsible for all expenses (including any capital expenses) related, but not limited to the operation, repair, maintenance, insurance and real estate taxes on the Property.

**5.1.6.** **Utility Charges**. Tenant will be solely responsible for obtaining and maintaining utility services to the Leased Premises and will pay or cause to be paid all charges for electricity, telephone service, sanitary sewer, water, natural gas, oil, electricity and utilities arising out of Tenant's use, occupancy, and possession of the Leased Premises during the Lease Term. Tenant shall also provide all replacement light bulbs and tubes and pay for all maintenance upon utilities after the Effective Date. In no event shall Landlord be liable for any interruption or failure of utility service to the Leased Premises.

**5.1.7.** **Impositions**.

(a)     **Tenant's Obligation to Pay Impositions**. Impositions for each Lease Year shall be borne by Tenant, in their entirety as Rent hereunder. Tenant shall pay all Impositions to the appropriate Governmental Authorities prior to delinquency and shall furnish Landlord with copies of paid receipts promptly following payment.

(b)     **Contest of Impositions**.     Neither Tenant nor Landlord shall be required to pay or discharge or cause to be paid or discharged any Impositions or other matter hereunder so long as the validity thereof is being contested in good faith and by appropriate legal proceedings and neither the Leased Premises nor any rent or income therefrom or interest therein would be in any immediate danger of being sold, forfeited, attached or lost; and provided further that each party shall immediately give the other written notice of any Imposition or other matter hereunder for which such party has received actual notice.

**5.1.8.** **Operating Expenses**. All Operating Expenses shall be borne by and paid by Tenant exclusively and Landlord shall have no liability or responsibility in respect thereto. Tenant agrees that it shall pay all Operating Expenses then due in the ordinary course of business in a timely manner.



# ARTICLE VI
## CAPITAL ADDITIONS AND IMPROVEMENTS

**6.1.** **Certain Definitions.** The following terms shall have the meanings specified below in this **Article VI** and elsewhere in this Lease:

**6.1.1. "Capital Additions"** shall mean all property, or interests in property, real, personal, and mixed, comprising any and all additions to or alterations of or modifications to or improvements to all or any part of the Leased Premises acquired or constructed by or for Landlord or Tenant after the Effective Date which are determined on the following basis:

**(a)** The term **"Capital Additions"** shall only include improvements which result in changes to the current configuration of the Improvements and result in material structural modifications to existing structures or new and additional free standing or attached buildings or structures or increased number of floors.

**(b)** Additions to or alterations of or modifications to or improvements to the Leased Premises shall constitute **"Capital Additions"** only in the event such additions to or alterations of or modifications to or improvements to the Leased Premises are classified as "capital expenditures" pursuant to GAAP.

**(c)** The term "**Capital Additions**" shall <u>not</u> include:

**(i)** any property or interests in property, whether real, personal or mixed, comprising any additions to or alterations of or modifications to or improvements to the Leased Premises which are treated by Tenant as current expenditures (as opposed to capitalized expenditures) in any report or submission to any Governmental Authorities.

**6.1.2. "Contractor"** shall mean the Person or Persons directly contracting with Tenant in regard to the performance of construction services (in the capacity of a general contractor or subcontractor) or oversight or activities in respect to the construction for Tenant of Capital Additions.

**6.2.** **Capital Additions and Improvements to the Leased Premises**.

**6.1.1. Approval of Capital Additions.** Tenant shall not construct or install any Capital Additions to the Leased Premises without the prior written Approval of Landlord, which Approval will not be unreasonably withheld, conditioned or delayed.

**6.1.2. Dispute as to Whether or Not an Addition or Alteration is to be Considered a Capital Addition.** In the event of a bona fide dispute between Tenant and Landlord over whether an expenditure is properly classified as a Capital Addition under GAAP, such dispute shall be resolved in accordance with the Dispute Resolution Procedures.



**6.3.    Construction Contracts**.

**6.1.1. Approval of Landlord.**  In connection with the construction or installation of any Capital Addition, Tenant shall obtain the Approval of Landlord (not to be unreasonably withheld, conditioned or delayed) of the following:

**(a)**    the selection of any Contractor,

**(b)**    an estimate of the costs of each such Capital Addition to the Leased Premises and the estimated schedule for payment of such costs, which estimates and schedules shall, to the extent that they relate to work done under Construction Contracts, be approved by an architect Approved by Tenant and Landlord, and

**(c)**    the plans and specifications for each such Capital Addition to the Leased Premises, prepared by an architect Approved by Tenant and Landlord.

**6.1.2. Terms of Construction Contracts.**  All Construction Contracts shall be in the name of Tenant and shall be approved by Landlord as to form and content, such approval not to be unreasonably withheld, conditioned or delayed. All materials, equipment and machinery constituting any part of the Capital Additions shall vest in Landlord under this Lease, as the same are deposited on or delivered to the Leased Premises. All Construction Contracts shall be awarded to the Contractor providing the lowest responsible bid, reasonably satisfactory to Landlord and Tenant.

**6.1.3. Enforcement of Construction Contracts.**

**(a)**    Tenant shall enforce the Construction Contracts, provided, however, that Landlord shall cooperate fully with Tenant's reasonable requests, including acting as the named plaintiff or defendant or party in interest in any such litigation or arbitration proceeding.

**(b)**    In the event of any material, uncured default on the part of any Contractor, architect or any subcontractor or supplier under any contract made by it in connection with any Capital Addition to the Leased Premises, or in the event of a material breach of warranty with respect to any materials, workmanship or performance guaranty of which Tenant becomes aware, Tenant will notify Landlord of such default or breach and Tenant will, on Landlord's behalf, proceed, either separately or in conjunction with others to pursue such remedies against the architect, the Contractor, subcontractor or supplier so in default and against such surety for the performance of such contract as it may deem advisable. Tenant agrees to advise Landlord of the steps it intends to take in connection with any such default.

**(c)**    If Tenant shall so notify Landlord, Tenant may, in the name of Landlord, prosecute any action or proceeding or take any other action involving any such Contractor, architect, subcontractor, supplier or surety which Tenant deems necessary, and in such event, Landlord hereby agrees to cooperate fully with Tenant.



**6.1.4. Modification of Construction Contracts.** Tenant shall have the right, without Landlord's approval, to effect amendments, modifications, changes and deletions relating to any Capital Additions or to any Construction Contracts, estimates, schedules, and Plans and Specifications therefore; provided, however, that (a) such changes are in compliance with all applicable Governmental Regulations as aforesaid, (b) Tenant shall provide for the payment of any increase in the costs of a Capital Addition resulting from a change therein, (c) such changes are filed with Landlord; provided, however, only if such changes represent changes and clarifications which are not consistent with the logical evolution of the construction of such Capital Additions or which changes materially alter the size, scope, quality or character of such Capital Additions, Tenant shall first obtain the prior written Approval of Landlord of such changes, which Approval shall not be unreasonably withheld, conditioned or delayed.

**6.4.    Compliance with Laws; Construction Requirements**.  Tenant shall cause all Capital Additions to the Leased Premises to be undertaken and completed in compliance with all applicable Governmental Regulations lawfully made and applicable thereto, and in accordance with Construction Contracts, estimates and schedules of costs and plans and specifications therefor.

**6.5.    Surety Bonds.**    To the extent that any Construction Contract relating to the construction of a Capital Addition involves more than $100,000.00 for Performance Bonds and $25,000.00 for Payment Bonds, or such higher amount as may be permitted by applicable Governmental Regulation, Tenant, to the extent Tenant contracts for the work in question, shall require that the Contractor shall furnish a Surety Bond or Bonds. To the extent that Landlord recovers money under any Surety Bonds, such money shall be made available for and shall be applied to the payment of costs incurred in connection with the construction of the Capital Additions in question.

**6.6.    Improvements as Part of the Leased Premises**.   All Capital Additions constructed by Landlord or Tenant shall be constructed on behalf of and for the benefit of Landlord and shall be and become the property of Landlord subject to the terms and conditions of this Lease and be a part of the Leased Premises. Additionally, subject to the  terms and provisions expressly set forth herein, Landlord and Tenant agree that all additions to or alterations of or modifications to or improvements to the Leased Premises, and all real estate or interests therein, which shall be made or acquired by Landlord or Tenant during the Lease Term shall constitute a part of the Leased Premises forthwith and shall become part of the fee ownership estate of Landlord in the Leased Premises. In such regard, Tenant agrees to execute such instruments as may be required, from time to time, by Landlord to affect the foregoing.

**6.7.    Legal Restrictions on Landlord**.  Notwithstanding the provisions of this **Article IX** or any other provision of this Lease, the obligations of Landlord hereunder are in all respects subject to all restrictions imposed on Landlord under Chapter 262 of the Texas Health and Safety Code, as from time to time amended (formerly Vernon's Rev. Tex. Civ. Stat. art. 4437e) and other applicable statutes.  In such regard, in the event by reason of any Governmental Regulation, Landlord is prevented from complying strictly with the



covenants under this **Article IX** or any other provision of this Lease, Landlord shall use reasonable efforts to take such other actions, subject to and as permitted by applicable restrictions of any Governmental Authorities or Governmental Regulations, as may be necessary to effect the intent of the applicable provision set forth herein.

**ARTICLE VII**
**ANNUAL CAPITAL EXPENDITURES;**
**MAINTENANCE AND REPAIR OBLIGATIONS;**
**RENOVATIONS; ALTERATIONS AND ADDITIONS**

7.1.    **Certain Definitions.** The following terms shall have the meanings specified below in this **Article VII** and elsewhere in this Lease:

7.1.1. **"Acceptable Maintenance Standards"** shall mean in the case of all Equipment and applicable components of FF&E and Building Systems to the extent covered by manufacturer's maintenance requirements and/or Maintenance Contracts, that are not obsolete or no longer used in connection with the operation of the Leased Premises, either:

(a)    in material conformity with the applicable manufacturer's suggested maintenance requirements, or

(b)    if a Maintenance Contract covering the applicable piece of Equipment, FF&E or Building System is in effect, in substantial compliance with the maintenance requirements set forth in and established under the Maintenance Contract, or

(c)    if no manufacturer's suggested maintenance requirements apply, and if no Maintenance Contract is applicable, in substantial compliance with maintenance standards commonly used at other comparable facilities in the area, or

(d)    any other maintenance standards that have been Approved by MHA Representative, such Approval not to be unreasonably withheld, conditioned or delayed.

7.1.2. **"Annual Capital Expenditures"** shall mean the Capital Expenditures to be made or committed to be made by Tenant during the Lease.

7.1.3. **"Capital Expenditures"** shall mean expenditures which are Capital in Nature to be made by Tenant in connection with the repair, renovation, alteration, addition to, replacement, purchase or installation of the Improvements, Equipment, Base Building Systems, FF&E and Personal Property. The classification of whether or not an item constitutes a **"Capital Expenditure"** as opposed to a **"Repair"** shall be determined in accordance with GAAP.

7.1.4. **"Capital in Nature"** shall mean that generally, an expenditure shall be considered to be "capital in nature" to the extent that the Useful Life, as defined below, of the piece or item in question is extended for more than one (1) year, or in the case of a new piece or item of Equipment or improvements to the Improvements, Base Building Systems,

---



FF&E or Personal Property, if its Useful Life is more than one (1) year. All other expenditures in respect to Equipment, Improvements, FF&E, Building Systems or Personal Property shall be classified as a "**Repair**" under the applicable "routine repair and maintenance" category.

**7.1.5. "Capital Expenditure Amount"** shall mean an amount equal to two-percent (2%) of Net Revenues for each Lease Year.

**7.1.6. "Repair"** shall mean expenditures which are not Capital In Nature to be made by Tenant in connection with the repair, renovation, alteration, addition to, replacement, purchase or installation of the Improvements, Equipment, Base Building Systems, FF&E and Personal Property and which are classified under GAAP as a "**Repair**" under the applicable "routine repair and maintenance" category.

**7.1.7. "Surplus Capital Expenditures"** shall mean the amount by which Tenant's expenditures in respect of the Annual Capital Expenditures exceed the Capital Expenditure Amount.

**7.2.    Annual Capital Expenditures.**

**(a)**    Tenant hereby agrees that it shall make, subject to the provisions of subparagraph (b) below, Capital Expenditures for each Lease Year during the Lease Term not less than the Capital Expenditure Amount ("**Capital Expenditure Threshold**").

**(b)**    To the extent that the Capital Expenditure Threshold is not satisfied in a particular Lease Year, but Tenant has committed in writing, by way of binding contracts or purchase orders, to expend the necessary funds to satisfy the Capital Expenditure Threshold, and such funds are actually expended in the succeeding Lease Year, along with funds in respect to the Capital Expenditure Threshold for the next Lease Year, Tenant's commitment set forth in subparagraph (a) shall be deemed satisfied.

**(c)**    The preceding **Section 7.2(b)** deals with the situation where the Capital Expenditure Threshold is not met in a given Lease Year, but Tenant has made binding commitments to do so (although some funds will actually be expended in the ensuing Lease Year). It may also be that Tenant forms a good faith belief that the Capital Expenditure Threshold for a given Lease Year is too high in light of any reasonably prudent capital expenditure program for that Lease Year, whether due to (i) unforeseeable technology advances, (ii) the fact that Capital Expenditures in prior years have combined to meet the needs for capital repairs, maintenance and replacements in the Leased Premises, obviating or reducing the need, from a practical standpoint, for additional Capital Expenditures for the Lease Year in question, or (iii) other unforeseen economic imperatives that manifest themselves in the future. Should Tenant form such a belief, it may notify Landlord, and they do now agree to work together in good faith to try to settle upon the Annual Capital Expenditures amount for the Lease Year in question. Should the parties be able to do so, they will commit their joint decision to writing, and it will not be an Event of Default that Tenant did not make Capital Expenditures equal to or greater than the Capital



Expenditure Threshold for that Lease Year.  If the parties are unable to settle upon a workable Annual Capital Expenditures amount for the Lease Year in question, the matter shall be resolved in accordance with the Dispute Resolution Procedures.

(d)    To determine whether **Sections 7.2(a)** and **7.2(b)** have been satisfied in any given Lease Year beginning with and continuing after the fifth Lease Year, the Annual Capital Expenditures for the given Lease Year are aggregated with the Annual Capital Expenditures for the previous four (4) Lease Years, and that aggregate is compared with two percent (2%) of the Net Revenues in that given Lease Year when aggregated with those of the four (4) prior Lease Years (provided, however, that the adjusted levels of Annual Capital Expenditures for previous Lease Years, resulting from the effects of **Section 7.2(c)** as described above, shall be taken into account).  **Sections 7.2(a)** and **7.2(b)** shall have been satisfied in any given Lease Year if the aggregate annual Capital Expenditures are equal to or greater than two percent (2%) of the aggregate Net Revenues.  For the first four (4) Lease Years, levels for the comparison Lease Year will be aggregated with those of all prior Lease Years.

(e)    Expenditures may be made from current or past Net Revenues or other capital, i.e., cash on hand, funds secured by debt incurred by Tenant in respect to Equipment financing or by way of Equipment Leasing. The terms of Equipment Leasing and/or Equipment financing in this context shall be subject to the following:

(i)    In the event that Tenant enters into an Equipment Lease covering Equipment, the purchase of which would otherwise constitute a Capital Expenditure for the purposes of this **Section 7.2**, the purchase price for such Equipment, as reflected in the Equipment Lease in question, shall be included within the amounts expended for Capital Expenditure for the Lease Year in question. In order for Equipment and expenditures to be so included, the Equipment Lease in question must provide for a term over the Useful Life, as defined below, of the piece of Equipment in question, with rental payable in equal monthly, quarterly or annual lease payments, with the final lease payment equal to a nominal amount.

(ii)    In the event that Tenant elects to finance the purchase of Equipment, the purchase of which would otherwise constitute a Capital Expenditure for the purposes of this **Section 7.2**, the purchase price for such Equipment shall be included within the amounts expended for Capital Expenditure for the Lease Year in question. In order for Equipment and expenditures to be so included, the terms of such financing must provide for equal monthly, quarterly or annual debt payments over the Useful Life of the piece of Equipment in question, on a fully amortized basis and with no balloon payment due at maturity (other than a nominal amount).

(f)    For the avoidance of doubt, Landlord and Tenant agree that all Capital Expenditures by Tenant during the Lease Term shall be credited to the satisfaction of Tenant's obligation under this **Section 7.2**.



**7.3.** **Tenant's Covenants Regarding Maintenance, Repair, Renovation and Alteration of the Leased Premises.**

(a)     Subject to the terms of **Section 7.2** hereof, Tenant hereby covenants and agrees that it shall, at its sole cost and expense, keep, renew, replace, remodel, maintain, renovate, repair, add to and alter the Leased Premises, both inside and outside, including the Improvements, Building Systems, FF&E, Personal Property and Equipment in a good state of repair and preservation, obsolescence in spite of repair and acts of God excepted.

(b)     Subject to the terms of **Section 7.2** hereof, the Leased Premises, including the Improvements, Building Systems, FF&E, Personal Property and Equipment will be expanded, renewed, remodeled, or replaced by Tenant, in such manner as may be commercially reasonable to maintain and keep the character, purpose, value and operating efficiency of the Leased Premises in order to:

(i)     substantially maintain and reasonably attempt to improve the revenue producing capability of the Leased Premises and the services offered thereby,

(ii)     provide new or expanded medical care services at the Leased Premises to serve the communities in which the Leased Premises is located and which is required to permit Tenant to offer the Service Lines to remain competitive in the market place, subject to Tenant's reasonable determination that new or expanded medical care services are economically feasible, including, but not limited to, determining that a reasonable profit may be generated in connection with such new or expanded services, and

(iii)     use commercially reasonable efforts to ensure the development of a program of high quality and comprehensive medical care embodied in the Service Lines, reflective of local characteristics and responsive to the current and anticipated demands from and within the communities of Landlord's Service Area, and to use commercially reasonable efforts to assure an effective, efficient and economical program manifesting financial viability.

(c)     All Equipment and applicable components of FF&E and Building Systems shall be maintained in substantial accordance with the Acceptable Maintenance Standards.

(d)     Throughout the Lease Term, Tenant shall maintain and repair the Leased Premises, including all Improvements, Building Systems, FF&E, Personal Property and Equipment, in material compliance with all Governmental Regulations which may be applicable to the Leased Premises or to the repair and alteration thereof.

**7.4.** **Maintenance Contracts.**     Tenant shall have the right to engage competent third parties to provide maintenance services for the Equipment and applicable components of FF&E and the Building Systems pursuant to one (1) or more Maintenance Contracts. The terms of any Maintenance Contract shall be subject to the Approval of the MHA Representative to the extent that the annual costs of any Contract equals, or exceeds



the sum of $50,000.00, which Approval shall not be unreasonably withheld, conditioned or delayed.

### 7.5.    Third-Party Consultants.

(a)    From time to time Landlord shall have the right, upon reasonable prior notice, to engage third party consultants experienced and expert in the maintenance of comparable facilities (the "**Consultant**"), at Landlord's cost, to assess whether or not the Improvements, Building Systems, FF&E, Personal Property and Equipment are being maintained in substantial accordance with Acceptable Maintenance Standards or other maintenance requirements set forth herein. The Consultant's report shall be based upon a standard of comparing the maintenance standards which have actually been followed by Tenant to those required in this Lease and shall set forth any material deficiencies, if any, in Tenant's maintenance procedures.

(b)    While conducting any inspection of the Leased Premises, the Consultant will at all times be accompanied by one (1) or more representatives of Tenant who shall be permitted to explain Tenant's maintenance procedures to Consultant.  A copy of the Consultant's report shall be delivered to Tenant promptly upon receipt thereof by Landlord. Tenant shall have a period of thirty (30) days thereafter to discuss the Consultant's findings with Consultant and Landlord.

(c)    In the event that the Consultant finds a material failure in compliance by Tenant of its covenants set forth in **Section 7.3**, subject to the right of Tenant to dispute the Consultant's conclusions pursuant to the provisions of subparagraph (e) below, Tenant shall take such action, on a reasonable time table,  as may be reasonably necessary to correct any material maintenance deficiencies at its sole cost and expense. To the extent that expenditures which are necessary to correct such deficiencies constitute "**Capital Expenditures**," such expenditures shall be included in the calculations provided for in and shall be subject to the terms and limitations of **Section 7.2**.

(d)    In the event that Tenant fails to commence corrective action contemplated by subparagraph (c) above within forty-five (45) days (or such longer period of time if such delay is beyond Tenant's reasonable control or Tenant is disputing the Consultant's conclusions pursuant to subparagraph (e) below) after written notice thereof and to complete such corrective action within a reasonable time thereafter, Landlord, at Tenant's cost, shall have the right to take such action as may be reasonably necessary to correct such maintenance deficiencies. In such event, Tenant shall promptly reimburse Landlord for all sums expended in connection with the correction of such maintenance deficiencies.

(e)    In the event that Tenant disputes the conclusions of the Consultant's report, Tenant shall have the right to institute the Dispute Resolution Procedures provided hereunder, by the selection of other expert Persons to make the appropriate determination as to whether or not Tenant's covenants dealing with the maintenance of the Leased Premises have been complied with.



7.6.    **Remodeling, Renovation, Alteration and Additions**.

  7.1.1. **Right and Obligation to Renovate; Remodeling Costs**.

  **(a)**    Notwithstanding the terms set forth in **Article VI** herein, Tenant shall have the right and obligation, at its sole cost and expense, to renovate and remodel the Leased Premises and make additions to, alterations of, modifications to or improvements to the Leased Premises, without Landlord's consent, from time to time as Tenant, in its reasonable discretion, may deem to be desirable for its uses and purposes and in order to permit Tenant to fully comply with its obligations set forth in this Lease, including the covenants set forth in **Section 6.2** and **6.3** hereof; provided that such actions will not significantly alter the character or purpose or detract from the value or operating efficiency thereof and will not significantly impair the revenue producing capability of the Leased Premises or adversely affect the ability of Tenant to comply with the provisions of this Lease.

  **(b)**    The cost of any renovation or remodeling of the Leased Premises or of making any additions to or alterations of or modifications to or improvements to the Leased Premises shall be paid solely by Tenant, unless Landlord requires Tenant to undertake such remodeling and/or additions or alterations and such requirement is not necessary to maintain Tenant's compliance with this Lease. Costs incurred with respect to such remodeling, additions or alterations, to the extent appropriate, shall constitute "**Capital Expenditures**" for the purposes of **Section 6.2.** above and shall be subject to the limitations set forth herein.

  **(c)**    It is expressly understood that, except as otherwise set forth herein, Tenant shall not be entitled to any credit or offset to payments of Rent or other obligations due under this Lease on account of the addition or replacement of any portion of the Improvements, Building Systems, FF&E, Equipment or other Personal Property or other depreciable assets as part of the Leased Premises in connection with the performance of its obligations hereunder or the renovation, remodeling or construction of alterations or additions to the Leased Premises or for any other improvements to the Leased Premises.

  7.1.2. **Landlord's Property**.  All components of renovation or remodeling the Leased Premises and any additions to or alterations of or modifications to or improvements to the Leased Premises shall become a part of the Leased Premises and be included under the terms of this Lease and shall be and become the property of Landlord for all purposes, other than Tenant Equipment, which shall become the Property of Landlord upon the expiration of the Lease Term.

  7.7.    **Municipal and Governmental Permits**.  Tenant shall not do or permit others under its control to do any work in or about the Leased Premises or related to any repair, rebuilding, restoration, replacement, alteration of or addition to the Leased Premises, or any part thereof, unless Tenant shall have first procured and paid for all requisite municipal and other governmental permits and authorizations. All such work



shall be done in a good and workmanlike manner and in compliance with all applicable Governmental Regulations and in accordance with the requirements, rules and regulations of boards of fire underwriters having jurisdiction and all insurers under the policies required to be carried under the provisions of **Article XII.**

**7.8.    Title: Investment Tax Credit.**

**7.1.1. Landlord Improvements.**    Title to those assets purchased by Landlord and/or paid for by Landlord shall be vested in Landlord, subject to the terms of this Lease.

**7.1.2. Tenant Equipment Purchases.**

**(a)**    Notwithstanding the other provisions of this Lease, Tenant has the right to hold title to Tenant Equipment purchased by Tenant, for the purpose of replacing obsolete or worn out Existing Equipment or adding additional Equipment to the Leased Premises to augment services and Service Lines or installed as a part of the remodeling of the Leased Premises, through payment by Tenant, purchase money financing or Equipment Leases, so long as upon the Lease Termination Date, Landlord's only obligation will be to pay the Equipment Reimbursement Obligation, at which time title to all Equipment held in the name of Tenant will pass to Landlord free and clear of all liens or other encumbrances.

**(b)**    During the Lease Term, title to all Tenant Equipment shall be and remain vested in Tenant.

**(c)**    In such regard Tenant shall be entitled to and receive any investment tax credit, if any, attributable to this Lease or the Equipment or other Personal Property paid for by Tenant.

**(d)**    On the Lease Termination Date, subject to the obligation of Landlord to pay to Tenant the Reimbursement Obligation Amount, as defined below, title to all such Equipment and Personal Property shall vest in Landlord free and clear of all liens, encumbrances and rights of any equipment lessor.

**(e)**    Expenditures for Tenant Equipment shall be credited against Tenant's obligations to make Capital Expenditures.

**ARTICLE VIII**
**EQUIPMENT; EQUIPMENT PURCHASES**

**8.1.    Certain Definitions**. For the purpose of this **Section 8** and otherwise in this Lease, the following terms shall have the following meanings:

**8.1.2. "AHA Guidelines"** shall mean the publication entitled, **"Estimated Useful Lives of Depreciable Hospital Assets,"** published by the American Hospital Association Health Data and Coding Standards Group (2004), which establishes useful lives



of the Equipment, as such publication may be released in new editions from time to time, or to the extent such publication becomes obsolete, such other standard as may be reasonably acceptable to Landlord which will act as a reference point for determining the useful lives of the Equipment in a manner similar to the American Hospital Association publication.

**8.1.3. "Depreciation Method"** shall mean, for any item of Equipment, the straight-line method of depreciation over its Useful Life.

**8.1.4. "Net Book Value"** shall mean the original cost of an item of Equipment less depreciation, using the Depreciation Method, over the Useful Life of such item of Equipment, calculated from the month such piece of Equipment was purchased. In the event of a bona fide dispute between Tenant and Landlord over the determination of the Net Book Value of an item of Equipment, such dispute shall be resolved in accordance with the applicable Dispute Resolution Procedures.

**8.1.5. "Reimbursement Equipment"** shall mean and/or include all Equipment purchased and/or installed by Tenant at the Leased Premises during the Lease Term hereof, the purchase of which shall have been Approved by Landlord to the extent approval is required hereunder, to the extent that such Equipment has, on the Lease Termination Date, a Net Book Value of greater than $0.00, and otherwise qualifies as Reimbursement Equipment.

**8.1.6. "Reimbursement Obligation Amount"** shall mean an amount equal to the aggregate Equipment Reimbursement Obligation as of the Lease Termination Date.

**8.1.7. "Equipment Reimbursement Obligation"** shall mean and refer to the obligation of Landlord to reimburse Tenant upon the Lease Termination Date for the Net Book Value of the Reimbursement Equipment, as of the Lease Termination Date.

**8.1.8. "Useful Life"** shall mean the estimated useful life of an item of Equipment, as determined by the then current AHA Guidelines.

**8.2.    Maintenance of Equipment**.  During the Lease Term, Tenant shall maintain and repair all Equipment in a manner consistent with the provisions of this Lease.

**8.3.    New or Replacement Equipment**.

**8.1.1. Replacement Equipment.**  During the Lease Term, to the extent that any piece of Equipment becomes beyond repair as a result of the failure of Tenant to properly maintain such piece of Equipment in substantial accordance with the Acceptable Maintenance Standards, or becomes obsolete or the piece of Equipment has been damaged and cannot be repaired in a cost efficient manner, Tenant shall replace same at its sole cost and expense in a timely manner, to the effect that the Leased Premises shall be fully equipped in a manner to permit Tenant to comply with its covenants set forth in **Section 10.3** hereof.



**8.1.2. New Equipment.**   Tenant shall, at its sole cost and expense, throughout the Lease Term purchase such additional Equipment which may be required or necessary to comply with Tenant's covenants set forth herein and which may be required to permit Tenant to offer the Service Lines consistent with such covenants.

**8.1.3. Landlord Approval.**  Except as expressly set forth herein, Tenant shall have the right and obligation to purchase and install the Equipment contemplated by this Lease and without securing Landlord's prior Approval.

**8.1.4. Tenant Equipment Purchases Which Constitute Capital Expenditures.**  Landlord and Tenant acknowledge that Tenant's obligations to expend or commit to expend Net Revenues in respect of Capital Expenditures for any and all purposes under this Lease, are capped at the Capital Expenditure Amount for any Lease Year. To the extent that Tenant is required to purchase new or replacement Equipment , but Tenant has expended or committed to expend the Capital Expenditure Amount for other Capital Expenditures, Tenant shall have the right to defer the Equipment purchases to the next or subsequent Lease Years; provided, however, such purchases shall be given priority as required to perform Tenant's covenants herein.

**8.4.   Reimbursement Equipment.**

**8.1.1. Equipment Reimbursement Obligation.**   Landlord and Tenant acknowledge and agree that Landlord will pay to Tenant on the Lease Termination Date the Equipment Reimbursement Amount.

**8.1.2. Qualification of Equipment as Reimbursement Equipment.**  For Equipment to qualify as Reimbursement Equipment, such Equipment must be classified as Capital in Nature. Equipment which should be "expensed" as opposed to "capitalized" under GAAP shall not constitute Reimbursement Equipment under any circumstance, nor shall Landlord be required to Approve any such piece of Equipment as Reimbursement Equipment as contemplated hereby.

**8.1.3. Dispute Over Determination of Useful Life.**  In the event of a bona fide dispute between Tenant and Landlord over the determination of the Useful Life of an item of Equipment, such dispute shall be resolved in accordance with the applicable Dispute Resolution Procedures. In the event that a particular piece of Equipment is not listed in the AHA Guidelines, such piece of Equipment shall have a deemed Useful Life of seven (7) years.

**8.1.4. Approval Process.**  Prior to the purchase and installation of any Reimbursement Equipment from and after the Effective Date, in the event that Tenant desires any piece of Equipment purchased and installed from and after such date to be subject to the Equipment Reimbursement Obligation, Tenant shall seek and obtain Landlord's prior written Approval (which approval shall not be unreasonably withheld, conditioned or delayed) thereof on the following basis:



**(a)** To the extent that Tenant desires to obtain Landlord's Approval of the acquisition and installation of Reimbursement Equipment, Tenant shall deliver to Landlord written requests (the "**Approval Request(s)**") for such Approval together with detailed information concerning the Equipment, the cost thereof, Tenant's estimate of the Useful Life thereof, the Depreciation Method to be followed, and any other information reasonably requested by Landlord.

**(b)** Except in emergency situations, Equipment purchases shall be Approved by Landlord on an as-needed basis.

**(c)** Landlord, through the MHA Representative, will consider each Approval Request within ten (10) days following the delivery to the MHA Representative of the Approval Request in question and shall notify Tenant of its rejection or approval thereof within such ten (10) day period. If Landlord fails to respond within such period, Landlord shall be deemed to have given its Approval to the Approval Request.

**(d)** In no event shall Landlord be required to approve any item of Equipment included in any Approval Request in the event that:

**(i)** the MHA Representative reasonably determines that the projected Useful Life does not conform to the AHA Guidelines,

**(ii)** the MHA Representative reasonably disagrees with Tenant's categorization of the piece of Equipment in question, i.e. whether or not the expenditure in question is Capital in Nature, or

**(iii)** the MHA Representative reasonably disagrees with Tenant's determination that the purchase of the piece of Equipment in question is required in order to satisfy Tenant's requirements to keep and maintain the Leased Premises in a condition which is consistent with the covenants set forth herein.

**(e)** If Landlord notifies Tenant in writing that it has determined to deny Tenant's request for Approval of the purchase of any item or items of Equipment as Reimbursement Equipment, Landlord shall provide a written explanation of its reasons for denying Tenant's request. Any denial by Landlord of a request by Tenant for the purchase of any item of Equipment as Reimbursement Equipment shall be subject to the Dispute Resolution Procedures in respect to any dispute over the matters described in subparagraph (d) above.

**(f)** Notwithstanding anything contained herein to the contrary, only Equipment which has been approved by Landlord in the manner set forth herein and shall be considered to be Reimbursement Equipment.

**8.1.5. Tenant's Rights After Landlord's Disapproval of Equipment Purchases.**

**(a)** To the extent that Landlord fails to approve the purchase and installation of any piece of Reimbursement Equipment, Tenant shall be free to go forward



with the purchase and installation thereof without expectation of reimbursement for the unamortized cost thereof and without such Equipment being classified as Reimbursement Equipment; provided that, such purchases shall be credited against Tenant's obligations to make Capital Expenditures.

(b)    All Equipment purchased pursuant to subparagraph (a) above, shall (i) become part of the Leased Premises on the Lease Termination Date and shall remain at the Leased Premises at the expiration of the Lease Term, and (ii) to the extent constituting Capital Expenditures, count towards the satisfaction of the Capital Expenditure Threshold.

**8.1.6. Notice of Actual Purchases.** Within sixty (60) days following the end of each Lease Year, Tenant shall deliver to Landlord a detailed list (including serial numbers, date of purchase and date of installation) of Equipment actually purchased in the Leased Premises for the previous Lease Year which Tenant has determined will be subject to Landlord's Equipment Reimbursement Obligation, provided, however, that Tenant's failure to do so shall not be deemed to be a Tenant Default hereunder.

**8.1.7. Equipment Purchases Excluded from Landlord's Approval Rights.** Landlord's Approval of the purchase of a piece of Equipment which is otherwise required hereunder also shall not be required in the event (a) installation is required in an emergency situation to protect life or property and there is not sufficient time to permit the approval process to be effected, (b) the purchase and installation of Equipment will have a Net Book Value of $0.00 at the end of the Lease Term, or (c) Tenant does not intend to seek reimbursement for such Equipment.

**8.1.8. Equipment Purchases Which Are Not Subject to Equipment Reimbursement Obligation.** In no event shall Landlord have any Equipment Reimbursement Obligation in respect to any piece of Equipment purchased or installed by Tenant, and which otherwise qualifies for an Equipment Reimbursement Obligation, in the event that:

(a)    the piece of Equipment in question is no longer located at the Leased Premises as of the Lease Termination Date, or

(b)    the piece of Equipment is not in good working order (taking into account the age of the Equipment) at the Lease Termination Date.

**8.1.9. Failure to Maintain Equipment.**

(a)    To the extent that (i) any piece of Equipment purchased or installed by Tenant is not in good working order on the Lease Termination Date due to Tenant's failure to properly maintain the item of Equipment in question over the course of its use, in substantial accordance with the Acceptable Maintenance Standards, or (ii) the piece of Equipment was purchased and installed by Tenant in replacement of a similar piece of Equipment which became obsolete or beyond repair as a result of the failure of Tenant to properly maintain such piece of Equipment in substantial accordance with the



Acceptable Maintenance Standards, and provided such piece of Equipment is not eligible for removal, Tenant shall be solely responsible for, at its sole cost and expense, either:

    **(i)**   repairing such Equipment such that the Equipment is in good working order and unaffected by the improper maintenance programs followed by Tenant, or

    **(ii)**   replacing same at its sole cost and expense at or prior to the expiration of the Lease Term.

    **(b)**   To the extent Tenant replaces such Equipment as contemplated by subparagraph (a) above, Landlord's Equipment Reimbursement Obligation with respect to that item of Equipment will not be its then Net Book Value, but rather the estimated Net Book Value of the original item of Equipment on the Lease Termination Date as if such Equipment had been properly maintained in accordance with the foregoing standards.

    **8.1.10.** <u>**Limitation of Equipment Reimbursement Obligation.**</u> There shall be no Reimbursement Obligation other than those contemplated herein without Landlord's express written prior Approval.

    **8.5.**   <u>**Removal of Equipment from Leased Premises**</u>. Equipment may be removed by Tenant from the Leased Premises only as hereafter authorized and on the terms and conditions herein specified:

    **(a)**   Equipment may be sold or exchanged upon receipt by Tenant of consideration at least equal to its fair market value, if any, if such Equipment is either replaced by Equipment of like kind and utility, or if such consideration is applied toward acquisition and installation by Tenant of other Equipment used in the conduct of the business of Tenant.

    **(b)**   Equipment may be so removed upon payment to Tenant of its then fair market value, if any, without replacement if it is obsolete or no longer useful or if such action will not significantly alter the character or purpose or detract from the value or operating efficiency of the Leased Premises and will not significantly impair the revenue producing capability of the Leased Premises.

    **(c)**   The proceeds realized by Tenant from the sale or other disposition of any item of Equipment removed from, and a part of, the Leased Premises pursuant to paragraph (b) in any Lease Year shall, to the extent not used to replace such equipment or other assets, be paid to Landlord within ninety (90) days following the end of any such Lease Year; provided, however, that there shall be no payment owed pursuant to this subparagraph (c) to the extent that (i) replacement or substituted equipment other depreciable property shall be, at the end of such Lease Year, on order and expected to be received by Tenant within a commercially reasonable time, or (ii) such Equipment constitutes Tenant Equipment.



**(d)**    Landlord hereby appoints Tenant as Landlord's true and lawful attorney-in-fact, with full power of substitution, to affect the sales and other dispositions of Equipment in a manner consistent with the provisions herein, so long as Tenant is not in Default hereunder. This limited power of attorney shall expire upon the Lease Termination Date.

**ARTICLE IX**
**PROPERTY AND CASUALTY INSURANCE**

**9.1.    Insurance Coverage.**

**9.1.1. During Construction.**  Tenant, at its own expense, shall, at all times during construction of improvements to the Leased Premises procure and maintain (a) all of the insurance required by the Construction Documents, and (b) such additional insurance coverages hereinafter set forth in full force and effect throughout the course of construction for the benefit of Tenant and Landlord.  The insurance required is as follows:

**(a)**    And at any time thereafter during which construction work is being performed at the Leased Premises Tenant will obtain and maintain, or will cause the Contractor to obtain and maintain  Builder's Risk "All Risk" insurance in an amount equal to one hundred percent (100%) of the replacement or repair cost value of the completed improvements and one hundred (100%) percent of the replacement or repair cost value of all improvements which are under construction, however the aggregate amount of insurance allocated to buildings under construction shall be adequate to replace the work in progress.  Such policy shall be written on a Special Perils Builder's Risk Completed Value Form or its equivalent and shall include an endorsement permitting occupancy prior to completion and coverage for loss by collapse (but excluding loss caused by settling, subsidence, cracking, shrinking, bulging or expansion of land, paved or concrete surfaces, foundations, pools or structures), theft, flood, and earth movement. Such insurance policy shall also include coverage for (i) Loss suffered with respect to materials, equipment, machinery, and supplies, whether on-site, in transit, or stored off-site and with respect to temporary structures, hoists, sidewalks, retaining walls, and underground property; (ii) Defined soft costs, with sub-limits mutually acceptable to Landlord and Tenant, plans, specifications, blueprints and models in connection with any restoration following a casualty; and (iii) Demolition and increased cost of construction, including, without limitation, increased costs arising out of changes in Governmental Regulations (which insurance may contain a sublimit mutually satisfactory to Landlord and Tenant). The foregoing requirement shall apply during the full term of the applicable Construction Contract.  Notwithstanding anything herein to the contrary, Tenant shall not be required to obtain Builder's Risk insurance for any construction project, the total cost of which is less than the Contractor's deductible.

**(b)**    Tenant shall cause the architect and the engineers to obtain and maintain architect's or engineer's, as the case may be, professional liability insurance during the period commencing on the date of such architect's agreement or the engineer's agreement, respectively, and expiring no earlier than one (1) year after completion of the



construction project.  Such insurance shall be in an amount equal to at least $2,000,000.00 per claim.

      **(c)**    Boiler and machinery coverage, as commercially reasonable under the circumstances, with a $2,000,000 minimum limit for all mechanical and electrical equipment.  Such coverage shall include, without limitation, all tenant improvements and betterments that Tenant is required to insure.

      **(d)**    Workers compensation and disability insurance as required by law covering Tenant and its employees.

      **(e)**    During the full term of the applicable Construction Contract, Tenant shall ensure that the Contractor maintains commercial general liability coverage, including, without limitation, products and completed operations insurance with no less than $5,000,000 in limits per occurrence and in the aggregate per project through primary and umbrella liability coverages.  Tenant shall require the Contractor to maintain automobile liability insurance in amounts not less than $1,000,000.00 per occurrence and $2,000,000 in the aggregate.  Such insurance shall name Tenant and Landlord as additional insureds with respect to general liability insurance. Tenant shall also ensure that all subcontractors to such Contractors maintain similar coverage with limits of no less than $2,000,000.00 per occurrence. All parties engaged in work on the Improvements shall maintain statutory workers compensation in force for all employees as required by Governmental Regulations.

      **9.1.2. <u>During Periods Where No Construction Takes Place</u>.**  During any period where the provisions are not applicable, Tenant shall maintain:

      **(a)**    Insurance against loss customarily included under special perils or so called "special form" (formerly known as "all-risk") policies and including coverage for; flood, earthquake, vandalism, and malicious mischief, boiler and machinery. Such insurance policy shall also ensure costs of demolition and increased cost of construction (which insurance for demolition and increased cost of construction may contain a sub limit of $150,000.00).  The amount of such insurance shall be not less than one-hundred percent (100%) of the replacement or repair cost value of the Improvements. Each such insurance policy shall contain an agreed amount and replacement or repair cost endorsement.  Insurance provided pursuant to the terms of this paragraph shall be governed in accordance with the loss payment provisions stated in the applicable policy or agreement.  If the insurance required under this paragraph is not obtained by blanket insurance policies, the insurance policy shall be endorsed to also provide guaranteed building replacement cost to the Improvements in an amount equal to Landlord's or Tenant's most recently appraised value of the Improvements in question.

      **(b)**    Public liability insurance, including, without limitation, commercial general liability insurance; owned, hired and non-owned auto liability; and umbrella liability coverage for personal injury, bodily injury, death, accident and property damage, providing in combination no less than $2,000,000 per occurrence and in the



annual aggregate on per location basis, if aggregate limits are shared with other locations the amount of umbrella liability insurance to be provided shall be not less than $7,000,000.00. The policies described in this paragraph shall cover: elevators, escalators, independent contractors, contractual liability (covering, to the maximum extent permitted by law, Tenant's obligation to indemnify Landlord as required under this Lease), products and completed operations liability coverage.

(c)    Malpractice insurance, insuring Landlord and Tenant against liability for death, injury, loss or damage occurring in the examination, diagnosis, treatment or care of any patient at the Leased Premises, in the amount of not more than $5,000,000 per occurrence and $10,000,000.00 in the aggregate.

(d)    Workmen's Compensation and employer's liability insurance meeting Tenant's statutory obligations; provided, however, that, if Tenant becomes an approved self-insured, employer's liability coverage in the amount of at least $100,000.00 shall be purchased. In the alternative, and as allowed under applicable law, Tenant, acting as a responsible non-subscriber may self-insure its employee occupational injury plan. Tenant shall carry no less than $1,000,000 in employer's liability insurance coverage at all times.

Notwithstanding anything herein to the contrary, Tenant shall have no obligation to provide insurance for perils that are not ordinarily included under commercial liability coverage, such as soil expansion, heavage or erosion and other perils over which Tenant has no control.

9.2.    **Insurance Policy Requirements**.    The form and content of the applicable insurance policies shall be governed by the following provisions:

(a)    All insurance policies shall be issued by an insurer or insurers with a S&P rating of "A" or better and an A.M. Best rating of A or better or other equivalent rating from another agency reasonably acceptable to Landlord.

(b)    To the extent that any Construction Contract relating to the construction of a Capital Addition involves more than $250,000.00 for Performance Bonds and $25,000.00 for Payment Bonds, or such higher amount as may be permitted by applicable Governmental Regulation, Tenant, to the extent Tenant contracts for the work in question, shall require that the Contractor shall furnish a Surety Bond or Surety Bonds. In the event that Tenant's subsidiary construction company is awarded a contract, Tenant may self-insure the performance bond requirement up to $250,000.

(c)    The property, boiler and machinery (if applicable) insurance policies shall be otherwise reasonably satisfactory to Landlord in form and content.

(d)    Loss of income insurance shall name Landlord as Landlord loss payee.



(e)    Tenant agrees to maintain deductibles consistent with the system-wide insurance programs maintained by SANA Healthcare System.  Should Landlord request a reduction in deductible amounts, at Tenant's sole option, such deductible amounts may be reduced or collateralized.  Any expense associated with such reduction or collateralization shall be the sole responsibility of Landlord.  Tenant shall retain the sole right to establish, manage, retire, substitute or release collateral securing any such reduction in deductible amounts.  Except as otherwise required by applicable Governmental Regulations.  Tenant shall not name any Person other than Landlord or Bond Trustee as a loss payee with respect to the Leased Premises without the consent of Landlord.

(f)    Each insurance policy shall contain a provision whereby, or a certificate shall be delivered whereby, the insurer:  (i) agrees that such policy shall not be canceled or terminated, the coverage, and limits of such policy shall not be modified, other provisions of such policy shall not be modified if such policy, after giving effect to such modification, would not satisfy the requirements of this Lease, and such policy shall not be canceled or fail to be renewed, without in each case, at least thirty (30) days prior written notice to Landlord provided however that such policy may be canceled upon at least fifteen (15) days prior written notice to Landlord in the event of non-payment of premiums then due, (ii)waives any right to claim any premiums and commissions against Landlord, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured and (iii) provides that Landlord is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums.  In the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Landlord, such insurance policy shall not be invalidated by and shall insure Landlord regardless of (A)any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, or (B)the occupancy or use of the Leased Premises for purposes more hazardous than permitted by the terms thereof.

(g)    Any insurance maintained may be evidenced by blanket insurance policies covering the Leased Premises and other properties or assets of Tenant or its Affiliates, provided that any such policy shall in all other respects comply with the requirements stated in this Lease.

(h)    Tenant shall deliver to Landlord certified copies of the insurance policies required to be maintained hereunder.  Tenant also shall deliver to Landlord, within ten (10) days of Landlord's request, a certificate of Tenant's insurance policies and that the same are in full force and effect.  Not later than the expiration date of each of the insurance policies Tenant shall deliver to Landlord a certificate of insurance evidencing renewal of coverage as required herein. Not later than ninety (90) days after the renewal of each of the insurance policies, Tenant shall deliver to Landlord a certified copy of all renewal policies.



**(i)**    If Tenant defaults in its obligations to insure or fails to deliver certificates of any such prepaid policy or policies within ten (10) Business Days written notice of its failure to do so, then Landlord may, without any further notice to Tenant, effect such insurance, and Tenant shall pay to Landlord such premium or premiums so paid by Landlord with interest from the later of the date of Tenant's receipt of such notice or the time of payment, at the Default Rate.

**(j)**    Tenant promptly shall comply with and conform to (1) all provisions of each such insurance policy, and (2) all requirements of the insurers applicable to Tenant or to the use, manner of use, occupancy, possession, operation, maintenance, alteration or repair of the Leased Premises. If Tenant shall use the Leased Premises in any manner which would permit the insurer to cancel any insurance policy, Tenant immediately shall obtain a substitute policy to be effective at or prior to the time of any such cancellation.

**9.3.    Tenant's Business Interruption Insurance.**

**(a)**    Tenant shall be responsible for securing and maintaining coverage for business interruption insurance on an actual loss sustained basis. Such insurance policy shall name Tenant as the insured. Such policy shall also name Landlord as "Loss Payee" as respects business interruption insurance. If the property and rent loss insurance policy required herein contain a limit of insurance less than the full replacement cost of improved and non-improved property and the full twelve (12) months of rent loss insurance, such other limit of insurer liability shall be acceptable.

**(b)**    Business interruption insurance shall be carried by Tenant to ensure that there will be sufficient insurance proceeds available to pay Base Rent in the event of a Casualty, in an amount not less that the Base Rent paid for the Lease Year immediately prior to the Lease Year in which the casualty occurred. Landlord shall be named on a Landlord's Loss Payee Endorsement as the party to which all losses shall be paid.

**(c)**    Except as provided for herein, all insurance proceeds payable by reason of the business interruption insurance maintained for the benefit of Tenant shall be paid to Tenant.

**(d)**    Notwithstanding anything contained herein to the contrary, Landlord shall not be entitled to any of the proceeds of such policy in excess of the amount of payments due from Tenant to Landlord under the terms of this Lease.

**9.4.    Consent of Landlord to Cancellation.**    All insurance policies shall provide, to the extent obtainable without additional cost, that coverage shall not be reduced or canceled without thirty (30) days prior written notice to Landlord.

**9.5.    Beneficiaries of Insurance Policies.**    All insurance policies required under this **Article IX** above shall be for the benefit of Landlord and Tenant as their respective interests may appear; provided, however, that to the extent that and for so long



as, under applicable law or prevailing commercial insurance practice Landlord shall have no insurable interest under any such policy, the party or parties having no such insurable interest shall not be required to be a named insured under the policy so affected.

      **9.6.**    **Failure to Maintain Insurance**.  In the event Tenant shall, at any time, neglect or refuse to procure or maintain insurance as herein required within ten (10) Business Days written notice of its failure to do so, Landlord may, at its option, procure and maintain such insurance, and Tenant shall be obligated to forthwith reimburse Landlord for all amounts expended in connection therewith.

      **9.7.**    **Non-Waiver of Tenant's Liability**. No acceptance or approval of any insurance policy by Landlord shall relieve or release Tenant from any liability, duty or obligation under the provisions of this Lease.

      **9.8.**    **Reports on Insurance Claims**.  Tenant shall promptly investigate and make a complete and timely written report to the appropriate insurance company as to all accidents, all claims for damage relating to the ownership, operation, and maintenance of the Leased Premises, and any damage or destruction to the Leased Premises and the estimated cost of repair thereof and shall prepare any and all reports required by any insurance company in connection therewith. All such reports shall be timely filed with the insurance company as required under the terms of the Policy involved.

      **9.9.**    **Self-Insurance**.  Notwithstanding anything in this Lease to the contrary, Tenant may maintain the insurance required hereunder (on the specific coverages included herein) through a program of self-insurance maintained by **SANA Healthcare System** ("SANA") and its Affiliates.  At the present time, SANA provides liability coverages through its Self-Insurance Retention Trust ("SIRT").  The SIRT maintained the following coverages in 2008:

      (i)    Hospital professional liability:  $10,000,000.00 per incident, $50,000,000.00 in the aggregate;

      (ii)    General liability:  $2,000,000.00 per incident, $7,000,000.00 in the aggregate;

      (iii)    Physician professional liability (members in HealthTexas Provider Network): $750,000.00 per incident, $15,000,000.00 in the aggregate.

      Total funds in claim reserves for the SIRT in 2008 were approximately $86,940,000.00

      In addition, excess coverage policies are maintained with Health Care Insurance Company of Texas, a wholly owned insurance company of BHCS, and these excess policies are in turn reinsured with several commercial reinsurers.  Casualty coverage is provided by commercial carriers.



Tenant shall provide Landlord with such other information reasonably requested by Landlord in order for such party to understand the funding and claim process involved with such self-insurance.

9.10  **Waiver of Subrogation**.  Landlord and Tenant hereby mutually release each other from liability and waive all right of recovery against each other for any loss in or about the Premises, from perils insured against under the respective property damage insurance policies required to be carried by Landlord and Tenant hereunder, whether due to negligence or any other cause; provided that this Section shall be inapplicable if it would have the effect, but only to the extent it would have the effect, of invalidating any insurance coverage of Landlord or Tenant. Tenant shall, at the request of Landlord, execute and deliver to Landlord a form of waiver of subrogation in the form and content as required by Landlord's insurance carrier.

## ARTICLE X
### DAMAGE AND RECONSTRUCTION

10.1.  **Notice of Casualty**.  Immediately after occurrence of loss, casualty, destruction or damage to the Leased Premises, which exceeds $50,000.00 per occurrence, whether or not covered by insurance required under the Lease, Tenant shall, as soon as reasonably practicable, notify Landlord of the occurrence of such loss, casualty, destruction or damage.

10.2.  **Reconstruction in the Event of Damage or Destruction**.  If, during the Lease Term, any portion of the Leased Premises is partially or totally destroyed, Tenant shall restore the Leased Premises to substantially the same condition as existed immediately before the damage or destruction and otherwise in accordance with the terms of this Lease, and this Lease shall not terminate as a result of such damage or destruction. If the Leased Premises are to be restored in accordance with the provisions of the Lease and if the cost of the repair or restoration exceeds the amount of proceeds received by Landlord from the insurance required herein, Tenant agrees to contribute and expend any excess amounts needed to restore the Leased Premises.

Notwithstanding the foregoing, if the damage or destruction should occur within the last five (5) years of the Lease Term, and provided Tenant is not then in Default hereunder, Tenant shall have the right to terminate this Lease by written notice served on Landlord within ninety (90) days after the occurrence of such damage or destruction, effective as of the date of the damage or destruction.  In the event of such termination, there shall be no obligation on the part of Tenant to repair or restore the Leased Premises, provided, that all insurance proceeds payable in connection with such casualty shall be paid to Landlord.  On such termination, Rent, Impositions and other sums due hereunder shall be prorated to the date of the damage or destruction.

10.3.  **Insurance Proceeds**.  All proceeds of the insurance contemplated herein, which are payable to Landlord, as applicable, by reason of any loss or damage to the Leased Premises, or any portion thereof, shall be paid to Landlord and made available to



Tenant for reconstruction or repair, as the case may be, of any damage to or destruction of the Leased Premises or any portion thereof, and shall be paid out by Landlord from time to time for the reasonable costs of such reconstruction or repair upon satisfaction of reasonable terms and conditions specified by Landlord and approved by Tenant. Any proceeds remaining after such restoration shall be retained by Landlord. All salvage resulting from any risk covered by insurance shall belong to Landlord to the extent not required to be utilized to defray the costs of repair, restoration or reconstruction. Any such proceeds received by Tenant shall be transferred promptly to Landlord for application to the repair or restoration of the Leased Premises. In addition, if any proceeds are transferred by Landlord to Tenant for application toward reconstruction, replacement or repair of the Leased Premises and are not required for such purpose, such excess monies shall be retained by Tenant.

**10.4.** **Scope of Repairs**. The scope of work required shall be limited to the repair, reconstruction or replacement of the Improvements, Equipment, FF&E, Building Systems and Personal Property existing on the Effective Date, as changed, augmented or remodeled in accordance with the terms and provisions hereof, together with any Capital Additions, Equipment, FF&E, Building Systems or Personal Property installed or constructed or purchased by Tenant or Landlord after the Effective Date, but prior to the date of such loss, casualty, damage or destruction.

**10.5.** **Non-Abatement of Rent**. Any damage or destruction due to casualty notwithstanding, this Lease shall remain in full force and effect and the Rent shall not be abated in any manner.

## ARTICLE XI
### OPERATING COVENANTS OF TENANT;
### COMPLIANCE WITH GOVERNMENTAL REGULATIONS; PERMITS; OTHER COVENANTS

**11.1.** **Operating Covenants**.

**11.1.1. Operation of the Leased Premises.**

**(a)** Tenant hereby agrees that, during the Lease Term, it shall use commercially reasonable efforts, at its sole cost and expense, but subject to the other terms of this Lease, as may be necessary or required to (i) ensure that the Leased Premises will be operated in a manner to ensure the development of a program of high quality and comprehensive medical care, reflective of local characteristics and responsive to the current and anticipated demands from and within the communities of Landlord's Service Area, and (ii) assure an effective, efficient and economical program manifesting financial viability.

**(b)** Additionally, commercially reasonable efforts shall be used to conduct operations in such a manner as may be necessary to: (i) maintain and keep the character, purpose, value and operating efficiency of the Leased Premises (ii) maintain and reasonably seek to improve the revenue producing capability of the Leased Premises and



the services offered thereby, (iii) to the extent economically feasible, provide new or expanded medical care services at the Leased Premises to serve the communities in which the Leased Premises are located, or (iv) permit Tenant to offer Service Lines to remain competitive in the market place, to provide a continuum of care offered by comparable community general hospitals in the Dallas Ft. Worth Metroplex, subject to the terms set forth herein.

(c)    Tenant hereby covenants and agrees that during the Lease Term in connection with the operation of the Leased Premises it will at all times use its commercially reasonable efforts to (i) meet standards and requirements and provide health care of such quality and in such manner as shall enable Tenant to participate in, and provide services in connection with, recognized health and hospital insurance programs, and (ii) so long as it shall remain a participating provider under the Payor programs, it will use its commercially reasonable efforts to comply with the standards and requirements for remaining a participating provider thereunder.

(d)    The Leased Premises, during the Lease Term, shall be operated by Tenant as a community general hospital, subject to the terms set forth herein.

(e)    Nothing in this Section shall be interpreted in a manner that would affect or diminish Tenant's obligations to provide the Service Lines (other than pediatrics) as set forth herein.

**11.1.2. Third Party Payor Cost Reports.** Tenant shall duly file all required Cost Reports or other required filings pertaining to the Leased Premises for all the Lease Years through and including the Lease Year in which the Lease Termination Date occurs. All of such Cost Reports shall accurately reflect the material information to be included thereon. Tenant shall furnish Landlord with copies of all Cost Reports and filings and a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances and any and all other unresolved claims or disputes in respect of such Cost Reports. Tenant shall establish adequate reserves to cover potential reimbursement obligations that Tenant may have in respect of any such third-party Cost Reports.

**11.1.3. Service Lines.** Tenant shall offer a range of services in an effort to meet the needs of Landlord's Service Area in a manner consistent with prudent operations of a general acute care community hospital facility with similar demands and demographics, including, but not limited to the Service Lines. Any change or discontinuance of a Service Line at the Leased Premises shall be made only with the approval of a Super Majority of the Tenant Board; provided however, prior to implementing any change in the Service Lines, Tenant shall meet with the Landlord Board and deliver an explanation as to the reasons why the Service Line in question is being changed or discontinued, including the potential economic hardship that Tenant desires to avoid.



**11.1.4. Inventory.** Tenant shall maintain an Inventory consistent with the amount of inventory which is customarily maintained in hospital facilities of the type and character of the Leased Premises and is otherwise required to operate the Leased Premises in the manner contemplated by this Lease and in compliance with all Governmental Regulations and Payor requirements. All Inventory shall be the property of Tenant, subject to Tenant's obligations to sell and convey the Inventory to Landlord upon the Lease Termination Date.

**11.1.5. Contracts.**

(a)    Any Contracts entered into by Tenant during the Lease Term and which are in existence on the Lease Termination Date shall not survive the Lease Termination Date, unless (i) Tenant desires to assign such Contracts to Landlord and such Contracts are assignable, without third party consent, or such third parties have consented to such assignment, (ii) such Contracts are cancelable upon thirty (30) days prior written notice, and (iii) Landlord has Approved the Contract or Contracts in question and agreed in writing to assume the Contracts in question from and after the Lease Termination Date.

(b)    To the extent that Landlord fails to Approve any Contract, Tenant shall be free to enter into the Contract in question, provided that the term thereof shall not extend beyond the Lease Termination Date.

(c)    Notwithstanding the foregoing, on the Lease Termination Date, Tenant shall use reasonable efforts to ensure that there will be Contracts in place (with a thirty (30) day cancellation clause), including Managed Care Contracts, to permit Landlord to operate the Leased Premises in the ordinary course of business without undue hardship or cessation of services. Landlord recognizes that some Managed Care Contracts, vendor's contracts and other Contracts, will not permit assignment without the other party's consent. Tenant shall not have the obligation to cause these contracts to be assignable to Landlord, but shall use reasonable effort to secure such consents.

(d)    All Contracts entered into by Tenant which affect or encumber the Leased Premises shall in all material respects comply with all applicable Governmental Regulations.

**11.1.6. Nuisance; Removal of Trash and Waste.** Tenant covenants that it will not use or permit the use of the Leased Premises, or any part thereof, for any unlawful purpose or permit any nuisance to exist thereon. Tenant shall be responsible for disposal of its trash and waste from the Leased Premises and will maintain adequate receptacles for such disposal. All trash and waste (including medical waste) shall be removed in compliance with all Governmental Regulations, including applicable Environmental Laws.

**11.1.7. Uniform Code of Rules and Regulations.** Tenant covenants that it will prepare Medical Staff Bylaws and Policies and Procedures consistent with those adopted by other Hospitals. A copy of these documents in force from time to time, including all amendments and revisions, shall be made available to Landlord on written request of Landlord.



**11.1.8. <u>Litigation</u>.**  Tenant shall promptly notify Landlord in writing of the occurrence of any litigation, arbitration or governmental investigation or proceeding not previously disclosed by Tenant to Landlord which has been instituted or (to the knowledge of Tenant) is threatened against Tenant or the Leased Premises before any court, department, commission, board, bureau, agency, or instrumentality of any Governmental Authorities, or the occurrence of any material development in any of the foregoing that has been previously disclosed, as the same becomes known to Tenant, which has or may have an effect resulting from any circumstance or event of whatever nature (including but not limited to the filing of, or any adverse determination or development in, any litigation, arbitration or governmental investigation or proceeding) which (a) could have any adverse effect whatsoever upon the validity or enforceability of this Lease, (b) is or is reasonably likely to be material and adverse to the financial condition of Tenant, (c) could impair the ability of Tenant to fulfill any material obligation under this Lease, or (d) causes a Tenant Default or any event which, with notice or lapse of time, or both, could become a Tenant Default, specifying in the case of each such matter so disclosed hereunder, the action Tenant has taken or caused to be taken, or proposes to take or to cause to be taken, with respect thereto.

**11.2.    <u>Compliance with Governmental Regulations</u>.**

**11.1.1. <u>Compliance</u>.**

**(a)**    Tenant shall take all necessary or required action to ensure that the Leased Premises remain in compliance in all material respects with all applicable Governmental Regulations and regulations of Governmental Authorities having jurisdiction over the Leased Premises and the operations of the Leased Premises, including, but not limited to  the maintenance, operation, repair, alteration and use of the Leased Premises and in a manner in compliance with the terms and provisions of this Lease. Tenant shall timely file all reports, data and other information required to be filed with all commissions, boards, bureaus and agencies having jurisdiction over the Leased Premises.

**(b)**    Tenant covenants and represents that all actions hereafter taken by Tenant in connection with the construction of any Capital Addition, including the making of contracts, will be in full compliance with all pertinent Governmental Regulations applicable to Tenant and the Leased Premises.

**(c)**    In connection with the operation, maintenance, repair and replacement of the Leased Premises, Tenant covenants that it shall comply with all applicable Governmental Regulations and orders of any Governmental Authorities and any requirement of any board of fire underwriters having jurisdiction or of any insurance company writing insurance on the Leased Premises.

**(d)**    If, as and when required by the Texas Department of Health, Tenant agrees to develop the organizational mission statement and the community benefits plan, to perform the community needs assessment and to file the annual community



benefits report with the Bureau of Health Data and Policy Analysis of the Texas Department of Health, all as required by Subchapter D of Chapter 311 of the Texas Health & Safety Code.

**11.1.2. Zoning.** Tenant shall cause the Leased Premises and its operations to be at all times during the Lease Term in compliance with all applicable zoning ordinances and building codes (excepting only instances of non-compliance which will not materially adversely affect the business of the Leased Premises), and will take no action which would result in a violation of any applicable zoning ordinance or the termination of any applicable zoning variance now or hereafter existing.

**11.1.3. Sensitive Payments.**

**(a)** Tenant shall not, nor shall anyone acting on behalf of Tenant, make or receive any **"sensitive"** payments pertaining to the Leased Premises, and no such Person shall maintain any unrecorded cash or noncash assets out of which any "sensitive" payments might be made. **"Sensitive"** payments mean, whether or not unlawful, (i) payments to or from governmental officials or employees, (ii) commercial bribes or kick-backs, (iii) amounts paid with an understanding that rebates or refunds will be made in contravention of the laws of any applicable jurisdiction, either directly or through a third party, and (iv) payments or commitments (whether made in the form of commissions, payments of fees for goods or services received, or otherwise) made with the understanding or under circumstances which would indicate that all or part thereof is to be paid by the recipient to government officials or employees or as a commercial bribe, influence payment or kick-back. To the extent that political contributions are made by Tenant on behalf of or in connection with the Leased Premises, Tenant shall use reasonable efforts to make sure that Landlord is not in any manner given credit for or has any ties to such contribution and all such contributions shall be made in accordance with applicable Governmental Regulations.

**11.3.    Required Permits; License; Accreditation; Physician Licensing.**

**11.1.1. Maintenance of Licenses and Required Permits.** Tenant covenants and agrees that it will use its commercially reasonable efforts to continuously operate the Leased Premises as a provider of health care services and will maintain its certifications for reimbursement and licensure, Permits, including the Required Permits, and its accreditation, if compliance with accreditation standards is required to maintain the operations of the Leased Premises and if failure to comply would adversely affect revenues from the Leased Premises. Additionally, Tenant shall secure and maintain all necessary software licenses, at its sole cost and expense, to insure the proper operation of computer equipment.

**11.1.2. Restriction of the Use of the Permits.**

**(a)** Except as expressly permitted by the provisions of this Lease, in no event shall Tenant use or permit the use of any Permits (whether issued to Landlord or Tenant or whether or not such Permits are included in the Assigned Permits or hereafter issued to Tenant or Landlord during the Lease Term), associated with the ownership, lease



and/or operation of the Leased Premises, including, but not limited to, certificates of need or provider numbers, at any facility, project, hospital, clinic, other healthcare operation or other similar business owned or operated by Tenant, other than with regard to or in connection with the ownership, lease, and/or operation of the Leased Premises, without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion.

   **(b)** The restrictions regarding the use of the Permits as set forth in this Lease shall not be applicable to the operation of "ancillary services" by Tenant at operations and locations other than the Leased Premises, so long as the revenues generated by such services are included within Net Revenues under this Lease. For the purposes of this subparagraph (b), the term "ancillary services" shall mean outpatient services provided by Tenant, their respective Affiliates which may include, but not be limited to, labs and imaging, but shall not include services related to or associated with additional inpatient beds or other inpatient components or services permitted to be provided under the Permits.

### 11.1.3. Medicare Participation/Accreditation.

   **(a)** Tenant shall take all necessary or required action to ensure that the Leased Premises are and remain qualified for participation in the Medicare and Medicaid programs. Tenant shall promptly upon receipt furnish Landlord with copies of all notices received from any of the Medicare or Medicaid programs or any other Payor programs of any pending or threatened investigations or surveys.

   **(b)** Tenant shall take such action to ensure that the Leased Premises remain duly accredited by JC, and shall deliver to Landlord, promptly upon receipt, copies of all accreditation letters, results of annual inspections, notice of any contingencies and other requests for change, from JC pertaining to the Leased Premises. To the extent that JC notifies Tenant that Tenant has failed to comply with applicable licensing requirements or standards and that JC recommends changes to Tenant's operations, Tenant shall notify Landlord in writing as to the nature and scope of such recommendations and Tenant's plans for compliance. During the course of actions taken to comply with such recommendations, Tenant shall continue to update and advise Landlord of Tenant's efforts to satisfy JC's recommendations or requests. In such regard Tenant shall promptly take all required actions to bring the Leased Premises into substantial compliance with JC requirements. Notwithstanding anything contained herein to the contrary, if during the Lease Term, a majority of general acute care community hospitals in Landlord's Service Area are no longer JC accredited, then Tenant shall not be required hereunder to remain duly accredited by JC, so long as Tenant thereafter complies with any accreditation requirements established from time to time by the Centers for Medicare & Medicaid Services, or its successor.

   ### 11.1.4. Physician Licensing Requirements. Persons eligible for the medical staff at the Carrollton Hospital shall be limited to physicians duly licensed to practice medicine by the State of Texas (and dentists duly licensed to practice dentistry by



the State of Texas) who have received favorable recommendation by the credentials committee of the medical staff of the Carrollton Hospital; provided that such physicians are board certified or eligible to be board certified in their respective specialty or sub-specialty in which they currently practice to the extent required by the medical staff bylaws, rules and regulations and policies.

**11.4.** **Contest of Liens**. The creation by Tenant of any lien or judgment of record against the Leased Premises shall not be a default hereunder so long as the validity thereof is being contested in good faith and by appropriate legal proceedings and neither the Leased Premises nor any Rent therefrom or interest therein would be in any immediate danger of being sold, forfeited, attached or lost and, in any such case, Tenant will, promptly after a final determination of such contests or proceedings, fully pay and discharge the amounts which may be levied, assessed, charged or imposed or determined to be payable therein or in connection therewith, together with all penalties, fines, interests, costs and expenses thereto or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.

**11.5.** **Additional Information**. Subject to the confidentiality provisions set forth herein, Tenant agrees, whenever reasonably requested by Landlord, to provide and certify (to the best of Tenant's knowledge) or cause to be provided and certified (to the best of Tenant's knowledge) such information concerning the Leased Premises or Tenant to the extent same is necessary to enable to enable Landlord to make any reports or supply any information required by the Indenture, Governmental Regulations, Governmental Authorities, Rating Agencies or Landlord's Financial Advisors.

## ARTICLE XII
### REPRESENTATIONS AND WARRANTIES OF TENANT

**12.1.** **Tenant's Representations and Warranties**. To induce Landlord to enter into this Lease, Tenant hereby makes the following representations and warranties with respect to Tenant, upon each of which Tenant acknowledges and agrees that Landlord is entitled to rely and has relied.

### 12.1.1. Formation, Qualification and Capacity.

**(a)** Tenant is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Nevada.

**(b)** The execution and delivery by Tenant of this Lease and documents described herein, the performance by Tenant of its obligations under this Lease and documents described herein and the consummation by Tenant of the transactions contemplated by this Lease and documents described herein have been duly and validly authorized and approved by all necessary actions on the part of Tenant, none of which actions have been modified or rescinded and all of which actions remain in full force and effect.



**12.1.2. <u>Powers; Consents; Absence of Conflicts with Other Agreements, Etc</u>.** To the best of Tenant's knowledge, the execution, delivery and performance by Tenant of this Lease and all other agreements referenced herein or therein or ancillary hereto or thereto to which Tenant is a party, and the consummation of the transactions contemplated herein by Tenant:

**(a)** are within its statutory powers, are not in contravention of law and have been duly authorized by all requisite limited liability company or corporate action;

**(b)** provided the other provisions of this Lease are performed and otherwise observed by Landlord, and except as otherwise expressly herein provided, do not require any approval or consent of, or filing with, any Governmental Authority bearing on the validity of this Lease which is required by law or the regulations of any such Governmental Authority;

**(c)** provided the other provisions of this Lease are performed and otherwise observed by Landlord, will not violate any Governmental Regulation of any Governmental Authority to which Tenant may be subject; and

**(d)** will not violate any judgment of any Governmental Authority to which Tenant may be subject.

**12.1.3. <u>Third Party Consents</u>.** Except as otherwise provided in this Lease, to the best of Tenant's knowledge, the execution and delivery of this Lease and the consummation of the transactions contemplated hereby will not require Tenant to obtain any consent, license, permit, waiver, approval, authorization, or other action of, by, or with respect to any non-governmental or governmental Person.

**12.1.4. <u>Binding Agreement</u>.** This Lease and all agreements to which Tenant will become a party pursuant hereto are and will constitute the valid and legally binding obligations of Tenant, and are and will be enforceable against Tenant in accordance with the terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

## ARTICLE XIII
### REPRESENTATIONS AND WARRANTIES OF LANDLORD

**13.1.    <u>Landlord's Representations and Warranties</u>.** To induce Tenant to enter into this Lease, Landlord hereby makes the following representations and warranties with respect to Landlord, upon each of which Landlord acknowledges and agrees that Tenant is entitled to rely and has relied.

**13.1.1. <u>Formation, Qualification and Capacity</u>.** Landlord is duly organized and existing as a body corporate and politic created by ordinance of the City Council of Farmers Branch, Texas, pursuant to applicable Governmental Regulations. The execution



and delivery by Landlord of this Lease and documents described herein, the performance by Landlord of its obligations under this Lease and documents described herein and the consummation by Landlord of the transactions contemplated by this Lease and documents described herein have been duly and validly authorized and approved by all necessary governmental actions on the part of Landlord, none of which actions have been modified or rescinded and all of which actions remain in full force and effect.

**13.1.2. Landlord's Powers; Consents; Absence of Conflicts with Other Agreements, Etc.** The execution, delivery and performance by Landlord of this Lease and all other agreements referenced herein or ancillary hereto to which it is a party, and the consummation of the transactions contemplated herein by Landlord:

**(a)** are within its respective statutory powers, are not in contravention of law and have been duly authorized by all requisite corporate action;

**(b)** provided the other provisions of this Lease are performed and otherwise observed, and except as otherwise expressly herein provided, do not require any approval or consent of, or filing with, any Governmental Authority bearing on the validity of this Lease which is required by law or the regulations of any such Governmental Authority;

**(c)** provided the other provisions of this Lease are performed and otherwise observed, will not violate any Governmental Regulation of any Governmental Authority to which Landlord may be subject; and

**(d)** will not violate any judgment of any Governmental Authority to which Landlord may be subject.

**13.1.3. Landlord Third Party Consents.** Except as otherwise provided in this Lease, the execution and delivery of this Lease and the consummation of the transactions contemplated hereby will not require Landlord to obtain any consent, license, permit, waiver, approval, authorization, or other action of, by, or with respect to any non-governmental or governmental Person.

**13.1.4. Binding Agreement Upon Landlord.** This Lease and all agreements to which Landlord will become a party pursuant hereto are and will constitute the valid and legally binding obligations of Landlord and are and will be enforceable against Landlord in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**13.1.5. Legal Compliance.** To Landlord's Knowledge, there are no facts or circumstances which would result in Landlord or the Leased Premises not being in compliance with all Governmental Regulations in all material respects which are applicable to Landlord's ownership of the Leased Premises and the performance of its obligations under this Lease. Landlord acknowledges, that to the extent issues of non-compliance with



Governmental Regulations are discovered from and after the date hereof, which arose prior to the Effective Date, it shall be Landlord's responsibility, at its cost, to take necessary actions to cure any such non-compliance.

## ARTICLE XIV
### COVENANTS OF LANDLORD; LANDLORD'S RIGHTS

**14.1.** **Landlord Covenants**.

**14.1.1.** **Title and Quiet Possession**.  Landlord warrants and covenants that as of the Effective Date it has title to the Leased Premises, subject only to Permitted Title Exceptions. For so long as Tenant is not in Default, Tenant shall quietly enjoy the Leased Premises, subject only to the covenants, terms and conditions of this Lease. Landlord further covenants that in the event of Landlord's future sale of the Leased Premises during the Lease Term, to someone other than Tenant, any such future sale shall transfer the Leased Premises subject to this Lease and the rights of Tenant.

**14.1.2.** **Additional Information**.  Landlord agrees, whenever  requested by Tenant, to provide and certify or cause to be provided and certified such information concerning the Leased Premises and other topics as Tenant considers necessary to enable it to assist in placing or to enable it to make any reports or supply any information required by the Indenture, Governmental Regulations or requirements of applicable Governmental Authorities.

**14.1.3.** **Landlord Retained Obligations**.   Landlord acknowledges and agrees that it will be responsible, from time to time hereunder, for satisfying the Landlord Retained Obligations.

**14.1.4.** **Landlord Obligation to Exercise Powers of Eminent Domain**. Upon the request of Tenant, should any claim or threatened claim of a defect in title or other claim or threatened claim challenging or questioning the state of Landlord's title in or Tenant's right to possession of the Leased Premises or any part thereof be raised, and if such claim or threatened claim is of such nature as to be capable of resolution through or by the exercise of Landlord's powers of eminent domain, Landlord agrees to use its powers of eminent domain to resolve such claim or threatened claim.  The costs, expenses and fees associated with resolving such claim or threatened claim and Landlord's exercise of its powers of eminent domain shall be borne by Landlord.

**14.2.** **Landlord Rights**.

**14.1.1.** **Right of Access**.  Upon at least twenty-four (24) hours advance written notice (except in case of emergency), Landlord and its consultants or representatives shall have reasonable access at all reasonable times to the Leased Premises for purposes of inspection of the Leased Premises; provided, that such Inspections do not materially interfere with the conduct of Tenant's Business.  Tenant shall have the right to have a representative of Tenant accompany Landlord during any Inspections.



**14.1.2. <u>Landlord's Right to Make Repairs</u>.**

**(a)**    In the event Tenant fails to maintain and make any necessary Repairs to the Leased Premises as required by this Lease, and Tenant fails to commence the appropriate maintenance and Repair of the matter in question within thirty (30) days following written notice from Landlord specifying such failure and requesting that same be remedied, as Landlord may deem necessary or desirable, then Landlord may, but shall not be obligated to, make such Repairs in the name, place and stead of Tenant, and Landlord shall be allowed to take all materials into and upon the Leased Premises that may be required therefor without the same constituting an eviction of Tenant, actual or constructive, and the Rent shall in no way abate while such Repairs are being made, by reason of loss or interruption of business of Tenant; provided, however, that Landlord shall use reasonable efforts not to interfere with the normal business operations of Tenant.

**(b)**    To the extent that Landlord elects to make Repairs to the Leased Premises pursuant to subsection (a) above, such Repairs shall be paid for in full by Tenant as Additional Payments (Rent) upon written demand. To the extent that sums so expended are not reimbursed by Tenant to Landlord within  ten (10) days following written demand for payment, such sums shall bear interest at the Default Rate until paid.

**14.1.3. <u>Exhibition or Inspection of the Leased Premises by Landlord</u>.**

**(a)**    Landlord may exhibit the Leased Premises to any Landlord Representative during normal business hours so long as Landlord gives Tenant at least twenty-four (24) hours prior written notice, in connection with the creation of any proposed relationship or arrangement relating to the operation of the Leased Premises from and after the Lease Termination Date or the refinancing of the **Bond**s.

**(b)**    Notwithstanding the foregoing, Landlord agrees that, except in emergency situations, Landlord shall not enter the Leased Premises without first delivering prior notice to Tenant and affording Tenant the right to have a Tenant's representative accompany Landlord, and that Landlord shall comply with all of Tenant's security regulations of which Landlord is notified in writing.

**14.1.4. <u>Actions Requiring Significant Input from Landlord.  The following sets forth a list of actions which may be taken by the Tenant Board in which Landlord will have significant input (but the consent of the Landlord will not be required): approval of capital and operating budgets for the Hospital; and other operational matters that could have a material effect on the obligations and rights of Tenant or Landlord pursuant to the terms of the Lease.  The term "significant input," as used in the preceding sentence, means that Tenant will provide Landlord with reasonable advance notice prior to taking such action and a reasonable opportunity for Landlord to provide significant input on such action, but will not require the presence of any Landlord representative at any meeting of the Tenant Board.</u>**



# ARTICLE XV
## LANDLORD BOARD REPRESENTATION

**15.1    Hospital Board.** During the Lease Term, Landlord shall be entitled to nominate a representative (referred to as the "**Landlord Board Member**") to serve on the board to the Hospital (referred to as the "**Hospital Board**") composed of community representatives appointed by the SANA that functions in substantially the same manner as the community hospital boards. Landlord shall have the right to remove and submit a replacement for the Landlord Board Member at any time. The Hospital Board will be governed by the meeting, notice and quorum provisions applicable to committees of the Tenant Board.

# ARTICLE XVI
## FINANCIAL REPORTING

**16.1.    Certain Definitions.** The following terms shall have the meanings specified below in this Article, and elsewhere in this Lease:

**16.1.1. "Audited Financial Statements"** shall mean, with respect to each Lease Year, published annual financial statements prepared by and certified to by Tenant's Auditor, covering Tenant and Tenant's operation of the Leased Premises.

**16.1.2. "Confidential Information"** shall mean any information which (a) is from time to time set forth in or contained in the Financial Reports, (b) is nonpublic or confidential in nature, and (c) is designated as such.

**16.1.3. "Confidentiality Agreement"** shall mean the Confidentiality Agreement in the form attached hereto as **Exhibit "G"** and made a part hereof for all purposes.

**16.1.4. "Financial Reports"** shall mean the Audited Financial Statements, the Unaudited Financial Statements and the Operational Statements.

**16.1.5. "Public Filings"** shall mean any portion of the Financial Reports which Tenant files or is required to file (original, supplemental and final filings) with Governmental Authorities, financial intermediaries or otherwise.

**16.1.6. "Public Information Act"** shall mean the statute found at Chapter 552 of the Texas Government Code, or any successor provision.

**16.1.7. "Public Information Claimant"** shall mean any Person claiming a right to be provided, or making a demand for, copies of any Confidential Information under the Public Information Act.

**16.1.8. "Public Information Request"** shall mean a written request by a Public Information Claimant with respect to any of the Financial Reports or other Confidential Information comprising an Application for Public Information under Section 552.221 of the Public Information Act.



**16.1.9. "Public Operating Information"** shall mean any portion of the Financial Reports which is public record as a result of Tenant's Public Filings.

**16.1.10. "Unaudited Financial Statements"** shall mean unaudited financial statements.

**16.2.    Books and Records**.  In connection with the operation of the Leased Premises and in connection with the performance of its duties hereunder Tenant hereby covenants and agrees to keep financial records and books of account with respect to the operation of the Leased Premises which are accurate in all material respects and which are prepared in accordance with GAAP. Tenant will provide financial results from the Leased Premises, along with complimentary utilization statistics and changes in market demographics consistent with Landlord's ability to sell **Bond**s on terms acceptable to it and, if applicable, to obtain desired ratings from the Rating Agencies, as well as to enable Landlord to meet Landlord's continuing disclosure obligations under SEC Rule 15c2-12.

**16.3.    Financial Reports**.

**16.1.1. Audited Financial Statements.**  Within one hundred fifty (150) days after the expiration of each Lease Year Tenant will deliver to Landlord Audited Financial Statements for such Lease Year.

**16.1.2. Monthly Financial Statements.**  Tenant shall deliver to Landlord, within thirty (30) days after the end of each month of each Lease Year, in comparative form with the preceding Lease Year's comparable month, Unaudited Financial Statements (the "**Monthly Financial Statements**") with respect to Tenant.

**16.1.3. Financial Statement Costs.**  The costs of the Financial Statements shall be borne by Tenant.

**16.1.4. Reports,    Opinions,    Certifications    and    Confirmations; Cooperation.**

**(a)**    The published Audited Financial Statements shall be accompanied by a report of Tenant's Auditor or Guarantor's auditor (if applicable), which report shall be based upon an examination made in accordance with GAAP.

**(b)**    The Unaudited Financial Statements shall be accompanied by a certification of the Chief Financial Officer of Tenant certifying that, to the best of his or her knowledge, the unaudited statements have been prepared in accordance with GAAP and accurately reflect the operations of Tenant for the periods indicated.

**(c)**    Tenant shall use reasonable efforts to cooperate with Landlord and make available to Landlord such information which may be reasonably necessary in order for Landlord to prepare and complete financial information.



**16.1.5. <u>Operational Statements</u>.**  Within forty-five (45) days after the expiration of each Calendar Quarter, Tenant will deliver to Landlord Operational Statements for the Calendar Quarter just expired, and with respect to the fourth Calendar Quarter, for that quarter and for the Lease Year just expired.

**16.4.    <u>Review of and Use by Landlord of the Financial Reports</u>.** Subject to the terms of this Lease and any applicable Confidentiality Agreement, Landlord shall have the right to use the Financial Reports for its general business purposes, before and after the Lease Termination Date, which use shall include reading, analyzing, planning, drawing conclusions from and acting on such conclusions, in connection with the ownership and operation of the Leased Premises. Landlord shall additionally have the right to use the Financial Reports before and after the Lease Termination Date, for (a) the selection of a new operator for the Leased Premises, (b) any other financing or the refinancing thereof, and (c) to enable Landlord to meet Landlord's continuing disclosure obligations under the Indenture and applicable Governmental Regulations, including SEC Rule 15c2-12.

**16.5.    <u>Feasibility Studies</u>.** Landlord, at its sole cost and expense, shall have the right to engage third parties to conduct feasibility studies of the Leased Premises and its operations and Tenant shall permit its employees to discuss the operations of the Leased Premises with such third parties, upon reasonable advance notice, in a manner otherwise consistent with the terms of this Lease; provided that Tenant shall have the right to participate in such feasibility studies and to consult with the third parties conducting such studies.

**16.6.    <u>Confidential Information</u>.**

**16.1.1. <u>Maintenance of Confidentiality and Confidential Information</u>.**

**(a)**    Landlord shall exercise reasonable precautions and efforts to (i) maintain and keep the confidentiality of the Confidential Information, and (ii) require Landlord's Representatives and Landlord's Board and other Persons to whom the Confidential Information is disseminated, to maintain and keep the confidentiality of the Confidential Information. Subject to the other provisions of this **Section 16.6.1**, Landlord may disclose the Confidential Information to:

**(i)**    Landlord's Representatives who have a need to know such information in connection with the performance of their respective duties to Landlord or in connection with Landlord's business and operations;

**(ii)**    Landlord's Board at any annual, regular, special or emergency meeting, or at any retreat; provided, however, that the discussion of such Confidential Information shall be confined to executive sessions of such meetings of the Landlord's Board;

**(iii)** Any other Person, including any Public Information Claimant, to the extent that disclosure is required to comply with applicable Governmental Regulations, including the occurrence of any event wherein Landlord becomes legally



compelled (by deposition, interrogatory, request for documents, subpoena, civil investigative demand, the requirements of the Public Information Act, or similar process or otherwise) to disclose any of the Confidential Information.

(b)    If Landlord is required to disclose any Confidential Information in order to comply with applicable Governmental Regulations, as referenced in clause **(a)(v)** above, Landlord shall, to the extent it is legally permitted to do so, provide Tenant with timely notice of such requirement so that Tenant may, to the extent practicable, seek an appropriate protective order or waive the parties' compliance with the provisions of this **Section 16.6**. If, in the absence of a protective order or the receipt of Tenant's waiver hereunder, Landlord's counsel advises that Landlord nonetheless is legally required to disclose any of the Confidential Information, Landlord will disclose only that portion of the Confidential Information that such counsel advises is legally required to be disclosed and shall take all reasonable actions to cooperate with Tenant (at Tenant's expense) in seeking to obtain a protective order or other assurance of confidential treatment of the Confidential Information.

(c)    Landlord shall provide to Tenant a copy of each Confidentiality Agreement (along with a copy of the information distributed to a Person under this **Section 16.6.1**) executed by a Person to whom Confidential Information is provided under this **Section 16.6.1** promptly following the delivery of any such information.

16.1.2. **Information Not Deemed to Be Confidential.** The information set forth in the Financial Reports shall not be deemed to be Confidential Information to the extent that such information:

(a)    at the time of disclosure or thereafter is generally available to and known by the public (other than as a result of a disclosure directly or indirectly by Landlord),

(b)    was available to Landlord on a non-confidential basis from a source other than Tenant, its Affiliates or their advisors,

(c)    is Public Operating Information found in Public Filings, or

(d)    has been independently acquired or developed by Landlord without violating any of Landlord's obligations under **Section 16.6**.

16.1.3. **Notification of Nature of Confidential Information.** Landlord and Tenant hereby agree that for any information, other than the Financial Reports, the Operational Statements and the Tenant's Company Agreement, to be deemed to be or to qualify as "**Confidential Information**," Tenant must notify Landlord in writing that the information in question is deemed by Tenant to be confidential in nature. Landlord and Tenant acknowledge and agree that the Financial Reports, the Operational Statements and the Tenant's Company Agreement and related documents are and will constitute Confidential Information.



**16.1.4.** **Dissemination of Financial Reports; Requirement of Confidentiality Agreements**.

(a)    Landlord shall have the right to use and distribute or disseminate any Financial Reports delivered to Landlord by Tenant only to Persons as contemplated by the provisions of **Section 16.6.1.(a)**, and in compliance with the provisions of this **Section 16.6.4**.

(b)    Distributions or disseminations of Financial Reports may be made by Landlord only to Persons permitted to receive Financial Reports only if the Person receiving same ("**Recipient**") executes and delivers to Landlord a Confidentiality Agreement, to be substantially in the form and to contain the content of the Confidentiality Agreement. Additionally, the Recipient of Financial Statements shall also execute and deliver to Landlord (for the benefit of Tenant) the Confidentiality Agreement.

(c)    Landlord shall provide a copy to Tenant of each Confidentiality Agreement (together with a copy of all information distributed to Recipient) executed by a Recipient promptly following the delivery of any Financial Report to a Recipient.

**16.1.5.** **Public Operating Information**.

(a)    Tenant agrees that it shall deliver to Landlord copies of all Public Operating Information and the Public Filings promptly following the filing of same with the applicable Governmental Authorities, financial intermediaries or other Persons.

**16.1.6.** **Survival**.  The obligations of Tenant and Landlord contained in this **Section 16.6** shall survive the expiration or earlier termination of this Lease.

**16.7.** **Public Information Act Issues**.

**16.1.1.** **Public Information Claimant**.  Landlord agrees that in the event that Landlord receives a request from any Public Information Act Claimant demanding access to or copies of any Confidential Information, the following provisions shall govern Landlord and Tenant in respect to such request:

(a)    Landlord acknowledges that Tenant considers that the Financial Statements and other Confidential Information from time to time delivered by Tenant to Landlord to be information of a type that is information exempt from public disclosure under Subchapter C of the Public Information Act ("**Exempt Information**").

(b)    Landlord agrees that, in the event that it receives a Public Information Act Request covering Exempt Information, Landlord shall, within three (3) Business Days following receipt of a Public Information Request, notify ("**Landlord's Public Information Act Notification**") Tenant of such request.

(c)    At Tenant's request, which shall be given in writing within three (3) Business Days following receipt by Tenant of Landlord's Public Information Act



Notification, Landlord shall withhold the Exempt Information in question and thereafter file with the Attorney General of Texas a request for a decision of the Attorney General regarding whether the Exempt Information in question is exempt from public disclosure under and pursuant to Subchapter G of the Public Information Act ("**Request for AG Opinion**"). However, nothing in this **Section 16.7.1** shall act to relieve Landlord of its responsibility to provide Tenant with any additional notices or information required by the Public Information Act.

(d)    The Request for AG Opinion shall state that Landlord wishes to withhold the Exempt Information and that it considers the Exempt Information to be within one (1) or more of the exceptions provided under the Public Information Act which grants Landlord the right to refuse to make the Exempt Information in question subject to public disclosure.

(e)    Subject to the provisions of **Section 16.7.2**, below, if the Attorney General determines that the Exempt Information is not exempt from the public disclosure requirements, then Landlord may release the Exempt Information in accordance with the Attorney General's findings and/or the Public Information Act free of the restrictions set forth in **Section 19.7**, unless Tenant has obtained a court order prohibiting the release, in which case Landlord will not release the Exempt Information to the extent of that order.

### 16.1.2. **PIA Judicial Proceeding; Appeal.**

(a)    In the event that the Attorney General determines that the Exempt Information is subject to public disclosure (the date on which determination is made herein called the "**AG Determination Date**") and in the event that Tenant gives written notice to Landlord to file a suit under the Public Information Act (such suit, and any appeal thereof, hereinafter called "**PIA Judicial Proceeding**"), Landlord shall do so within the time frames statutorily required, so long as Tenant informs Landlord of its desire within five (5) Business Days of the AG Determination Date. Landlord shall notify Tenant of the Attorney General's decision within two (2) Business Days of the AG Determination Date.

(b)    To the extent that any PIA Judicial Proceeding results in an adverse decision to Landlord and in the event that an appeals process is available to Landlord to contest such adverse decision, Landlord shall prosecute such appeal (herein called an "**Appeal**") to the highest court so long as (i) Tenant continues to give Landlord written direction to do so, and (ii) Tenant continues to pay the costs of such appeal as such costs are incurred.

(c)    Landlord recognizes that Tenant may have an independent right to file suit to withhold Exempt Information. In the event that Tenant files such a suit or otherwise obtains a protective order, Landlord will not release the Exempt Information to the extent of the order.



**16.1.3. <u>Notice of Prosecution of Request for AG Opinion and PIA Judicial Proceeding</u>.** From time to time, upon request, Landlord will keep Tenant advised of and will consult with Tenant concerning (a) the status of the Request for AG Opinion or any PIA Judicial Proceeding or any Appeal, including the charges and costs incurred for Landlord's outside counsel, and (b) the manner in which such contest is being prosecuted by Landlord.

**16.1.4. <u>Landlord's Control of Proceedings</u>.** All final decisions as to the manner in which the Request for AG Opinion or any PIA Judicial Proceeding or any Appeal will be prosecuted will be subject to Landlord's sole and absolute approval and control. However, nothing contained herein shall affect the right of the Tenant to intervene in the PIA Judicial Proceeding, independently file suit seeking to withhold Exempt Information, or to file a memo, brief or other writing with the Attorney General. The manner in which any suit is prosecuted by Tenant and the contents of any writing filed with the Attorney General will be in the sole discretion of the Tenant.

**16.8.    <u>Selection of Counsel</u>.** In connection with a Request for AG Opinion or any PIA Judicial Proceeding or any Appeal the following agreements shall govern the rights and duties of Landlord and Tenant:

**(a)** Landlord shall have the right to select counsel of its choice to represent Landlord in connection with a Request for AG Opinion or any PIA Judicial Proceeding or any Appeal, without the approval of Tenant. Landlord agrees to engage counsel which is reputable and qualified to prosecute the Request for AG Opinion or any PIA Judicial Proceeding or any Appeal.

**(b)** Each Landlord's Public Information Act Notification shall include the name of Landlord's counsel that it intends to engage in a Request for AG Opinion in regard to the Public Information Request in question and such counsel's estimate of legal costs to be incurred in connection with the prosecution of the Request for AG Opinion. Likewise, in connection with any Appeal, Landlord shall secure and deliver to Tenant an estimate of the costs of a PIA Judicial Proceeding or an Appeal prior to authorizing Landlord's counsel to proceed with the PIA Judicial Proceeding or the Appeal, which authorization shall be made only with Tenant's prior written approval. To the extent that such authorization to proceed with the PIA Judicial Proceeding is not issued by Tenant, Landlord may thereafter release the Exempt Information free of the restrictions set forth in this **Section 16.8**.

**(c)** Tenant shall reimburse Landlord for all of its reasonable attorneys' fees and all other reasonable costs and disbursements expended by Landlord in connection with the prosecution of a Request for AG Opinion or any PIA Judicial Proceeding or any Appeal.

**(d)** Landlord shall deliver to Tenant monthly statements of reasonable costs incurred in connection with a Request for AG Opinion, PIA Judicial



Proceeding or Appeal. Tenant shall pay such costs promptly and in any event within thirty (30) days of receipt of such statements.

**(e)** Tenant from time to time shall have the right to request that Landlord cease the prosecution of the Request for AG Opinion, the PIA Judicial Proceeding or the Appeal, in which event Landlord shall do so, subject to any applicable legal constraints or restrictions regarding the termination of the prosecution in mid-stream, and thereafter Landlord shall have the right to release the Exempt Information free of the restrictions set forth in this **Section 19.8.**, unless there is an independent legal basis for the information to be withheld (e.g., a court order prohibiting the release) and Tenant shall reimburse Landlord for the reasonable costs of the prosecution of such proceedings incurred to the date of such release.

**(f)** In no event shall Landlord have any responsibility for any reasonable legal costs incurred in connection with a Public Information Act Request, a Request for AG Opinion, a PIA Judicial Proceeding or an Appeal, which responsibility shall rest solely with Tenant.

## ARTICLE XVII
### MECHANICS AND MATERIALMENS LIENS

**17.1.** **Mechanics Liens and Materialmen's Liens**.

**17.1.1. Claims for Mechanics Liens.** Tenant covenants and agrees that it will not create or suffer to be created any lien, encumbrance or charge upon the Leased Premises, or any part thereof, and Tenant shall satisfy or cause to be discharged, or will make adequate provision to satisfy and discharge, within sixty (60) days after the same shall occur, all claims and demands for labor, materials, supplies or other items which, when not satisfied, might by law have become a lien upon the Leased Premises, or any part thereof; provided that liens for labor and materials arising by operation of statutory law shall not be within the purview of this paragraph if, when such liens shall be perfected, Tenant shall cause them to be promptly removed, released or discharged.

**17.1.2. Removal of Mechanics Liens.** If any such lien shall be filed or asserted against the Leased Promises or any Rent payable hereunder, by reason of work, labor, services or materials supplied or claimed to have been supplied on or to Tenant or the Leased Premises, at the request or with the permission of Tenant or of anyone claiming under it, Tenant shall, within thirty (30) days after it receives notice of the filing thereof or the assertion thereof against the Leased Premises, or any Rent, cause the same to be discharged of record, or take such action as may be necessary to prevent the enforcement or foreclosure thereof, by contest, payment, deposit, order of court or otherwise.

**17.2.** **NOTICE. NOTICE IS HEREBY GIVEN THAT LANDLORD IS NOT AND SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIALS FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES OR ANY PART THEREOF THROUGH OR UNDER TENANT, AND THAT NO MECHANICS' OR**



**OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTERESTS OF LANDLORD IN AND TO THE LEASED PREMISES OR ANY PART THEREOF.**

## ARTICLE XVIII
## HAZARDOUS SUBSTANCES

**18.1.** **Certain Definitions**.  The following terms shall have the meanings specified below in this **Article XVIII** and elsewhere in this Lease:

**18.1.1. "Current Environmental Study"** shall mean that certain Environmental Assessment, Phase I, dated November 6, 2008, prepared by Green Star Environmental and issued to Landlord and Tenant which contains an assessment of the existing Environmental Activity at the Leased Premises as of the date set forth therein.

**18.1.2. "Environmental Activity"** shall mean, with respect to activities taking place on or after the Effective Date:

**(a)** any present or future storage, holding, presence, existence, release, threatened release, emission, discharge, generation, processing, use, abatement, disposition, handling or transportation of any Hazardous Substance in violation of any applicable Environmental Law from, under, into or on the Land or the Improvements, or otherwise relating to the Land or the Improvements or the ownership, use, operating or occupancy thereof, or any threat of such activity, or

**(b)** the migration of any Hazardous Substance to other property, or

**(c)** the violation of any applicable federal laws and regulations relating to (i) pollution of the environment (including without limitation, ambient air, surface water, ground water, land surface or subsurface strata), or (ii) emissions, discharges, releases or threatened releases of Hazardous Substances, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances, any and all state and local laws similar to, in whole or in part, federal toxic waste laws, which from time to time are in effect in the jurisdiction in which the Leased Premises are located, and the regulations adopted pursuant thereto, any laws or regulations governing "wetlands," and any common law theory based on nuisance or strict liability, or

**(d)** the loss or injury resulting from any underground or aboveground storage tanks located on or at the Leased Premises, whether filled, empty, or partially filled with any Hazardous Substance and the release thereof from the Leased Premises into the air, atmosphere, ground, water supply or sewer systems on, into, above or adjacent to the Leased Premises.



**18.1.3. "Environmental Inspections"** shall mean any environmental inspections, tests or audits conducted by Landlord or Tenant in accordance with the terms hereof.

**18.1.4. "Environmental Laws"** shall mean all federal, state, and local laws, ordinances, common law requirements and regulations and standards, rules, policies and other Governmental Regulations, administrative rulings and court judgments and decrees having the force of law in effect now or in the future and including all amendments, that relate to Hazardous Substances and apply to Tenant or to the Leased Premises, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, et seq., and their state analogs, and any other successor statutes.

**18.1.5. "Environmental Liabilities"** shall mean:

**(a)** to the extent arising out of any Environmental Activity, any and all actual or potential obligations to pay (i) the amount of any judgment or settlement, (ii) the reasonable cost of complying with any settlement, judgment or order for injunctive or other equitable relief, (iii) the reasonable cost of compliance or corrective action in response to any notice, demand or request from any department, agency or other body or component of any Government Authority that exercises any form of jurisdiction or authority under any Environmental Laws, (iv) the amount of any civil penalty or criminal fine, and any court costs and reasonable amounts for attorneys' fees, fees for witnesses and experts, and (v) reasonable costs of investigation and preparation for defense of (A) any claim or any judicial action, suit or proceeding (whether civil or criminal), any administrative proceeding (whether formal or informal), (B) any investigation by a governmental authority or entity (including a grand jury), and (C) any arbitration, mediation or other non-judicial process for dispute resolution, regardless of whether such proceeding is threatened, pending or completed, that may be or have been asserted against or imposed upon Landlord, Tenant, the Leased Premises or any property used therein; and

**(b)** any and all costs arising out of or associated with: (i) the failure by Tenant to comply at any time with all Environmental Laws applicable to the Leased Premises; (ii) the presence of any Environmental Activity on, in, under, at or in any way affecting the Leased Premises as a result of any Environmental Activity; (iii) the identification of Tenant or Landlord as a potentially responsible party under any Environmental Laws; (iv) the presence at any time of any underground or aboveground storage tanks used or installed by Tenant, whether filled, empty, or partially filled with any Hazardous Substances on, in, at or under the Leased Premises; or (v) any and all claims for injury or damage to persons or property arising out of exposure to Hazardous Substances originating or located at or migrating from the Leased Premises to adjacent properties, or



resulting from operation thereof, but only to the extent that in the case of (i) through (iv) above, such Hazardous Substances first originate or are located at, or migrate from, the Leased Premises on or after the Effective Date or resulting from operation of the Leased Premises on or after the Effective Date, or arise from the Existing Conditions.

**18.1.6. "Environmental Permit"** shall mean any permit, license or other authorization issued under any Environmental Law with respect to any activities or businesses conducted by or on behalf of Tenant on or in relation to the Leased Premises.

**18.1.7. "Hazardous Substance(s)"** shall mean petroleum and petroleum products and compounds and wastes containing them, including gasoline, diesel fuel and oil; explosives; radon, flammable materials; radioactive materials; polychlorinated biphenyls ("**PCBs**") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is friable; underground or above-ground storage tanks (except for tanks which have been closed in accordance with applicable Environmental Laws); any medical waste, infectious waste and any other material or substance now or in the future each in the amount and form defined as a "**hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant"** or "**pollutant**" within the meaning of any Environmental Law; provided that Hazardous Substances shall not include (a)substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purposes of cleaning or maintenance; and (b)gas, oil and other ordinary automotive fluids contained in an ordinary amount and manner in motor vehicles visiting the Leased Premises.

**18.1.8. "Remediation"** shall mean any investigation, site monitoring, containment, cleanup, removal, restoration, or other activities of any kind which are required under applicable Environmental Law.

### 18.2.    Tenant's Covenants Regarding Operations and Compliance.

#### 18.1.1. Existing Conditions.

**(a)** Tenant acknowledges that it has received and reviewed a copy of the Current Environmental Study and Tenant acknowledges that it understands the nature and scope of the Environmental Activity which is disclosed therein (the "**Existing Conditions**"). Tenant agrees and commits that it shall be responsible for any future Remediation relating to Tenant's possession or operation of the Leased Premises from and after the Effective Date required to correct, contain, cleanup, remove or restore the Existing Conditions, at its sole cost and expense.

**(b)** To the extent that there is Environmental Activity in the Leased Premises which (i) occurred prior to the Effective Date or (ii) has not been disclosed to Tenant in the Current Environmental Study, or (iii) is caused by Landlord, Landlord agrees and commits that it shall be responsible for any future Remediation required to correct, contain, cleanup, remove or restore such conditions, at its sole cost and expense.



**18.1.2. <u>Negative Environmental Covenants</u>.** Tenant hereby covenants and agrees with Landlord that, except as expressly permitted hereunder, it shall not do or shall use commercially reasonable efforts not to permit or allow any of the following in any material respect:

(a) any Environmental Activity to take place in, on or under the Leased Premises, or to be incorporated in the Improvements thereon, or

(b) the Leased Premises to be used as a landfill or a waste disposal site, or a manufacturing, handling, storage, distribution or disposal facility for any Hazardous Substance or other toxic material, except in accordance with applicable Environmental Laws;

(c) the use, generation, manufacture, production, storing, release, discharge, treatment, or disposal of, on, under, from or about the Leased Premises or transport to or from the Leased Premises any Hazardous Substance or allow any other Person to do so except in compliance with Environmental Laws;

(d) the installation of any asbestos or any substance containing asbestos, or any underground or aboveground storage tanks (except in compliance with applicable Environmental Laws), whether filled, empty, or partially filled with any substance, as defined in any applicable Environmental Law at the Leased Premises;

(e) any violation of or noncompliance in any material respect with the terms of any Environmental Permit with respect to the Leased Premises or any property of Tenant that is adjacent to the Leased Premises.

The matters described in clauses(a) through (e) above are referred to collectively as "<u>Prohibited Activities or Conditions</u>."

**18.1.3. <u>Affirmative Environmental Covenants</u>.** During the Lease Term, Tenant shall, at its sole cost and expense:

(a) keep and maintain the Leased Premises in compliance in all material respects with, and not cause and shall use commercially reasonable effort not to permit the Leased Premises to be in violation, in any material respect, of, any Environmental Law;

(b) remedy all violations of Environmental Laws by Tenant with respect thereto, including, but not limited to, removal of asbestos or any substance containing asbestos, and/or any underground or aboveground storage tanks, whether filled, empty, or partially filled with any substance, if and to the extent required by applicable Environmental Laws;

(c) secure, maintain, give, register for or file for all licenses, licenses and other permits, orders, approvals, consents, notices or other form of permission



or authorization required under any Environmental Law in connection with the operation of the Leased Premises and the compliance with applicable Environmental Laws;

        **(d)**    handle, store, remove and otherwise deal with medical waste in compliance with all Environmental Laws and Applicable Laws relating thereto; and

        **(e)**    take all commercially reasonable actions to prevent its employees, agents, and contractors, and all tenants and other occupants of the Leased Premises from causing or permitting any Prohibited Activities or Conditions.

    **18.3.**    **Exceptions to Prohibited Activities and Conditions**.  Prohibited Activities or Conditions shall not include the safe and lawful use and storage of quantities of (a) pre-packaged supplies, cleaning materials and petroleum products customarily used in the operation and maintenance of comparable hospital facilities; (b) cleaning materials, personal grooming items and other items sold in pre-packaged containers for consumer use and used by tenants, patients and occupants of the Leased Premises; (c) petroleum products used (i) in the operation and maintenance of motor vehicles from time to time located on the parking areas at the Leased Premises, or (ii) in connection with a storage tank for fuel for one (1) or more emergency generators; (d) necessary and customary types and quantities of materials used by the Tenant in connection with the construction of the Improvements, and (d) medical waste, so long as all of the foregoing are used, stored, handled and transported on-site and disposed of off-site in compliance with Environmental Laws.

    **18.4.**    **Notices**. Tenant, on the one hand, and Landlord, on the other hand, shall give prompt written notices to the other and to any holder of a lien against Landlord's or Tenant's interest in the Leased Premises of: (a) any proceeding with respect to any Environmental Activity; (b) discovery of any Prohibited Activity or Condition; (c) receipt of or knowledge of any complaint, order, notice of violation or other written communication from any Governmental Authority or other person with regard to present or future alleged Prohibited Activities or Conditions or any other environmental, health or safety matters affecting the Leased Premises or any other property of Tenant that is adjacent to the Leased Premises; (d) discovery of the presence of any Hazardous Substances on or under any adjoining property which can reasonably be expected to have a material adverse effect on the Leased Premises or the value of the Leased Premises; (e) receipt of any notice of any claim made or threatened in writing by any third party against the Tenant or Landlord relating to loss or injury from Hazardous Substances; (f) any claims made or threatened in writing by any third party against Tenant or the Leased Premises or Landlord or any other Person relating to any Environmental Activity; and (g) Tenant's or Landlord's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Leased Premises that could reasonably cause the Leased Premises or any part thereof to be subject to any investigation or cleanup of the Leased Premises pursuant to any Environmental Law or that could reasonably result in Tenant or Landlord becoming liable for any Environmental Liability.



**18.5.    Environmental Inspections.**  Tenant shall pay promptly the costs of any Environmental Inspections required by Landlord following a reasonable determination by Landlord that Prohibited Activities or Conditions exist for which Tenant is obligated, after written notice thereof, but has failed to address as required by Environmental Law. Any such costs incurred by Landlord (including the reasonable fees and out-of-pocket costs of attorneys and technical consultants whether incurred in connection with any judicial or administrative process or otherwise) shall be payable upon demand and shall constitute Rent hereunder. Notwithstanding the foregoing so long as no Tenant Default has occurred and is continuing, prior to Landlord entering upon or inspecting the Leased Premises, Landlord shall provide reasonable advance notice in writing to Tenant.  Tenant shall have the right, but not the duty, to observe all inspections and testing, to split environmental samples, to take duplicate or alternative samples, and take all such other action as Tenant deems necessary or appropriate in connection with such activities, provided that such does not interfere with the conduct of the work.

**18.6.    Remediation.**

**18.1.1. Commencement and Completion of Remediation.**  In the event that the Leased Premises (or any portion thereof) become the subject of any Remediation for which Tenant is responsible, Tenant shall commence such Remediation (a) within a reasonable period of time, or (b) such shorter period of time as may be required under applicable Environmental Laws, and thereafter shall diligently prosecute the same to completion in accordance with, and to the extent required by, applicable Environmental Laws, taking into effect all Remediation options and the use of the Leased Premises.

**18.1.2. Approval of Contractors.**  All Remediation shall be performed by Contractors, and under the supervision of a consulting engineer all approved by Landlord, which Approval shall not be unreasonably withheld, conditioned or delayed. All costs and expenses of such Remediation shall be paid by Tenant, including, without limitation, reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remediation of Landlord's interest, and any holder of a lien against Landlord's interest, in the Leased Premises.

**18.1.3. Tenant's Failure to Timely Perform Remediation.**  In the event Tenant shall fail to timely commence, or cause to be commenced (within the time periods set forth above), or fail to diligently prosecute to completion, such Remediation, Landlord may, but shall not be required to, cause such Remediation to be performed, and all reasonable costs and expenses thereof, or incurred in connection therewith, shall be payable upon demand by Tenant to Landlord and shall become part of and constitute Additional Payments (Rent).

**18.7.    Cooperation.**  Tenant shall comply with any governmental or judicial order which arises from any alleged Prohibited Activity or Condition for which Tenant is responsible hereunder, if not being contested by Tenant in good faith, and provided non-compliance during the pendency of such contest does not subject the Leased Premises to actual or threat of Lien or material devaluation.



**18.8.** **Legal Proceedings**. Tenant, on the one hand, and Landlord, on the other hand, shall permit the other to join and participate in, as a party if they so elect, any legal proceedings or actions initiated with respect to the Leased Premises in connection with any Environmental Law or Environmental Liability. Landlord shall be responsible for all attorneys' fees incurred by Landlord in connection therewith, unless Tenant has defaulted in its obligations under this **Article XVIII** and as a result thereof Landlord has elected to or has become obligated to join such proceedings, in which event Tenant shall reimburse Landlord for all costs incurred in such joinder, including its attorney's fees.

<h1 style="text-align:center">ARTICLE XIX</h1>
<h2 style="text-align:center">CONDEMNATION</h2>

**19.1.** **Definitions**. For purposes of this **Article XIX**, the following terms shall have the respective meanings set forth below:

**19.1.1. "Award"** shall mean the amount of any award or compensation, sums or anything of value awarded, paid or received as a result of a Taking.

**19.1.2. "Condemnation"** shall mean a Taking resulting from (a)the exercise of any governmental power, whether by legal proceedings or otherwise, by a Condemnor, and (b)a voluntary sale or transfer by Landlord to any Condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending.

**19.1.3. "Condemnor"** shall mean any public or quasi-public authority, or private corporation or individual, having the power of Condemnation.

**19.1.4. "Date of Taking"** shall mean the date upon which title to the Leased Premises, or a portion thereof, passes to and vests in the Condemnor or the effective date of any order for possession if issued prior to the date title vests in the Condemnor.

**19.1.5. "Partial Permanent Taking"** shall mean the Taking of only a portion of the Leased Premises for a term of three (3) months or more which does not constitute a Total Permanent Taking.

**19.1.6. "Partial Temporary Taking"** shall mean the Taking of any part of the Leased Premises for a temporary term of less than three (3) months which does not constitute a Total Temporary Taking.

**19.1.7. "Taking"** shall mean a taking of the Leased Premises or any damage related to the exercise of the power of eminent domain and including a voluntary conveyance to any agency, authority, public utility, person, or corporate entity empowered to condemn property in lieu of court proceedings.

**19.1.8. "Total Permanent Taking"** shall mean (a) the Taking of the entire Leased Premises or a Taking of over twenty percent (20%) or more in terms of square footage of the Improvements located on the Carrollton Hospital, or (b) more than twenty percent (20%) of the parking for Carrollton Hospital is taken for permanent use, or (c) a



part of the Leased Premises shall be permanently taken so that the remaining portion does not comply with the minimum parking requirements provided by law after the taking, or (d) there is a permanent Taking of access to the Leased Premises that results in cutting off direct access from the Leased Premises to any adjacent public street or highway, or the permanent closing or relocation of any street, adjoining the Leased Premises to which there is direct access to and from the Leased Premises materially impairs or adversely affects Tenant's use of the Leased Premises and the Landlord is unable to promptly provide Tenant with suitable alternate means; or (e) there is a permanent Taking of any portion of the Leased Premises that materially, adversely affects Tenant's ability to conduct the Primary Intended Use in the Leased Premises.

**19.1.9. "Total Temporary Taking"** shall mean (a) a Taking of over twenty percent (20%) or more in terms of square footage of the Improvements for a temporary term not to exceed three (3) months, or (b) there is a Taking for a temporary term not to exceed three (3) months of access to the Leased Premises that results in cutting off direct access to the Leased Premises to any adjacent public street or highway, or the closing or relocation of any street, adjoining the Leased Premises to which there is direct access to and from the Leased Premises materially impairs or adversely affects Tenant's use of the Leased Premises and the Landlord is unable to promptly provide Tenant with suitable alternate means.

**19.2.    Parties Rights and Obligations**.  If, during the Lease Term, there is any Condemnation of all or any part of the Leased Premises or any interest in this Lease, the rights and obligations of Landlord and Tenant shall be determined by this Article.

**19.3.    Notice of Condemnation**.  Immediately after notice of condemnation has been received, Tenant shall notify Landlord whether the type of taking is a Total, Partial or Temporary Taking.

**19.4.    Total Taking**.  If title to the fee of the whole of the Leased Premises is condemned by any Condemnor which constitutes a Total Permanent Taking, this Lease shall cease and terminate as of the Date of Taking by the Condemnor. If title to the fee of less than the whole of the Leased Premises is so taken or condemned, which nevertheless constitutes a Total Permanent Taking, then either Tenant or Landlord shall have the option, by notice to the other, at any time prior to the Date of Taking, to terminate this Lease as of the Date of Taking. Upon such date, if such Notice has been given, this Lease shall thereupon cease and terminate. All Rent paid or payable by Tenant hereunder shall be apportioned as of the Date of Taking, and Tenant shall promptly pay Landlord, or Landlord shall promptly reimburse Tenant, such amounts.

**19.5.    Allocation of Award**.  The Award arising as a result of a Total Permanent Taking in respect to the Leased Premises shall be allocated in its entirety to Landlord. Any portion of the Award given in respect to Tenant's leasehold estate under this Lease, the loss of Tenant's equipment or trade fixtures and/or Tenant's moving expenses, shall be allocated to and retained by Tenant. In any Condemnation proceedings Landlord and Tenant shall each seek their Award in conformity herewith, at their respective



expense; provided, however, neither Landlord nor Tenant shall initiate, prosecute or acquiesce in any proceedings that may result in a diminution of any Award payable to the other.

     **19.6.**   **Partial Permanent Taking**. If title to less than the whole of the Leased Premises is condemned, and such Taking constitutes a Partial Permanent Taking, then Tenant shall, with all reasonable dispatch restore the remaining portions of the Leased Premises which have not been the subject matter of the Taking, and any Improvements located thereon, so that such Improvements constitute a complete architectural unit of the same general character and condition (as nearly as may be possible under the circumstances) as the Improvements existing immediately prior to the Condemnation. Landlord and Tenant shall each contribute to the cost of restoration up to all of their Award for such restoration, if any, together with severance and other damages awarded for the taken Improvements; provided, however, that the amount of such contribution shall not exceed such cost. To the extent that the applicable portions of the Award are not sufficient to defray the cost of such Repair or restoration, such excess costs shall be borne by Tenant, so long as such costs do not exceed the sum of $100,000.00. If such costs exceed the sum of $100,000.00, Tenant shall have the right to cancel this Lease and treat such event as a Total Permanent Taking unless Landlord agrees to pay the amount by which such excess costs exceed the sum of $100,000.00. Any sums paid by Tenant under this **Section 19.6** may be applied against the Capital Expenditure Threshold for the Lease Year in question. In the event of a Taking which does not result in a termination of this Lease by Landlord, the Rent shall not be abated in any manner, provided however, the Rent shall be adjusted in a manner that is fair, just and equitable to both Tenant and Landlord, taking into consideration, among other relevant factors, the amount of square footage or the revenues affected by such Partial Taking. If Landlord and Tenant are unable to agree upon the amount of such abatement within thirty (30) days after such Partial Taking, the matter shall be submitted to the Dispute Resolution Procedures.

     **19.7.**   **Temporary Taking**.

     **19.1.1. Temporary Taking.** If the whole or any part of the Leased Premises or of Tenant's interest under this Lease is condemned by any Condemnor for its temporary use or occupancy, and such Taking constitutes a Temporary Taking, this Lease shall not terminate by reason thereof, and Tenant shall continue to pay, in the manner and at the times herein specified, the full amounts of Rent and Tenant shall be entitled to retain the Award relating to such Temporary Taking. Except to the extent that Tenant may be prevented from so doing due to the Temporary Taking or pursuant to the terms of the order of the Condemnor, Tenant shall continue to perform and observe all of the other terms, covenants, conditions and obligations hereof on the part of the Tenant to be performed and observed, as though such Condemnation had not occurred. In the event of any Temporary Taking described in this **Section 19.7.1**, the entire amount of any Award made for such Condemnation allocable to the Lease Term, whether paid by way of damages, rent or otherwise, shall be paid directly to Tenant. Tenant covenants that upon the termination of any such period of temporary use or occupancy it will, subject to



Landlord's contribution as set forth below, restore the Leased Premises as nearly as may be reasonably possible to the condition in which the same was immediately prior to such Condemnation, unless such period of temporary use or occupancy extends beyond the expiration of the Lease Term, in which case Tenant shall not be required to make such restoration. If restoration is required hereunder, Landlord shall contribute to the cost of such restoration that portion of its Award (up to the entire award) that is required to complete such restoration (provided that Tenant's Award is insufficient), if any. Any sums expended by Tenant in restoring the Leased Premises in excess of any Award received by Tenant or paid to Tenant by Landlord, may be applied against the Capital Expenditure Threshold for the Lease year in question.

## ARTICLE XX
## EVENTS OF DEFAULT AND REMEDIES

**20.1.**    **Definitions**. For purposes of this **Article XX**, the following terms shall have the respective meanings set forth below:

**20.1.1. "Bankrupt Person"** shall mean any Person:(a) that: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Person a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Person in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (b) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Person or of all or any substantial part of the Person's properties; or (c) against which a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced or with respect to which, without the Person's consent or acquiescence, a trustee, receiver, or liquidator of the Person or of all or any substantial part of the Person's properties has been appointed, and such proceeding has not been dismissed within one hundred twenty (120) days following the commencement of such proceeding.

**20.1.2. "Landlord Default"** shall mean the occurrence of a Landlord Event of Default as specified in Section 20.3.1 below.

**20.1.3. "Tenant Default"** shall mean the occurrence of a Tenant Default as specified in **Section 20.2.1** below.

**20.2.**    **Tenant Default.**

**20.1.1. Tenant Default.**    An event of default shall be deemed to have occurred if any of the following events (herein called "Tenant Default") shall happen:

**(a)**    If Tenant fails to make any payment of Rent hereof when the same shall become due and payable and such failure continues for ten (10) days after



written notice from Landlord to Tenant specifying such default and requesting that same be remedied; or

      **(b)**    If Tenant fails to perform any of its other covenants, conditions or provisions under this Lease or in the Parking Agreement and such failure continues for thirty (30) days after Landlord gives Tenant written notice thereof specifying such default and requesting that same be remedied; provided, however, that if such performance requires work to be done, actions to be taken, or conditions to be remedied, which by their nature cannot reasonably be done, taken or remedied, as the case may be, within such thirty (30) day (or lesser) period, no Tenant Default shall be deemed to have occurred or to exist if, and as long as, Tenant shall commence such performance within such thirty (30) day (or lesser) period and shall diligently and continuously prosecute the same to completion; or

      **(c)**    If Tenant becomes a Bankrupt Person; or

      **(d)**    If Tenant shall fail to pay any insurance premiums for the insurance coverages required of Tenant hereunder which are then due within ten (10) days after receipt of a notice form the applicable insurance provider stating that the policy or policies in question are to be cancelled within fifteen (15) days following the date of such notice unless the premiums which are due are paid in full; or

      **(e)**    Subject to the provisions herein, in the event that any Required Permits are terminated, lapse or cancelled, or the rights thereunder are lost or removed or withdrawn, or accreditation or certification has been terminated, and the applicable Required Permits are not reinstated or reissued within sixty (60) days following the date of such termination, lapse, cancellation, loss or removal; provided, however, that if such reinstatement requires work to be done, actions to be taken, or conditions to be remedied, which by their nature cannot reasonably be done, taken or remedied, as the case may be, within such sixty (60) day period, no Tenant Default shall be deemed to have occurred or to exist if, and as long as, Tenant shall commence such performance within such sixty (60) day period and shall diligently and continuously prosecute the same to completion; or

      **(f)**    If Tenant concludes any other Transfer which is not permitted by the terms and conditions hereof;

      **20.1.2. <u>Loss of Required Permits</u>.** In the event that any Required Permit has been terminated, lost or withdrawn and in the event that Tenant has available to it an appeal or re-application process during which the Leased Premises may be operated as if the Required Permit has not been terminated, lost or withdrawn, Landlord shall refrain from taking any action hereunder in respect to the Tenant Default in question pending the results of such appeal or re-application process. To the extent that Tenant's appeal or re-application process is rejected and upon such rejection the Required Permit is deemed to be terminated, lost or withdrawn, and as result thereof, Tenant is unable to operate the Leased Premises in a manner consistent in all material respects with operations conducted while the applicable Required Permit was in effect, then in such event a Tenant Default



shall be deemed to have occurred without further notice by Landlord or time to cure by Tenant.

### 20.1.3. <u>Landlord's Remedies Upon a Tenant Default</u>.

(a)    <u>Landlord's Remedies</u>.  Subject to the terms of the Indenture, if a Tenant Default shall have occurred, Landlord shall have the right at its election, then or at any time thereafter while such Tenant Default shall continue, to pursue any one (1) or more of the following remedies:

(i)    Terminate this Lease by giving notice thereof to Tenant, in which event Tenant shall immediately surrender the Leased Premises to Landlord and if Tenant fails so to do, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in Rent, enter upon and take possession of the Leased Premises and (except as regards any patients on the Leased Premises) expel or remove Tenant and any other person who may be occupying said premises, or any part thereof without being liable for prosecution or any claim of damages therefor and Tenant hereby agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether through inability to re-let the Leased Premises on satisfactory terms or otherwise, specifically including, but not limited to, (a) all reasonable expenses necessary to re-let the Leased Premises, which shall include the cost of renovating, making necessary Repairs to and altering the Leased Premises for a new tenant, advertisements and brokerage fees, and (b) any increase in insurance premiums caused by the vacancy of the Leased Premises. Nothing contained in this Lease shall limit or prejudice the right of Tenant to apply for and obtain in proceedings for bankruptcy or insolvency by reason of the termination of this Lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, the damages are to be proved, whether or not the amount be greater, equal to, or less than the amount of the loss or damages referred to above.

(ii)    Enter upon and take possession of the Leased Premises and (except as regards any patient on the Leased Premises) expel or remove Tenant or any other person who may be occupying said premises, or any part thereof, without having any civil or criminal liability therefor and, without terminating this Lease, Landlord shall use commercially reasonable efforts to re-let the Leased Premises or any part thereof for the account of Tenant, in the name of Landlord or otherwise, without notice to Tenant for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Lease Term) and on such conditions (which may include concessions or free rent) and for such uses as Landlord in its absolute discretion may determine and Landlord may collect and receive any rents payable by reason of such re-letting; and Tenant agrees to pay Landlord on demand all reasonable expenses necessary to re-let the Leased Premises which shall include the cost of renovating, making necessary Repairs to and altering the Leased Premises for a new tenant or Tenant, advertisements and brokerage fees, and Tenant further agrees to pay Landlord on demand any deficiency that may arise by reason of such re-letting. Landlord shall not be responsible or liable for any failure to re-let the Leased Premises or any part thereof or for any failure to collect any rent due upon any such re-letting. No such re-entry or taking of possession of



the Leased Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such termination is given to Tenant.

**(iii)** Lawfully enter upon the Leased Premises without having any civil or criminal liability therefor, and do whatever Tenant is obligated to do under the terms of this Lease and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such lawful action, except that Tenant shall not be responsible for damages resulting from the negligence or willful misconduct of Landlord.

**(iv)** Exercise any and all rights and remedies to which it may be entitled as a secured party in and to the Collateral.

Upon the occurrence of a Tenant Default hereunder, all past due sums shall bear interest at the Default Rate from the date due. Additionally, any reasonable cost incurred by Landlord, including reasonable attorneys' fees, in connection with the enforcement of Landlord's remedies shall be due immediately by Tenant upon written demand, together with interest thereon at the Default Rate, from and after the date of demand.

**(b)** **Compliance with Applicable Laws**. Landlord agrees that in connection with the exercise of the remedies set forth herein, Landlord will, with the exercise of its remedies, comply with applicable law, including those provisions of the Texas Property Code regarding re-letting, mitigation of damages, and any successor statutes.

**20.1.4. Continuing Obligations of Tenant.** No repossession of or re-entering on the Leased Premises and no re-letting of the Leased Premises or any part thereof shall relieve Tenant of its liabilities and obligations hereunder, all of which survive such repossession or reentering. In the event of any such repossession or re-entering on the Leased Premises or any part thereof by reason the occurrence of a Tenant Default, Tenant will continue to make the payments of Rent required to be paid by Tenant.

**20.1.5. Payments Due Tenant Upon Surrender.** In the event of the occurrence of a Tenant Default and in the event of the exercise by Landlord of its remedies, all payments due by Landlord to Tenant in respect to the Estimated or Actual Adjusted Working Capital (as both terms are defined below) shall be payable in forty-eight (48) equal consecutive monthly installments commencing on the first day of the first month following the surrender of the Leased Premises by Tenant to Landlord.

**20.3.** **Landlord Default**.

**20.1.1. Landlord Default.** An event of default shall be deemed to have occurred if any of the following events (herein called "**Landlord Default**") shall happen:

**(a)** If Landlord fails to make any payment of any sum required to be paid by Landlord to Tenant when the same shall become due and payable and such



failure continues for ten (10) days after written notice from Tenant to Landlord specifying such default and requesting that same be remedied; or

> **(b)** If Landlord fails to perform any of its other covenants, conditions or provisions under this Lease or the Parking Agreement and such failure continues for thirty (30) days after Tenant gives Landlord written notice thereof specifying such default and requesting that same be remedied; provided, however, that if such performance requires work to be done, actions to be taken, or conditions to be remedied, which by their nature cannot reasonably be done, taken or remedied, as the case may be, within such thirty (30) day (or lesser) period, no Landlord Event of Default shall be deemed to have occurred or to exist if, and as long as, Landlord shall commence such performance within such thirty (30) day (or lesser) period and shall diligently and continuously prosecute the same to completion; or

> **(c)** If Landlord becomes a Bankrupt Person.

**20.1.2. <u>Tenant's Remedies Upon a Landlord Default</u>.** If a Landlord Default shall have occurred, Tenant shall have the right at its election, then or at any time thereafter while such Landlord Default shall continue, to pursue any and all remedies available at law or in equity, including, but not limited to:

> **(a)** Terminate this Lease by giving Landlord thirty (30) days written notice thereof; and/or

> **(b)** Correct, at Landlord's expense, Landlord's Default in a manner consistent with the terms hereof, which amounts shall be due and payable on demand and shall bear interest at the Default Rate until paid; and/or

> **(c)** Obtain damages from Landlord for such default without any requirement of terminating this Lease.

> Additionally, any reasonable cost incurred by Tenant, including reasonable attorneys' fees, in connection with the enforcement of Tenant's remedies shall be due immediately by Landlord upon written demand, together with interest thereon at the Default Rate, from and after the date of demand.

**20.4.    <u>Remedies Cumulative</u>.** No right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative of and in addition to any other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute. In addition to other remedies provided in this Lease, Landlord or Tenant shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation, or attempted or threatened violation, of any of the covenants, agreements, conditions or provisions of this Lease, or to a decree compelling performance of any of the other covenants, Leases, conditions or provisions of this Lease, or to any other remedy allowed to Landlord or Tenant at law or in equity.



**20.5.** **No Implied Waiver**. The failure of either Landlord or Tenant to insist at any time upon the strict performance of any covenant or agreement or to exercise any option, right, power or remedy contained in this Lease shall not be construed as a waiver or a relinquishment thereof for the future. The waiver of or redress for any violation of any term, covenant, agreement or condition contained in this Lease shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation. No express waiver shall affect any condition other than the one specified in such waiver and that one only for the time and in the manner specifically stated. A receipt by Landlord of any Rent with knowledge of the breach of any covenant or agreement contained in this Lease shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord.

**20.6.** **Delay Not to Constitute Waiver**. As a material part of the consideration for Landlord's entry into this Lease, each party hereto hereby waives any applicable exemption laws now or hereafter in force. No failure by either party to insist upon strict performance of this Lease or to exercise any remedy upon the occurrence of a Landlord Default or a Tenant Default shall constitute a waiver of such default, or a waiver or modification of any provision of this Lease and, likewise, no prior course of dealing between the parties hereto shall constitute a waiver of such default or a waiver or modification of any provision of this Lease. Upon the occurrence of a Landlord Default or a Tenant Default, the non-defaulting party may exercise any one (1) or more of the remedies available to it separately or concurrently and as often as required to enforce the defaulting party's obligations. In addition to the other remedies provided in this Lease, the non-defaulting party shall be entitled to the restraint by injunction of the violation, or attempted or threatened violation by the defaulting party of any of the covenants, conditions or provisions of this Lease, and to a decree compelling specific performance of any such covenants, conditions or provisions.

# ARTICLE XXI
## SURRENDER UPON LEASE TERMINATION

**21.1.** **Certain Definitions**. The following terms shall have the meanings specified below for the purposes of this **Article XXI** and elsewhere in this Lease with respect to the Leased Premises:

**21.1.1. "Actual Adjusted Working Capital"** shall mean the Adjusted Working Capital, as of the Lease Termination Date, as finally determined in accordance with the Final Working Capital Report and the provisions hereof.

**21.1.2. "Adjusted Working Capital"** shall mean an amount equal to the aggregate of (a) the Reimbursement Obligation Amount in excess of the Base Amount; plus (b) the Inventory Asset Purchase Price; plus (c) the Pre-Paid Items Amount; minus the sum of the following items: (i) the Employee Liability Amount; plus (ii) the Proration Credit Amount.



**21.1.3. "Assigned Contracts"** shall mean those Contracts which Landlord desires to assume in writing as of the Lease Termination Date, and to which assignment is granted, to the extent applicable, by the appropriate contracting third-party.

**21.1.4. "Assigned Equipment Leases"** shall mean those Equipment Leases which Landlord desires to assume in writing as of the Lease Termination Date.

**21.1.5. "Assumed Transition Liabilities"** shall mean the following obligations and liabilities of Tenant which are to be assumed by Landlord as of the Lease Termination Date:

(a)    Tenant's obligations under any Assigned Contract, but only to the extent of the obligations arising thereunder which apply to events or periods after the Lease Termination Date;

(b)    Tenant's obligations under any Assigned Equipment Lease, but only to the extent of the obligations arising thereunder which apply to events or periods after the Lease Termination Date;

(c)    the Employee Liabilities; and

(d)    all accrued and unpaid Impositions, if any, that are attributable to the Leased Premises for periods prior to the Lease Termination Date, for the calendar year in which the Lease Termination Date occurs and prior periods, to the extent that Landlord has received a Proration Credit Amount in respect thereto.

**21.1.6. "Employee Liabilities"** shall mean all liabilities for the accumulated sick pay, extended sick pay and all accrued vacation and holiday pay liabilities with respect to the Hired Employees as of the Lease Termination Date, all as determined in accordance with GAAP.

**21.1.7. "Employee Liability Amount"** shall mean an amount equal to the aggregate accrued Employee Liabilities as of the Lease Termination Date.

**21.1.8. "Estimated Adjusted Working Capital"** shall mean Tenant's reasonable good faith estimate, made on or prior to the Lease Termination Date, of the Adjusted Working Capital, as of the Lease Termination Date, which shall include Tenant's determination, based upon Tenant's Records, of: (a) the Inventory Asset Purchase Price, (b) the Pre-Paid Items Amount, (c) the Reimbursement Obligation Amount, (d) the Employee Liability Amount, and (e) the Proration Credit Amount.

**21.1.9. "Final Working Capital Report"** shall mean a final report setting forth the Tenant's determination of the Actual Adjusted Working Capital, together with supporting documentation and calculations thereof, issued by Tenant within a reasonable period of time following the Lease Termination Date pursuant to the provisions hereof.



**21.1.10. "<u>Government Payment Programs</u>"** shall mean federal and state Medicare, Medicaid and CHAMPUS, and similar or successor programs with or for the benefit of Governmental Authorities.

**21.1.11. "<u>Hired Employee(s)</u>"** shall mean any Employee who accepts an offer of employment with Landlord as of or after the Lease Termination Date.

**21.1.12. "<u>Inventory Assets</u>"** shall mean Inventory owned or used by Tenant and associated with or employed in the operation of the Leased Premises on the Lease Termination Date which shall (a) be in usable condition on the first day immediately following the Lease Termination Date, (b) shall not have an expired expiration date, and (c) shall not be obsolete.

**21.1.13. "<u>Inventory Asset Purchase Price</u>"** shall mean an amount equal to the invoiced cost of the Inventory Assets, as of the Lease Termination Date, as evidenced by appropriate back-up furnished by Tenant to Landlord, which back-up shall consist of reasonable evidence of invoiced costs which may include entries in Tenant's Records, and if requested by Landlord, copies of actual invoices.

**21.1.14. "<u>Landlord</u>"** shall, as used in this **<u>Article XXI</u>**, be inclusive of any tenant, manager or operator of the Leased Premises after the Lease Termination Date.

**21.1.15. "<u>Lease Termination Date Accounts Receivable</u>"** shall mean all Accounts of Tenant as of the Lease Termination Date and all claims, rights, interests and proceeds related thereto, arising from the rendering of services to inpatients and outpatients at the Leased Premises, billed and unbilled, recorded and unrecorded, for services provided by Tenant prior to the Lease Termination Date while Tenant was the operator of the Leased Premises, whether payable by private pay patients, private insurance, Payors, Medicare, Medicaid, or by any other source.

**21.1.16. "<u>Pre-Paid Items Amount</u>"** shall mean an amount equal to the aggregate amount of prepaid deposits, payments or credits existing for the account of Tenant as of the Lease Termination Date in respect to Impositions, utility services or the Assigned Contracts. The term "<u>Pre-Paid Items Amount</u>" shall exclude any amounts prepaid by Tenant in connection with the Retained Assets or Retained Liabilities.

**21.1.17. "<u>Proration Credit Amount</u>"** shall mean an amount equal to the accrued liabilities as of the Lease Termination Date relating to the operation of the Leased Premises which constitute a portion of the Assumed Transition Liabilities for accrued liabilities for Impositions, utility services and accrued sums payable under the Assigned Contracts.

**21.1.18. "<u>Retained Assets</u>"** shall mean those assets of Tenant, as of the Lease Termination Date, described below:

    **(a)**    cash and cash equivalents;



**(b)** all amounts payable to Tenant in respect of Payors pursuant to retrospective settlements (including, without limitation, pursuant to Cost Reports filed or to be filed by Tenant with respect to the Leased Premises for periods prior to the Lease Termination Date or any reimbursement from Medicare or Medicaid as a result of any loss suffered by Tenant in respect to the termination of this Lease for purpose of Medicare or Medicaid reimbursement), including depreciation "recapture" (gain or loss) whether recorded as a current or long-term asset;

**(c)** all Tenant Retained Records;

**(d)** all claims, causes in action and judgments in favor of Tenant relating to the Leased Premises;

**(e)** computer software and related hardware and programs which are Proprietary Assets and associated data processing systems manuals and licensed software and related materials;

**(f)** any prepaid expenses related to Retained Assets and Retained Liabilities (such as prepaid legal expenses, maintenance or service Lease prepayments or insurance premiums);

**(g)** tax accruals and tax revenues received after the Lease Termination Date and all claims, rights, interests and proceeds with respect to state or local tax refunds (including but not limited to property tax) resulting from periods ending on or before the Lease Termination Date, and the right to pursue appeals of same;

**(h)** all inter-company receivables of Tenant with any of Tenant's Affiliates;

**(i)** all of Tenant's or its Affiliates (i) manuals, (ii) marketing materials and brochures, (iii) policy and procedure manuals, and (iv) standard operating procedures, data and studies or analyses related thereto which constitute or relate to Proprietary Assets or which are related to Tenant's corporate environment;

**(j)** any asset which would revert to the employer upon the termination of any Benefit Plan of Tenant, including assets representing a surplus or overfunding of any Benefit Plan;

**(k)** all Contracts, other than the Assigned Contracts, including, but not limited to, any Contracts which are available only to Tenant or its Affiliates;

**(l)** the name of Tenant and any other similar names or symbols, all abbreviations and variations thereof and service marks, symbols and logos related thereto, together with any promotional material, stationery, supplies or other items of inventory bearing such names or symbols or abbreviations or variations thereof;



**(m)** any assets owned and provided by vendors of services or goods to the Leased Premises; and

**(n)** all Lease Termination Date Accounts Receivable, together with all documents, records, correspondence, work papers and other documents relating to the Lease Termination Date Accounts Receivable.

**21.1.19. "Retained Liabilities"** shall mean any liability, indebtedness, commitment or obligation of Tenant, as of the Lease Termination Date, other than those liabilities, indebtedness, commitments or obligations included within the Assumed Transition Liabilities, whether known or unknown, fixed or contingent, recorded or unrecorded, currently existing or hereafter arising or otherwise, including, without limitation:

**(a)** any debts or payables of Tenant;

**(b)** claims or potential claims for medical malpractice, negligence, and other claims to the extent based upon acts or omissions of Tenant or its Affiliates or their respective directors, officers, employees and/or agents, whether such claims are asserted before or after the Lease Termination Date;

**(c)** any liabilities associated with or arising out of any of the Retained Assets;

**(d)** liabilities and obligations of Tenant in respect of periods prior to the Lease Termination Date arising under the terms of the Medicare, Medicaid or other Payor programs;

**(e)** federal, state or local tax liabilities or obligations of Tenant in respect of periods prior to the Lease Termination Date, including, without limitation, any income tax, any franchise tax, any tax recapture, and any sales and/or use tax and any FICA, FUTA, workers compensation and any and all other taxes or amounts due and payable as a result of the exercise by the Employees at the Leased Premises of such Employee's right to vacation, sick leave and holiday benefits accrued while in the employ of Tenant (provided, however that this clause (e) shall not apply to any and all taxes payable with respect to any Employee Liabilities which constitute Assumed Transition Liabilities), and any liabilities or obligations to former employees of Tenant under COBRA;

**(f)** liability (other than Employee Liabilities) for any and all claims by or on behalf of Tenant's Employees to the extent relating to periods prior to the Lease Termination Date, including, without limitation, liability for any Benefit Plans, liability for any EEOC claim, wage and hour claim, unemployment compensation claim or workers compensation claim;

**(g)** liabilities or obligations either arising as a result of (i) any breach by Tenant at any time of any Contract which is not an Assigned Contract, or (ii) any breach by Tenant of any Assigned Contract prior to the Lease Termination Date;



(h)    any debt, obligation, expense or liability of Tenant arising out of or incurred solely as a result of any transaction entered into by Tenant occurring after the Lease Termination Date, except to the extent Landlord is expressly obligated therefore under the terms of this Lease;

(i)    any civil or criminal debt, obligation, expense or liability accruing, arising out of, or relating to any acts or omissions of Tenant, its Affiliates or their respective directors, officers, employees and agents claimed to violate any Governmental Regulations as such relate to the period ending on the Lease Termination Date; and

(j)    any other liability, fixed or contingent of Tenant, relating to the Leased Premises, the Contracts or the Inventory Assets occurring prior to the Lease Termination Date and which do not constitute an Assumed Transition Liabilities.

### 21.2.    **Surrender of Possession Upon Termination**.

**21.1.1. Early Surrender.**  Except upon the termination or expiration of the Lease Term, or the termination of this Lease due to the acquisition by Tenant of the Leased Premises, no surrender by Tenant to Landlord of this Lease or of the Leased Premises or any part thereof, or of any interest therein, shall be valid or effective unless agreed to and accepted in writing by Landlord and no act by Landlord or any representative or agent of Landlord, other than such a written acceptance by Landlord, shall constitute an acceptance of any such surrender.

**21.1.2. Surrender and Delivery of the Leased Premises Free and Clear of All Liens; Condition of the Leased Premises.**  Tenant will, upon the expiration or prior termination of the Lease Term, whether caused by lapse of time or otherwise, vacate and surrender the Leased Premises and the Inventory Assets, subject to the payments due by Landlord pursuant to **Section 21.3.1**, to Landlord:

(a)    free and clear of all liens and encumbrances, other than:

(i)    the Permitted Title Exceptions, and

(ii)    those additional liens and encumbrances placed against the Leased Premises by Landlord or permitted by Landlord during the Lease Term, and

(b)    in a condition which complies with the requirements of this Lease, except

(i)    as repaired, remodeled, rebuilt, restored, altered or added to as permitted or required by the provisions of this Lease, or

(ii)    damage by casualty or condemnation (subject to the obligation of Tenant to restore or repair as set forth in this Lease).

**21.1.3. Landlord's Right to Take Possession.**  If possession of the Leased Premises is not immediately surrendered, Landlord may forthwith enter upon and take possession of the Leased Premises and expel or remove Tenant and any other person



(other than any patients on the Leased Premises) who may be occupying the Leased Premises, or any part thereof, by force, if necessary, without having any civil or criminal liability therefor.

**21.1.4. <u>Additions - Property of Landlord</u>.** All Capital Additions and other additions to or alterations of, or modifications to, and improvements to, the Leased Premises (whether temporary or permanent in character) made in or upon the Leased Premises and, except as otherwise expressly provided herein, Equipment installed in the Leased Premises, either by Landlord or Tenant, shall be Landlord's property on termination of this Lease and shall remain on the Leased Premises without compensation to Tenant except as otherwise expressly provided for herein.

**21.1.5. <u>Fully Equipped; Condition and Quantity of FF&E and Equipment</u>.**

**(a)** On the Lease Termination Date, subject to the payment of the Adjusted Working Capital and the assumption by Landlord of the Assumed Transition Liabilities, the Leased Premises shall be equipped and stocked with Inventory, Equipment, FF&E, and the Personal Property in such condition and/or in such quantities to permit Landlord to have the ability to operate the Leased Premises in substantially the same manner and substantially to the same extent as the Leased Premises have been operated by Tenant during the previous thirty-six (36) months, assuming a census, bed occupancy and availability of ancillary services consistent with such operating history and taking into consideration the level of healthcare being delivered at the time in question and the community demands at that time, so as to permit effective and efficient operation of the Leased Premises in a manner consistent with the terms and provisions of this Lease.

**(b)** The foregoing covenant is not intended to expand Tenant's obligations, assuming that those obligations have been performed over the Lease Term in accordance with the terms of this Lease; but the foregoing provisions are intended to provide that Tenant shall surrender the Leased Premises in a condition that permits Landlord to immediately operate the Leased Premises in the ordinary course of business in a manner consistent with the guidelines set forth herein in respect to Tenant's operating covenants and responsibilities.

**(c)** Tenant's obligations regarding the condition of the Leased Premises on the Lease Termination Date shall take into consideration the fact that the Improvements and/or Equipment may not be new, but have a remaining Useful Life so long as such Improvements and/or Equipment are in good working order. Thus, in no event shall Tenant be obligated to replace Equipment which has a remaining Useful Life on the Lease Termination Date.

**21.3. <u>Payments Upon Surrender</u>.**

**21.1.1. <u>Estimated Adjusted Working Capital</u>.** At least ten (10) Business Days prior to the Lease Termination Date, Tenant shall deliver to Landlord a written certification setting forth the Estimated Adjusted Working Capital, which estimate shall contain reasonable detail showing the derivation of such estimate.



**21.1.2. <u>Payments Due Tenant</u>.** On the Lease Termination Date, Landlord shall be obligated to pay to Tenant an amount equal to the Estimated Adjusted Working Capital. The sums paid on the Lease Termination Date shall be adjusted based upon the Final Working Capital Report and sums due to Tenant or payable by Tenant in respect to the Actual Adjusted Working Capital shall be determined in accordance with the provisions of **<u>Section 21.3.4</u>** hereof.

### 21.1.3. <u>Determination of the Value of the Inventory Assets</u>.

**(a)**    For purposes of the determination of the Actual Adjusted Working Capital, the value of the Inventory Assets shall be as determined pursuant to this **<u>Section 21.3.3</u>** Landlord and Tenant jointly shall cause an actual count or inventory to be taken of the Inventory Assets by an independent third party, qualified in the taking of inventories of the nature of the Inventory Assets in connection with the sale and transfer of business assets, which party shall be selected by Landlord. The inventory or count shall be concluded within three (3) Business Days prior to the Lease Termination Date, with the results extended and adjusted through the Lease Termination Date. Tenant and Landlord both shall have their respective representatives or employees present to observe such inventory process. The cost of conducting the inventory shall be borne by Tenant and Landlord equally. All Inventory Assets shall be valued at Tenant's actual invoiced cost (after rebates or credits).

**(b)**    Landlord and Tenant acknowledge that the inventory to be taken pursuant to this **<u>Section 21.3.3</u>** will not be conducted until immediately prior to the Lease Termination Date and, as such, the results of such inventory will not be available until sometime after the Lease Termination Date. Accordingly, the parties agree that for purposes of determination of the Estimated Adjusted Working Capital, the value of the Inventory Assets shall be as reflected by the latest available unaudited financial reports or inventory lists prepared by Tenant in the ordinary course of business.

### 21.1.4. <u>Determination of Actual Adjusted Working Capital</u>.

**(a)**    Within sixty (60) days after the Lease Termination Date, Tenant shall prepare and deliver to Landlord the Final Working Capital Report which shall set forth Tenant's calculation of the Actual Adjusted Working Capital, as of the Lease Termination Date.

**(b)**    If Landlord disputes any entry on the Final Working Capital Report and the resulting computation of the Adjusted Working Capital, Landlord shall notify Tenant in writing (which writing shall contain in detail the reasons for such dispute or questions which have arisen) within thirty (30) days after Landlord's receipt of the Final Working Capital Report from Tenant.

**(c)**    If Landlord agrees with the determination of Actual Adjusted Working Capital as set forth on the Final Working Capital Report, or fails to object within such thirty (30) day period, the Actual Adjusted Working Capital as set forth on the Final Working Capital Report shall be the Actual Adjusted Working Capital to be utilized for the



purposes hereof, and Landlord and Tenant shall, within sixty (60) days after the Lease Termination Date, pay to or receive from the other such amounts which will result in Tenant receiving the proper amount of the Actual Adjusted Working Capital, as reflected in the Final Working Capital Report.

(d)    If Landlord and Tenant cannot reconcile or resolve any dispute with respect to the Final Working Capital Report within thirty (30) days after Landlord notifies Tenant in writing of the disputed matter, then Landlord and Tenant shall select a Certified Public Accountant experienced in hospital industry accounting procedures, who shall review the matters in dispute and shall promptly recommend corrections to the manner in which the Adjusted Working Capital has been computed. Such recommendation shall also include a final recalculation of the amount of the Adjusted Working Capital. The recommendation of the Certified Public Accountant shall be conclusive and binding as between Landlord and Tenant, and the costs of such review shall be borne by both Tenant and Landlord in proportion to the relevant amount each party's determination has been modified.

(e)    In the event, at the Lease Termination Date, the Adjusted Working Capital is a negative number, the Actual Adjusted Working Capital Amount shall be an amount equal to One Dollar ($1.00).

### 21.4.    Transition Procedures.

#### 21.1.1. Good Faith Efforts to Cooperate.

(a)    Tenant shall reasonably cooperate in good faith to provide access and information to any prospective purchaser or tenant or manager of the Leased Premises who may acquire, lease or manage the Leased Premises upon the expiration or termination of the Lease Term in the same manner as Tenant is required to provide access and information of Landlord upon the expiration of the Lease Term.

(b)    Upon any expiration or earlier termination of the Lease Term, Landlord and Tenant in general shall reasonably cooperate in good faith to affect an orderly transition of the management and operation of the Leased Premises.

#### 21.1.2. Transitional Information.    Subject to applicable licensing arrangements, Tenant shall provide transitional information services and related access to software to Landlord from and after the Lease Termination Date for a period not to exceed one (1) year. Landlord will pay Tenant a commercially reasonable fee for informational services, a passthrough of Tenant's actual costs for providing such services consistent with actual prior period allocations assuming no change in systems or support, plus conversion costs. Tenant's obligation to offer information and to provide credit collection services will be determined by the facts and circumstances on the Lease Termination Date. If all capabilities are inherent within the Leased Premises, it should not be necessary for Tenant to provide these services after the Lease Termination Date.



**21.1.3. <u>Survival</u>.** The provisions of this **<u>Section 21.4</u>** shall survive the expiration or earlier termination of the Lease Term until they have been fully performed. Nothing contained herein shall limit Landlord's rights and remedies under this Lease if such termination occurs as the result of a Tenant Default.

**21.5.** **<u>Transfer of Assets at Lease Termination</u>.** On the Lease Termination Date, Tenant shall assign, reassign, transfer, convey, release, quitclaim and deliver to Landlord, and Landlord shall acquire or accept or receive, or Tenant shall take the other action set forth below, all of Tenant's right, title and interest in and to each of the following assets and properties, as such assets and properties shall exist on the Lease Termination Date with respect to the operation of the Leased Premises:

**21.1.1. <u>The Leased Premises, Equipment, FF&E, Personal Property and Additions</u>.** Tenant shall deliver the Leased Premises, including all Equipment, FF&E, any additions to or alterations of or modifications to or improvements to the Leased Premises and other Personal Property that is owned or leased by Tenant and used with respect to the operation of the Leased Premises and required by the terms of this Lease to be delivered or transferred to Landlord by Tenant.

**21.1.2. <u>Required and Other Permits</u>.** Upon the expiration or earlier termination of the Lease Term, Tenant shall either:

**(a)** transfer to Landlord's designee all Required Permits and other permits and licenses, to the extent assignable or transferable, which may be necessary for the operation of the Leased Premises, or

**(b)** transfer to Landlord's designee Tenant's provider number or other similar designations under all Payor programs to the extent assignable or transferable; or

**(c)** if such transfer is prohibited by law, not permitted by a third party or Landlord otherwise elects, reasonably cooperate with Landlord's designee in connection with the processing by Landlord's designee of any applications for Required Permits and other permits and licenses, including, but not limited to, Landlord's processing of any applications for new provider numbers; provided, in either case, that the costs and expenses of any such transfer or the processing of any such application shall be paid by Landlord's designee.

**21.1.3. <u>Contracts and Equipment Leases</u>.** Tenant shall seek assignment to Landlord's designee simultaneously with the termination of this Lease, and the assignee shall assume, all Contracts and/or Equipment Leases in effect with respect to the Leased Premises then in Tenant's name, to the extent that (a) Tenant desires to assign such Contracts and/or Equipment Leases, and (b) the terms of such Contracts and/or Equipment Leases are commercially reasonable. To the extent that either or both of the requirements set forth in clauses (a) or (b) in the preceding sentence are not satisfied, then the applicable Contract or Equipment Lease shall remain the property of and responsibility of Tenant from and after the Lease Termination Date. Landlord and Tenant acknowledge



that certain of the Contracts and Equipment Leases may not be assignable by their terms without the prior written consent of the applicable vendor. In this regard Tenant makes no representation or warranty as to whether or not such Contracts or Equipment Leases can be assigned.

      **21.1.4. Pre-Paid Items.** Tenant shall transfer all of Tenant's rights and interests in and to any advance payments, prepayments, prepaid expenses, deposits and the like which exist as of the Lease Termination Date, to the extent that such items are included within the Pre-Paid Items Amount.

      **21.1.5. Inventory Assets.** Tenant shall deliver at the Leased Premises all Inventory Assets.

      **21.1.6. Warranties.** Tenant shall assign and transfer all Warranties, to the extent assignable.

      **21.1.7. Keys and Locks.** Upon termination of this Lease, Tenant shall deliver to Landlord all keys to all doors of the Leased Premises, and give to Landlord the explanation of the combination of all locks for safes, safe cabinets, and vault doors, if any, in the Leased Premises.

      **21.1.8. Conveyance.** The transfer of the Inventory Assets, Pre-Paid Items, the Data Processing Materials, the Assigned Contracts and the Assigned Equipment Leases shall be made by the execution and delivery by Tenant of a Bill of Sale and Assignment in substantially the form attached. The Bill of Sale and Assignment shall provide for the assumption by Landlord of the Assumed Transition Liabilities.

      **21.6.**    **Retained Assets and Liabilities.** Upon the termination of this Lease, Tenant shall retain title to all Retained Assets and shall remain liable for all Retained Liabilities existing as of the Lease Termination Date.

      **21.7.**    **Assumption of Certain Liabilities by Landlord.** On the Lease Termination Date, Landlord shall assume and thenceforth be liable and responsible for, the Assumed Transition Liabilities; provided, however, that in no event shall Landlord assume or be liable for any of the Retained Liabilities.

      **21.8.**    **Transitional Arrangements.**

      **21.1.1. Operational Transition.** To compensate Tenant for services rendered and medicine, drugs and supplies provided on or before the Lease Termination Date (the "**Lease Termination Date Transition Services**") with respect to patients admitted to the Leased Premises on or before the Lease Termination Date, but who are not discharged until after the Lease Termination Date (such patients being referred to herein as the "**Lease Termination Date Transition Patients**"), Landlord and Tenant shall take the following actions:



(a)    **Payments for Lease Termination Date Transition Services Provided to Lease Termination Date Transition Patients**.

(i)    With respect to all Lease Termination Date Transition Patients, including without limitation, those whose medical care is paid for, in whole or in part, by Medicare, Medicaid or any other Payor that makes reimbursements on the basis of a diagnostic related group, case rate or similar basis (such Lease Termination Date Transition Patients being referred to herein as the "**DRG Lease Termination Date Transition Patients**"), the parties shall take the following actions:

1.    As soon as practicable after the Lease Termination Date, Tenant shall deliver to Landlord a statement itemizing the Lease Termination Date Transition Services provided by Tenant on or though the Lease Termination Date to DRG Lease Termination Date Transition Patients.

2.    Landlord shall pay to Tenant an amount equal to:

3.    the DRG and other payments received by Landlord on behalf of a DRG Lease Termination Date Transition Patient, multiplied by a fraction, the numerator of which shall be the total charges for the Lease Termination Date Transition Services provided to such DRG Lease Termination Date Transition Patient by Tenant, and the denominator of which shall be the sum of (A) the total charges of the Lease Termination Date Transition Services provided to such DRG Lease Termination Date Transition Patient by Tenant, plus (B) the total charges charged by Landlord to such DRG Lease Termination Date Transition Patient after the Lease Termination Date, <u>minus</u>

4.    any deposits or co-payments made by such DRG Lease Termination Date Transition Patient to Tenant and retained by Tenant.

5.    Such payment shall be made to Tenant by Landlord monthly, on the fifth (5th) day of each month for payments received by Landlord for the previous month, accompanied by copies of remittances and other supporting documentation as reasonably required by Tenant. In the event that the amount of payments received by Landlord in respect of DRG Lease Termination Date Transition Patients exceeds the sum of Fifty Thousand and No/100ths Dollars ($50,000.00) during any period that is shorter than a month, Landlord shall pay such amounts to Tenant within three (3) Business Days after the Fifty Thousand and No/100ths Dollars ($50,000.00) threshold has been met. Any such payments shall be accompanied by copies of remittances and other supporting documentation as reasonably required by Tenant.

6.    If Landlord receives any amounts from the Medicare program for capital costs associated with the operation of the Leased Premises and relating to periods prior to Lease Termination Date, Landlord shall promptly tender same to Tenant.

7.    If Tenant receives any amounts from the Medicare program for capital costs associated with the operations of the Leased Premises



relating to periods subsequent to the Lease Termination Date, Tenant shall promptly tender same to Landlord.

**8.** Each party shall receive cost reimbursement (including capital costs) for those patients receiving services at the time such party operated the Leased Premises based upon the Cost Report filed by such party.

**(ii)** With respect to all Lease Termination Date Transition Patients who are not DRG Lease Termination Date Transition Patients (such patients being herein referred to as the "**Non-DRG Lease Termination Date Transition Patients**"), the parties shall take the following actions:

**1.** Immediately prior to the Lease Termination Date, Tenant shall prepare cut-off billings for all Non-DRG Lease Termination Date Transition Patients (which shall include Lease Termination Date Transition Patients whose medical care is paid for, in whole or in part, by Medicare or Medicaid on a cost basis). Tenant shall be entitled to receive amounts collected in respect of such cut-off billings.

**2.** With respect to Non-DRG Lease Termination Date Transition Patients whose cut-off billings cannot be prepared immediately prior to the Lease Termination Date, Landlord shall pay to Tenant an amount equal to:

**3.** the payments received by Landlord after the Lease Termination Date on behalf of a Non-DRG Lease Termination Date Transition Patient, multiplied by a fraction, the numerator of which shall be the total charges for Lease Termination Date Transition Services provided to such Non-DRG Patients by Tenant, and the denominator of which shall be the sum of (A) the total charges of the Lease Termination Date Transition Services provided to such Non-DRG Lease Termination Date Transition Patient by Tenant, plus (B) the total charges charged by Landlord to such Non-DRG Patient after the Lease Termination Date, <u>minus</u>

**4.** any deposits or co-payments made by such Non-DRG Lease Termination Date Transition Patient to Tenant and retained by Tenant. Any payments received by Landlord relating to such cut-off claims shall be remitted to Tenant within five (5) Business Days of receipt.

**(iii)** In the event that Landlord and Tenant are unable to agree on the amount to be paid to Tenant under **Section 24.8.1.(a)(i) or (ii)**, then such amount shall be determined by a Certified Public Accountant with expertise in such matters mutually acceptable to Landlord and Tenant at their joint expense.

**(iv)** If Landlord receives any amounts from the Medicare program for capital costs associated with the operation of the Leased Premises and relating to periods prior to Lease Termination Date, Landlord shall promptly tender same to Tenant.

**(v)** If Tenant receives any amounts from the Medicare program for capital costs associated with the operations of the Leased Premises relating to



periods subsequent to the Lease Termination Date, Tenant shall promptly tender same to Landlord.

**(vi)** The parties acknowledge that all charges for outpatient and other cost-based services shall be made by Tenant for all periods ending before the Lease Termination Date and by Landlord for all periods ending after the Lease Termination Date.

**(b)** <u>Other Payments</u>. Except with amounts transferred to Tenant, if either Landlord or Tenant receives any amount from patients or third-party payors which relate to services rendered by the other party, the party receiving such amounts shall immediately remit such amounts in their entirety to the other party. Metrocrest shall have the right to review the cash remittance advice information maintained by Tenant in order to assist in the proper determination of to whom such amounts are owed.

**21.1.2.** <u>Medicare and Medicaid Billings After Lease Termination Date</u>. Landlord shall bill for services provided by Landlord on or after the Lease Termination Date to Medicare and Medicaid beneficiaries until such time as Landlord has received approval of the change of ownership of the Leased Premises from the Centers For Medicare and Medicaid Services of the United States Departments of Health and Human Services and certification on the Medicare and Medicaid programs and is able to bill and collect for services provided to Medicare and Medicaid beneficiaries.

**21.1.3.** <u>Preparation and Submission of Charges</u>. Landlord shall prepare all charges and bills with respect to services provided by Landlord on or after the Lease Termination Date to Medicare and Medicaid beneficiaries. Landlord, as Tenant's billing agent, promptly shall submit or arrange to have submitted, all such charges and bills to the appropriate Payor using Tenant's tax identification number.

**21.1.4.** <u>No Offset Against Other Payments</u>. Each party will promptly deliver to the other all funds due to such other party without any offset or reduction. Each party specifically agrees that it will not retain any funds or amounts in its possession or control which are due hereunder to the other party as a credit or offset against any amount such party is or may be owed by such other party.

**21.1.5.** <u>Lease Termination Date Accounts Receivable</u>. Upon Tenant's request, Landlord agrees to collect, or cause to be collected, any other of Tenant's Lease Termination Date Accounts Receivable, which pertain to Tenant's operations of the Leased Premises prior to the Lease Termination Date for up to one (1) year at a mutually acceptable and commercially reasonable fee. The necessity of these collection services shall be determined by the facts and circumstances as of the Lease Termination Date.

**21.9.** <u>Defense of Claims; Landlord's and Tenant's Cooperation</u>.

**21.1.1.** <u>Landlord's Cooperation</u>. Landlord shall give Tenant and its Affiliates and its insurance carriers reasonable cooperation in respect of the defense of claims by third parties against Tenant, in respect of events occurring on or prior to the Lease Termination Date with respect to the operation of the Leased Premises. Such



cooperation shall include, without limitation, using reasonable efforts to make employees available for interviews, depositions, hearings and trials. Such cooperation shall also include using reasonable efforts to make all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses. Landlord shall be reimbursed for its reasonable cost, including personnel cost, incurred in respect to the performance of the obligations set forth herein.

        **21.1.2. Tenant's Cooperation.** Tenant shall give Landlord and its Affiliates and its insurance carriers reasonable cooperation in respect of the defense of claims by third parties against Landlord, arising out of events occurring on or prior to the Lease Termination Date with respect to the operation of the Leased Premises. Such cooperation shall include, without limitation, using reasonable efforts to make all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses. Tenant shall be reimbursed for its reasonable cost, including personnel cost, incurred in respect to the performance of the obligations set forth under this **Section 21.9.2**.

        **21.10.    Third Party Consents.** Anything contained herein to the contrary notwithstanding, this Lease shall not constitute an agreement to assign any claim, right, contract, license, lease, commitment, sales order or purchase order, if an attempted assignment thereof without the consent of the other party thereto would constitute a breach thereof or in any material way affect the rights of Tenant thereunder, unless such consent is obtained. Each of Landlord and Tenant shall use their commercially reasonable efforts to obtain any third-party consents to the transactions contemplated by this Lease. If such consent is not obtained, or if an attempted assignment would be ineffective or would materially affect the rights thereunder of Tenant, so that Landlord would not in fact receive all such rights, Landlord and Tenant shall cooperate in good faith in any reasonable arrangement designed to provide for Landlord the benefits under any such claim, right, contract, license, lease, commitment, sales order or purchase order, including, without limitation, enforcement of any and all rights of Landlord against the other party or parties thereto arising out of the breach or cancellation by such other party or otherwise.

        **21.11.    Landlord's Cost Reports.**

        **21.1.1. Preparation and Filing of Costs Reports.** Landlord will prepare and timely file all Cost Reports required to be filed after the Lease Termination Date for periods ending on or prior to the Lease Termination Date, including any terminating Cost Report required as a result of the execution and delivery of this Lease. Tenant agrees to provide Landlord with any information Landlord shall reasonably require in regard to the preparation of the Cost Reports.

        **21.1.2. Tenant's Rights Regarding Its Cost Reports.** Tenant shall retain all rights to Tenant's Cost Reports, including all amounts due to Tenant with respect to the period prior to the Lease Termination Date, any payables resulting from or reserves relating to the Cost Reports and the right to appeal any Medicare determinations relating to the Cost Reports. Landlord will forward to Tenant any and all correspondence, remittances



and demands relating to Tenant's Cost Reports received by Landlord from and after the Lease Termination Date within five (5) Business Days after receipt by Landlord.

**21.12.** **Confidentiality**.  Landlord acknowledges that, as a result of the expiration or termination of this Lease and the assumption of the responsibility to operate the Leased Premises, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality. Landlord hereby agrees that it shall abide by any such rules and regulations relating to the confidential information it acquires.

**21.13.** **Changes in Laws and Procedures**.  Landlord and Tenant recognize that the procedures set forth in this **Article XXI** have been based upon existing laws and procedures which are in place on the Effective Date. To the extent that the applicable laws governing hospital operations and the matters described herein have changed or are no longer applicable on the Lease Termination Date, Landlord and Tenant agree to make such adjustments as may be necessary to give effect to the intent of the foregoing provisions as if such laws had not been changed and remained applicable.

The provisions of this Article XXI shall not apply in the event of the termination of this Lease due to the acquisition by Tenant of the Hospital and MOBs.

## ARTICLE XXII
### HOLDING OVER

**22.1.** **Certain Definitions**.  For the purposes of this **Article XXII**, the following terms shall have the following meanings:

**22.1.1. "Hold Over"** shall mean the retention of possession of the Leased Premises, or any material or substantial part thereof, by Tenant from and after the Lease Termination Date, without the approval or acquiescence of Landlord, other than possession or occupancy of portions of the Leased Premises required for the transition of the operations of the Leased Premises wherein each instance, all Gross Revenues from operations flow to, are paid to and inure to the benefit of Landlord.

**22.1.2. "Gross Revenues"** shall mean all receipts, revenues, income and other monies received by or on behalf of Tenant or accrued to the benefit of Tenant from the operation of the Leased Premises for each Lease Year and all rights to receive the same, including, but not limited to, patient and other revenues derived from the operation of the Leased Premises, all computed in accordance with GAAP.

**22.2.** **Holding Over**.  On or before the Lease Termination Date, Tenant shall immediately vacate and surrender the Leased Premises to Landlord and from and after the Lease Termination Date Tenant shall have no right to the continued occupancy of the Leased Premises (other than for purposes of fulfilling Tenant's obligations in connection with the transition of the Leased Premises) or to the revenues generated from the operation of the Leased Premises. In the event that Tenant remains in possession of the Leased Premises, or any part thereof, from and after the Lease Termination Date, which



possession constitutes a Hold Over, as that term is defined above, the retention of possession of the Leased Premises in such a manner shall be (a) in violation of the terms and conditions of this Lease, (b) without the approval or acquiescence of Landlord, and (c) governed by the following provisions:

      **(a)** From and after the Lease Termination Date:(i) All revenues generated as a result of the operation of the Leased Premises shall be and remain the sole property of Landlord and (ii) If Tenant shall receive any revenues, such revenues shall be received and held IN TRUST for the benefit and account of Landlord and shall be promptly delivered over to Landlord.

      **(b)** Tenant's retention of possession which constitutes a Hold Over shall be considered a breach of Tenant's obligations under this Lease and Tenant immediately shall become liable for and shall indemnify and hold Landlord harmless against any and all damages suffered by or incurred by Landlord as a result of such breach, including but not limited to:(i) the actual, reasonable costs of recovering the Premises, including reasonable attorneys' fees and costs; (ii) unpaid Rent due as of the Lease Termination Date, (iii) the amount of the excess of (A)the Gross Revenues and other benefits which Landlord would have received from the operation of the Leased Premises from and after the Lease Termination Date, over (B) operating and other expenses which Landlord would have incurred in the ordinary course of business, payable on a daily basis, (iv) interest on such at the Default Rate; and (v) all other sums or damages incurred or suffered by Landlord, without double counting the amounts paid to Landlord pursuant to (iii) and (iv) above.

      **(c)** Notwithstanding the above, in no event shall any Hold Over by Tenant be deemed to be a Tenant Default under the Lease.

      **(d)** In the event of a Hold Over, any sums due Tenant under the provisions of the Lease shall be abated until such time as Tenant has vacated and surrendered the Leased Premises in accordance with the provisions hereof. Any sums due Tenant thereunder shall be subject to offset or reduction for the damages suffered by Landlord as contemplated by the provisions of subparagraph (b) above.

      **(e)** In the event of a Hold Over, Landlord shall be entitled to pursue whatever remedy that may be available in law or in equity to recover possession of the Leased Premises and to recover damages as a result of such Hold Over.

    **22.3.**   **Certain Limitations**. Notwithstanding any provision of this **Article XXII** to the contrary, a Hold Over under this Lease shall not be deemed to have occurred resulting solely from the following: (a) the presence of any of the Retained Assets within the Leased Premises after the Lease Termination Date; (b) the presence of Employees, contractors or agents of Tenant or of Tenant's Affiliates within the Leased Premises after the Lease Termination Date for the purpose of: (i) moving and transporting Retained Assets and personal effects; (ii) performing Transition Services, or (iii) complying with Tenant's legal obligations for patient safety and operation of the Leased Premises or with



respect to the Retained Liabilities; (c) receipt by Tenant of any monies generated by the Leased Premises after the Lease Termination Date so long as Tenant promptly accounts for and turns those funds over to Landlord; provided, however, that any such occupancy, presence or possession of any part of the Leased Premises after the Lease Termination Date will not interfere with the possession and operation of the Leased Premises by Landlord or any successor lessee or manager. In addition, Tenant will have a period of up to thirty (30) days after the Lease Termination Date to remove its personal effects and Retained Assets from the Leased Premises, unless such assets are required for Tenant's performance of its obligation in respect to providing Transition Services, in which event the period for removal shall be extended for a reasonable period of time after the completion of the Transition Services.

### ARTICLE XXIII
### INDEMNIFICATION

**23.1.    Tenant's Indemnity Covenants.**

**23.1.1. Tenant's Indemnity. TENANT SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND EACH LANDLORD INDEMNIFIED PARTY FROM AND AGAINST, WITHOUT DUPLICATION, ALL PROCEEDINGS, CLAIMS, DAMAGES, LOSSES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE) PENALTIES AND REASONABLE OUT-OF-POCKET COSTS (WHETHER INITIATED OR SOUGHT BY GOVERNMENTAL AUTHORITIES OR PRIVATE PARTIES), INCLUDING REASONABLE FEES FOR ATTORNEYS AND EXPERT WITNESSES, INVESTIGATORY FEES, AND REMEDIATION COSTS, WHETHER INCURRED IN CONNECTION WITH ANY JUDICIAL OR ADMINISTRATIVE PROCESS OR OTHERWISE, ACTUALLY IMPOSED UPON OR INCURRED BY OR ASSERTED AGAINST THE INDEMNIFIED PARTY (COLLECTIVELY, "LANDLORD INDEMNIFIED MATTERS") TO THE EXTENT ARISING OUT OF OR BY REASON OF:**

(a)    ANY ACCIDENT, INJURY TO OR DEATH OF PERSONS OR LOSS OF OR DAMAGE TO PROPERTY OCCURRING ON OR ABOUT THE LEASED PREMISES, DURING THE LEASE TERM OR WHILE THE LEASED PREMISES ARE IN THE POSSESSION OR CONTROL OF TENANT, EXCEPT TO THE EXTENT ARISING FROM LANDLORD'S FAILURE TO FULFILL THE LANDLORD RETAINED OBLIGATIONS OR LANDLORD'S WILLFUL MISCONDUCT OR NEGLIGENCE;

(b)    ANY FAILURE ON THE PART OF TENANT TO PAY, PERFORM OR COMPLY WITH ANY OF THE TERMS OF THIS LEASE, THE PARKING AGREEMENT OR THE BILL OF SALE;

(c)    ANY LOSS SUFFERED BY LANDLORD AS A RESULT OF TENANT'S FAILURE TO PAY THE COSTS, EXPENSES, AND OBLIGATIONS; PROVIDED THAT, IN NO EVENT SHALL TENANT BE LIABLE OR OBLIGATED TO INDEMNIFY LANDLORD FOR ANY LOSS SUFFERED BY LANDLORD TO THE EXTENT SAME IS THE RESULT OF LANDLORD'S VIOLATION OF GOVERNMENTAL REGULATIONS, ITS NEGLIGENCE OR



WILLFUL MISCONDUCT, OR AS A RESULT OF LANDLORD'S BREACH OF ITS COVENANTS SET FORTH HEREIN;

(d)    TENANT'S FAILURE TO COMPLY WITH THE PROVISIONS OF THE WARN ACT PRIOR TO THE LEASE TERMINATION DATE;

(e)    ANY CLAIM FOR MALPRACTICE RELATING TO OR ARISING FROM THE USE BY TENANT OF THE LEASED PREMISES OR THE OPERATION BY TENANT OF THE LEASED PREMISES;

(f)    ALL    ENVIRONMENTAL    LIABILITIES    ARISING    FROM ENVIRONMENTAL ACTIVITIES OCCURRING DURING THE PERIOD COMMENCING ON THE EFFECTIVE DATE AND ENDING ON THE LEASE TERMINATION DATE, WHETHER ANY CLAIMS RELATING THERETO ARISE DURING THE LEASE TERM OR FROM AND AFTER THE LEASE TERMINATION DATE, PROVIDED, HOWEVER, TENANT SHALL NOT BE LIABLE FOR ANY ENVIRONMENTAL LIABILITY ARISING FROM ANY ENVIRONMENTAL ACTIVITY WHICH FIRST AROSE PRIOR TO THE EFFECTIVE DATE, UNLESS EXPRESSLY PROVIDED FOR HEREIN;

(g)    ANY    LITIGATION,    PROCEEDING    OR    CLAIM    BY GOVERNMENTAL AUTHORITIES OR ANY OTHER THIRD PARTY TO WHICH A LANDLORD INDEMNIFIED PARTY IS MADE A PARTY OR PARTICIPANT RELATED TO THE USE, MISUSE, NON-USE, CONDITION, MANAGEMENT, OPERATION, MAINTENANCE, OR REPAIR OF THE LEASED PREMISES BY TENANT OR ANY OF ITS AGENTS, EMPLOYEES, CONTRACTORS OR INVITEES, INCLUDING ANY FAILURE OF TENANT OR ANY OF ITS AGENTS, EMPLOYEES, CONTRACTORS OR INVITEES TO PERFORM ANY OBLIGATIONS UNDER THIS LEASE OR IMPOSED BY APPLICABLE GOVERNMENTAL REGULATIONS, EXCEPT TO THE EXTENT ARISING FROM LANDLORD'S FAILURE TO FULFILL THE LANDLORD RETAINED OBLIGATIONS OR FROM LANDLORD'S NEGLIGENCE OR WILLFUL MISCONDUCT;

(h)    ANY USE, MISUSE, NON-USE, CONDITION, MANAGEMENT, OPERATION, MAINTENANCE OR REPAIR BY TENANT OR ANY OF ITS AGENTS, EMPLOYEES, CONTRACTORS OR INVITEES OF THE LEASED PREMISES DURING THE LEASE TERM; AND

(i)    ANY IMPOSITIONS THAT ARE THE OBLIGATION OF TENANT PURSUANT TO THE APPLICABLE PROVISIONS OF THIS LEASE.

23.1.2. **Limitations of Tenant's Obligations**. **NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, IN NO EVENT SHALL TENANT BE LIABLE TO LANDLORD FOR ANY PUNITIVE OR SPECIAL DAMAGES, WHETHER IN AN ACTION IN CONTRACT OR TORT, EVEN IF LANDLORD HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

23.2.    **Counsel**. Counsel selected by Tenant to defend Landlord Indemnitees shall be subject to the reasonable approval of the Landlord Indemnitees, and such counsel, at the direction of Tenant, shall control the defense of the action. However, in the event that



such counsel or any Landlord Indemnitee reasonably determines that a conflict exists between Tenant and one (1) or more Landlord Indemnitees or defenses are available to one (1) or more Landlord Indemnitees which are not available to other Landlord Indemnitees, any such Indemnitee(s) may employ separate counsel to defend any such claim or legal or administrative proceeding at the Tenant's reasonable expense; provided that unless such separate counsel is employed with the approval of Tenant, which approval shall not unreasonably be withheld, Tenant shall not be required to pay any of the fees and expenses of such separate counsel.

23.3.    **Settlement of Claims**.    Tenant shall not, without the prior written consent of those Landlord Indemnitees who are named as parties to a claim or legal or administrative proceeding (a "**Landlord Claim**"), settle or compromise the Landlord Claim if the settlement (a)results in the entry of any judgment that does not include as an unconditional term the delivery by the claimant or plaintiff to Landlord of a written release of those Landlord Indemnitees, reasonably satisfactory in form and substance to Landlord; or (b)may materially and adversely affect Landlord or the Landlord Indemnities, as determined by Landlord in its reasonable discretion.

23.4.    **Additional Obligations**.    Tenant shall, at its own cost and expense, do all of the following, subject to the terms of this Indemnity:

(a)    pay or satisfy any final, non-appealable judgment or decree that is entered against any Landlord Indemnitees in any legal or administrative proceeding incident to any matters against which Landlord Indemnitees are entitled to be indemnified under this **Article XXIII**;

(b)    reimburse Landlord Indemnitees for any actual, reasonable expenses paid or incurred which constitute Indemnified matters; and

(c)    reimburse Landlord Indemnitees for any and all actual, reasonable expenses, including fees and out-of-pocket expenses of attorneys and expert witnesses, paid or incurred in direct connection with the enforcement by Landlord Indemnitees of their rights under this **Article XXIII**.

The provisions of this **Article XXIII** shall be in addition to any and all other obligations that Tenant may have under applicable law, and each Landlord Indemnitee shall be entitled to indemnification under this **Article XXIII** without regard to whether Landlord or that Indemnitee has exercised any rights against the Leased Premises or any other security, pursued any rights against any guarantor or other indemnitor, or pursued any other rights available under this Lease or applicable law.

23.5.    **Term of Indemnity**.    The obligation of Tenant to indemnify the Landlord Indemnitees shall survive any termination of this Lease as and to the extent provided in this **Article XXIII** and shall not expire.

23.6.    **Non-Waiver; Remedies Cumulative**.    No failure or delay on Landlord's part in exercising any right, power or privilege under this **Article XXIII** in



connection with this Lease shall operate as a waiver of any such privilege, power or right or shall be deemed to constitute Landlord's acquiescence in any default by Tenant under any of this Lease.  A waiver by Landlord of any right or remedy under any of the terms of this Lease, including this **Article XXIII**, on any one (1) occasion shall not be construed as a bar to any right or remedy which Landlord would have on any future occasion.  The rights and remedies provided in this Lease are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law or in this Lease.

23.7.    **Landlord's Indemnity**.  LANDLORD SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND TENANT FROM AND AGAINST, WITHOUT DUPLICATION, ALL PROCEEDINGS, CLAIMS, DAMAGES, LOSSES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), PENALTIES AND REASONABLE OUT-OF-POCKET COSTS (WHETHER INITIATED OR SOUGHT BY GOVERNMENTAL AUTHORITIES OR PRIVATE PARTIES), INCLUDING REASONABLE FEES FOR ATTORNEYS AND EXPERT WITNESSES, INVESTIGATORY FEES, AND REMEDIATION COSTS, WHETHER INCURRED IN CONNECTION WITH ANY JUDICIAL OR ADMINISTRATIVE PROCESS OR OTHERWISE; ACTUALLY IMPOSED UPON OR INCURRED BY OR ASSERTED AGAINST TENANT, AND/OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE OR AGENT OF TENANT, TO THE EXTENT ARISING OUT OF OR BY REASON OF (I) ANY ACCIDENT, INJURY TO OR DEATH OF PERSONS OR LOSS OF OR DAMAGE TO PROPERTY OCCURRING ON OR ABOUT THE LEASED PREMISES ARISING FROM LANDLORD'S WILLFUL MISCONDUCT OR NEGLIGENCE, OR (II) THE FAILURE ON THE PART OF LANDLORD TO PERFORM OR COMPLY WITH THE TERMS OF THIS LEASE, THE PARKING AGREEMENT OR THE BILL OF SALE.  LANDLORD'S OBLIGATIONS UNDER THIS **SECTION 23.7** SHALL SURVIVE ANY TERMINATION OF THIS LEASE.

23.8.    **Certain Limitations**.  Landlord, Tenant and each Person entitled to indemnification under this **Article XXIII** shall each be entitled to assert, or to have asserted by its indemnitor on its behalf, any available governmental immunity and limitation of liability defenses with respect to claims brought by third parties.  However, in order to permit each Person entitled to indemnification under this **Article XXIII** to fully enforce its rights against its indemnitor under this **Article XXIII** and to enjoy the full benefit of any public liability and contractual indemnification insurance as may exist from time to time, and for that purpose only, Landlord and Tenant each expressly waives as to claims arising from and after the Effective Date of this Lease and brought against each other pursuant to the terms of this **Article XXIII**, the immunities and limitations of liability afforded by its status as a governmental unit, a "municipal hospital management contractor" or by the Texas Tort Claims Act or the Texas Health and Safety Code, or any successor or similar provisions of the law.  The provisions of this **Section 23.8** do not constitute a waiver by either Landlord or Tenant of any defense or defenses, including immunity, created by or set forth in the Texas Health and Safety Code or the Texas Tort Claims Act available to such parties as to liability to third parties that Landlord, Tenant or any Person entitled to indemnification under this **Article XXIII** may assert against such third party.



## ARTICLE XXIV
## TRANSFER AND ASSIGNMENT

**24.1.    Certain Definitions**.  The following terms shall have the meanings specified below for the purposes of this **Article XXIV** and elsewhere in this Lease:

**24.1.1. "Change in Control"** shall mean and shall be deemed to have taken place upon the occurrence of any of the following:

**(a)**    If the "person" is a publicly held company, a tender offer or an exchange offer is consummated pursuant to which a "person," as such term is defined in Sections 3(a)(9) and 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), including a "group" as defined in Section 13(d)(3) of the Exchange Act, acquires beneficial ownership of securities of the Parent representing fifty percent (50%) or more of the combined voting power of the Parent's then outstanding voting securities; or

**(b)**    The Parent is merged into or consolidated with another corporation and as a result of such merger or consolidation less than fifty percent (50%) of the outstanding voting securities of the surviving or resulting corporation shall then be owned in the aggregate by the former shareholders, members or partners of the Parent or Affiliates thereof, other than affiliates within the meaning of the Exchange Act or any party to such merger or consolidation; provided, however, a recapitalization transaction, the primary purpose of which is to provide additional financing to Parent by issuing up to seventy percent (70%) of the stock of Parent to third parties, shall not be treated as a Change in Control hereunder.

**24.1.2. "Transfer" or "Transferred"** shall mean at any given time, the grant, conveyance, mortgage, encumbrance, pledge, hypothecation, release, sublease, quit-claim, assignment, subletting and sale of the Leasehold Estate, or any interest therein or part thereof, in the case of Tenant, or the Leased Premises, in case of Landlord, and shall include the creation of a license, the passage or creation of title, the passage or creation of any interest, the creation of any material lien or judgment of record against the Leasehold Estate which is not satisfied within thirty (30) days after any applicable appeal period has lapsed, or any interest therein or part thereof, or the Leased Premises, or any disposition thereof or any interest therein or part thereof, whether voluntary or involuntary or by operation of law.

**24.2.    Landlord's Transfer Right**.  Subject to Tenants Purchase Option and ROFO rights hereunder, Landlord shall have the right to Transfer its interest under this Lease, the Parking Agreement or the Leased Premises, or any interest therein or part thereof, without the prior consent of Tenant as long as the transferee assumes in writing for Tenant's benefit all liabilities and obligations of Landlord hereunder and Landlord shall not be released from its obligations. From and after the effective date of such Transfer, Tenant shall attorn to such purchaser, transferee, or assignee.



### 24.3.    **Tenant's Transfer of the Leasehold Estate**.

**24.1.1. Prohibition of Transfer.**  Except as set forth herein, Tenant shall not Transfer or permit the Transfer of the Leasehold Estate or any interest therein or part thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld or denied; provided, however, Tenant shall be permitted, without Landlord's consent, to Transfer or permit the Transfer of the Leasehold Estate or any interest therein or part thereof to an Affiliate of Parent.  Any attempted Transfer, subject to the foregoing provisions, without the prior consent of Landlord shall be void. Any such assignee of Tenant's interests hereunder must assume all of Tenant's obligations under this Lease and such assignment shall not affect or release Tenant from its obligation under this Lease.

**24.1.2. Exceptions to Transfer.**   This Section shall not prohibit the subleasing or licensing of the use of a part or parts of the Leased Premises to any Person for commercial uses or medical research or for use in performing professional or other services necessary or appropriate for proper and economical operation and use of the Leased Premises for hospitals and related purposes in accordance with customary business practices in the industry.  In addition, and notwithstanding any provision of this Lease to the contrary, in connection with any working capital financing, Tenant shall have the absolute right to grant a lender a first priority security interest in Tenant's accounts receivable.

**24.1.3. Notice of Intent to Assign.**  If Tenant should desire to Transfer this Lease or sublet the Leased Premises and provided that Tenant is not then in default hereunder, Tenant shall give Landlord written notice at least thirty (30) days in advance of the date on which Tenant desires to make such assignment or sublease.  Landlord shall then have a period of thirty (30) days following receipt of such notice within which to notify Tenant in writing that Landlord elects either:

**(a)**    to permit Tenant to assign or sublet the Leasehold Estate, subject, however, to the subsequent written approval of Landlord of the proposed assignee or subtenant by Landlord, which approval shall not be unreasonably withheld or delayed; provided, however, that if the rental rate agreed upon between Tenant and its proposed subtenant under any proposed sublease of the Leasehold Estate (or any part thereof) is greater than the rental rate that Tenant must pay Landlord hereunder, or if any consideration shall be received by Tenant in connection with such proposed assignment or sublease (in addition to rental as provided in such proposed sublease), then such excess rental or such consideration, as the case may be (or both), shall be considered Additional Payments (Rent) owed by Tenant to Landlord, and shall be paid by Tenant to Landlord, in the case of excess rentals,  in the same manner that Tenant pays Base Rent and, in the case of any other consideration, immediately upon receipt thereof by Tenant; or

**(b)**    to refuse, in Landlord's reasonable discretion, to consent to Tenant's assignment or subleasing of such space and to continue this Lease in full force and effect.



If Landlord should fail to notify Tenant in writing of such election within such thirty (30) day period, Landlord shall be deemed to have elected option (c) above. No assignment or subletting by Tenant shall relieve Tenant of Tenant's obligations under this Lease. Any attempted assignment or sublease by Tenant in violation of the terms and provisions of this **Section 24.4** shall be void.

**24.4.**    **Maintenance of Existence**.   Tenant covenants to preserve and to maintain its existence for so long as it is the Tenant hereunder and each successor of Tenant pursuant to the provisions of this Lease covenants to preserve and to maintain its existence under the laws of the State of Texas for so long as it is the Tenant hereunder.

**24.5.**    **Dissolution or Liquidation**.   Tenant covenants that during the Lease Term Tenant or any successor of Tenant, as applicable, shall not initiate any proceedings or take any action whatsoever to dissolve or liquidate or to terminate its existence as a corporation or otherwise dispose of all or substantially all of its assets or the Leased Premises.

**24.6.**    **Change of Control of the Parent**.

**24.1.1. Change of Control – Consequences of the Failure to Meet Certain Requirements.**

(a)    A Change in Control shall not constitute a **"Transfer"** for purposes of the restrictions set forth in this Lease, so long as any successor entity to a merger or consolidation is reasonably determined to have:

(i)    substantial operating expertise and experience in operating and managing general acute care community hospitals, and

(ii)    not been excluded from the Medicare Program nor convicted of a felony involving the violation of Governmental Requirements.

(b)    Such successor entity must assume, either by contract or by operation of law, all of Tenant's obligations under this Lease.

(c)    Any Change in Control which does not satisfy the requirements of this **Section 27.7.1** and which is consummated shall, upon the effective date thereof, result in the occurrence of a Tenant Default under this Lease.

**24.1.2. Failure to Meet New Owner Criteria.** Following the occurrence of a permitted Change in Control, if Tenant fails to meet, in all material respects, the "New Owner Criteria" during the period which begins on the third (3rd) anniversary of the consummation of such Change in Control and ends on the fifth (5th) anniversary of the consummation of such Change in Control, then Landlord may elect to terminate this Lease during the sixty (60) day period after such fifth anniversary date by providing written notice to Tenant. In such event, in addition to the other amounts due from Landlord to Tenant upon the Lease Termination Date, Landlord shall also pay to Tenant an amount equal to the total of (i) all capital contributions and (ii) the outstanding principal amount of

all loans, in the case of (i) and (ii), made to Tenant by its members prior to the Lease Termination Date.

    24.1.3. **Definition of "New Owner Criteria"**  For the purposes hereof the term "**New Owner Criteria**" shall mean, as reasonably determined by the parties:

    **(a)**    maintaining all Required Permits in good standing;

    **(b)**    maintaining financial profile typical of operators of like full-service acute care, community hospitals;

    **(c)**    maintaining health care expertise and experience typical of operators of like full-service acute care, community hospitals; and

    **(d)**    not being excluded from the Medicare program or convicted of a felony involving a violation of the Governmental Requirements.

**ARTICLE XXV**
**RESOLUTION OF CERTAIN DISPUTES**

    **25.1.**    **Disputes Subject to Dispute Resolution Procedures**.  The purpose of this **Section 25.1** is to provide a mechanism whereby the parties hereto can resolve a bona fide dispute over the use or application of certain accounting concepts and principles used in this Lease, namely:

    **(a)**    the Determination of whether an expenditure is appropriately characterized as a "**Capital Addition**" in those cases in which all of the requirements of this Lease are satisfied except a dispute as to the proper characterization of such expenditure under GAAP; or

    **(b)**    the Determination of the Useful Life of a category of property or the Net Book Value thereof; or

    **(c)**    the Determination of the actual Effective Date Working Capital Amount, or the Adjusted Working Capital; or

    **(d)**    the Determination of the appropriate amount of any adjustment to Rent payable hereunder in the event of a Partial Taking; or

    **(e)**    a resolution of any dispute concerning whether or not Tenant has complied with its covenants concerning maintenance; or

    **(f)**    the Determination of any other matter in dispute herein or hereunder to which reference is made to the Dispute Resolution Procedures for the resolution thereof.



**25.2.** **Certain Definitions.** As used in **Section 25.1**, the term **"Determination"** shall mean, as applicable, the decision to be determined pursuant to the Dispute Resolution Procedures, including, but not limited to, whether or not to characterize the disputed expenditure as a **"Capital Addition"** or the determination of the Useful Life of the category of property in question or the Net Book Value thereof, the determination of the amount of the Adjusted Working Capital and the determination as to the appropriate amount of Rent abatement in the event of a Partial Taking, or whether Tenant has complied with the terms of this Lease.

**25.3.** **Dispute Resolution Procedure.**

**25.1.1. Disputes Arising Under Subsections (a) - (d) of Section 25.1.** If a dispute arises with respect to any item set forth in subsections (a) - (d) of **Section 25.1** and the provisions of **Article XXV** are instituted by a party hereto, Landlord and Tenant shall immediately attempt to agree upon an Independent Certified Public Accountant or another Person qualified to resolve the dispute in question, who shall have at least ten (10) years of financial and accounting experience or other relevant experience in or for the management and operation and/or maintenance of healthcare facilities similar to the Leased Premises, as appropriate, to make the Determination in question (such Person is hereinafter called a "CPA Decision Maker").

**25.1.2. Determination by CPA Decision Maker.** If Landlord and Tenant cannot agree upon a CPA Decision Maker within fifteen (15) Business Days after the initiation of this procedure, then:

**(a)** The party initiating this procedure (the **"First Party"**) shall notify the other party (the **"Second Party"**) and in such notice shall designate the first CPA Decision Maker. If the first CPA Decision Maker is acceptable to the Second Party, the Second Party shall immediately so notify the First Party and the first CPA Decision Maker shall proceed to make the Determination within fifteen (15) days thereafter.

**(b)** If the first CPA Decision Maker is not acceptable to the Second Party, then within twenty (20) days after receipt of the First Party's notice, the Second Party shall designate, in a written notice, the second CPA Decision Maker. If the Second Party fails to timely approve the first CPA Decision Maker or designate the second CPA Decision Maker, then the first CPA Decision Maker shall proceed to make the Determination within fifteen (15) days thereafter.

**(c)** If a second CPA Decision Maker is designated, the first and second CPA Decision Makers shall meet within ten (10) days after the designation of the second CPA Decision Maker, and proceed to make the Determination within fifteen (15) days thereafter.

**(d)** If the first and second CPA Decision Makers are unable to reach a decision within such fifteen (15) day period, they shall jointly appoint a third CPA Decision Maker who shall make an independent evaluation of the analysis and the Determinations made by the first and second CPA Decision Makers and who shall elect the



analysis and Determination of the first two CPA Decision Makers which, in the opinion of such third CPA Decision Maker is closest to his own Determination.

**25.1.3. <u>Disputes Arising Under Subsection (e) of Section 25.1</u>.** If a dispute arises with respect to any item set forth in subsection (e) of **<u>Section 25.1</u>** and the provisions of **<u>Article XXV</u>** are instituted by a party hereto, then:

**(a)** Such dispute between the parties first shall be referred for resolution to a senior representative of each party. Upon receipt of a notice describing the dispute, designating the notifying party's senior representative and indicating that the dispute is to be resolved by the parties' senior representatives under this Lease, the other party shall promptly designate its senior representative to the notifying party. The senior representatives so designated shall attempt to resolve the dispute on an informal basis as promptly as practicable. If the dispute has not been resolved within thirty (30) days after the notifying party's notice was received by the other party, or within such other period as the parties may jointly agree, the parties shall submit the dispute to arbitration in accordance with the arbitration procedure set forth in subsection (b) below.

**(b)** Any dispute which cannot be resolved pursuant to subparagraph (a) above shall be submitted to binding arbitration by one (1) arbitrator qualified by education, experience or training to render a decision upon the issues in dispute and who is Independent. Such arbitrator shall either be mutually agreed upon by the parties within thirty (30) days after written notice from either party requesting arbitration, or failing agreement, the arbitration shall be conducted by a panel of three arbitrators having the qualifications set forth in the preceding sentence, one (1) to be selected by each party and the third arbitrator to be selected by the two (2) arbitrators selected by the parties (the "**<u>Legal Decision Makers</u>**" and together with the CPA Decision Maker, the "**<u>Decision Makers</u>**" and each, a "**<u>Decision Maker</u>**").

**(c)** If either party fails to notify the other party of the arbitrator selected by it within ten (10) days after receiving notice of the other party's arbitrator, or if the two (2) arbitrators selected fail to select a third arbitrator within ten (10) days after notice is given of the selection of the second arbitrator, then such arbitrator shall be selected under the expedited rules of the American Arbitration Association (the "**<u>AAA</u>**").

**(d)** The commercial arbitration rules of the AAA shall apply to the resolution of all such disputes, to the extent not inconsistent with the rules specified above

**(e)** Notwithstanding the procedures contained in this **<u>Section 25.3</u>** either party may apply to any court of competent jurisdiction (i) to enforce the agreement to arbitrate a dispute, (ii) to seek injunctive relief so as to maintain the status quo until the arbitration award is rendered or the dispute is otherwise resolved, (iii) to avoid the expiration of any applicable limitation period, (iv) to preserve a superior position with respect to other creditors, (v) to protect its confidential information or intellectual property, or (vi) to enforce an arbitration award.



        **(f)**    In any such proceeding, the parties agree to accept service of process by mail at the addresses herein provided for notice.

        **25.1.4. <u>Final Decision</u>.**  A decision of the Decision Maker or Decision Makers shall be binding and conclusive on the parties hereto. To the extent that a dispute has arisen as to Tenant's maintenance obligations and in the event the Legal Decision Maker finds that Tenant has failed to fulfill its obligations under this Lease in accordance with the terms and provisions hereof, then in such event Tenant shall, within fifteen (15) Business Days following the entry of the Legal Decision Maker's Determination, commence all actions which may be required to cure Tenant's failure to perform its obligations and Tenant shall use all reasonable efforts to complete such actions as soon as reasonably practical, and if such failure is cured, such failure shall not constitute a Tenant Default. Tenant's failure to perform the covenants set forth herein shall constitute a Tenant Default hereunder and issues relating around such failure shall not be the subject matter of the Dispute Resolution Procedures.

        **25.1.5. <u>Refusal to Act</u>.**  If any Decision Maker shall fail, refuse, or become unable to act, a new Decision Maker shall be appointed in his place following the same method as was originally followed with respect to the Decision Maker to be replaced.

        **25.1.6. <u>Decision Maker Fees</u>.**  Landlord and Tenant shall pay the fees and expenses of the Decision Maker appointed by them. If one (1) Decision Maker is used, or if a third Decision Maker is required, the fees and expenses of the sole Decision Maker or the third Decision Maker, as applicable, and all other Decision-Making expenses shall be borne equally by the parties.  All hearings, proceedings and arbitrations held and all investigations and actions taken by the Decision Makers shall take place in Dallas, Dallas County, Texas.

        **25.1.7. <u>Independence and Residence</u>.**  Any Decision Maker designated to serve in accordance with the provisions of this **<u>Section 25.3</u>** shall (i) be Independent of Landlord, Tenant or any of their respective Affiliates, and (ii) shall not reside or practice professionally in Texas.

**ARTICLE XXVI**
**<u>FORCE MAJEURE</u>**

        **26.1.**    **<u>Force Majeure</u>.**  Force Majeure shall be defined as any event that delays or prevents Landlord or Tenant from performing, in whole or in part, any of its obligations under this Lease due to any cause beyond the reasonable control of and not due to the fault or negligence of the declaring party, including but not limited to acts of God, war, riots, civil insurrection, acts of the public enemy, terrorism, strikes, lockouts, natural disasters, breakdown of or damage to necessary facilities or equipment, transportation delays, orders or acts of civil or military authorities, legislation, regulation or administrative orders, or any limitation or prohibition on, or inability to obtain governmental permits or approvals required by law, or other causes that are beyond the reasonable control and without the fault or negligence of the party affected thereby.



26.2.    **Effect of Force Majeure**.  If because of Force Majeure either Landlord or Tenant is rendered wholly or partially unable to carry out its respective obligations under this Lease, and if such party promptly gives the other party written notice of such Force Majeure, the obligations and liabilities of the party giving such notice and the corresponding obligation of the other party shall be suspended to the extent made necessary by and during the continuance of such Force Majeure; provided, however, that the party claiming Force Majeure shall use its commercially reasonable efforts to eliminate the cause or effect of Force Majeure as soon as and to the extent possible, except that labor disputes or strikes shall be settled at the sole discretion of the party affected. The provisions regarding Force Majeure set forth in this **Article XXVI** shall not apply to Tenant's obligation to pay Rent or providing financial or operating data which are necessary for Landlord to comply with its covenants under the Indenture and other **Bond Documents**.

## ARTICLE XXVII
### MISCELLANEOUS

27.1.    **Performance of Defaulting Party's Obligations**.  If Tenant at any time fails to pay any Impositions or other sums payable by it or to be performed by it in accordance with this Lease, then after ten (10) days' written notice, Landlord may, but shall not be obligated so to do, and without further notice to or demand upon Tenant and without waiving or releasing Tenant from any of its obligations contained in this Lease, (a) pay any Impositions payable by Tenant in accordance with this Lease, or (b) make any other payment or perform any other act on Tenant's part to be made or performed as provided for in this Lease.  All sums so paid by Landlord and all necessary incidental costs and expenses incurred by Landlord in connection with the performance of any such acts required to be performed by Tenant shall be payable by Tenant to Landlord on demand, and Tenant covenants to pay any such sums together with interest thereon at the Default Rate from the date due.

27.2.    **Partial Invalidity**.  If any term or provision hereof or the application thereof for any reason or circumstances shall to any extent be held to be invalid or unenforceable, the remaining provisions or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision hereof shall be valid and enforced to the fullest extent permitted by law.

27.3.    **No Personal Recourse Against Landlord; Indemnification**.

(a)    In the exercise of the power of Landlord and its directors, officers, employees and agents under this Lease including (without limiting the foregoing) the application of monies, the investment of funds and the letting or other disposition of the Leased Premises following a Tenant Default, Landlord shall not be accountable to Tenant for any action taken or omitted by it or its directors, officers, employees and agents in good faith and reasonably believed by it or them to be authorized or within the



discretion or rights or powers conferred. Notwithstanding such limitation, nothing herein shall relieve Landlord of its obligations and liabilities under this Lease.

**(b)**    Each of Landlord and Tenant shall be protected in its acting upon any instrument or document reasonably believed by it to be genuine, and it or they may conclusively rely upon the advice of counsel and may (but need not to) require further evidence of any fact or matter before taking any action.

**(c)**    No recourse shall be had by Tenant or Landlord, as the case may be, for any claims based on this Lease or on the Indenture against any director, officer, member, manager, employee or agent of Landlord or Tenant, as the case may be, alleging personal liability on the part of such Person. The provisions of the previous sentence shall not relieve Landlord or Tenant of any of their respective obligations and liabilities under this Lease. Notwithstanding the foregoing or any other provision in this Lease, neither Landlord or Tenant nor their respective directors, officers, members, managers, employees, and agents shall be held harmless or indemnified against their fraud or misrepresentation, violations of law, willful misconduct, gross negligence, nor from allegations thereof.

**27.4.**    **Amendments to Law**.    A reference herein to a statute or to a regulation issued by a Governmental Authority includes the statute or regulation in force as of the Effective Date hereof, together with all amendments and supplements thereto and any statute or regulation substituted for such statute or regulations, unless the specific language or the context of the reference herein clearly includes only the statute or regulation in force as of the Effective Date. A reference herein to a governmental agency, department, board, commission or other public body or to a public officer includes an entity or officer which or who succeeds to substantially the same functions as those performed by such public body or officer as of the Effective Date, unless the specific language or the context of the reference herein clearly includes only such public body or public officer as of the Effective Date.

**27.5.**    **Governing Law**.    This Lease shall be governed exclusively by the provisions hereof and by the applicable laws of the State of Texas.

**27.6.**    **Entire Lease; Amendments**.    This Lease is a total and complete integration of and all undertakings between Landlord and Tenant and supersedes any prior oral and written agreements, promises, or representations between them. The parties hereto may enter, from time to time, into any written amendments hereto (which will thereafter form a part hereof); provided that any such amendment is duly authorized by Landlord's Board and Tenant, and is duly executed by the authorized representative of each party hereto.

**27.7.**    **Notices**.    Whenever this Lease requires or permits any consent, approval, notice, request or demand from one (1) party to the other (collectively, "**Notice**"), such Notice must be in writing to be effective and shall be effective on the date of delivery of such Notice to the addressee. The following shall be prima facia evidence of delivery of Notice: (a) if mailed, by United States certified mail, return receipt requested, signed by the



addressee or the addressee's agent or representative or a certified mail return receipt indicating attempted delivery of the Notice to the addressee at its proper address, (b) if by telegram, by a telegram receipt signed by the addressee or the addressee's agent or representative, or (c) if hand delivered, by a delivery receipt signed by the addressee or the addressee's agent or representative. All notices required or authorized to be given by Tenant or Landlord pursuant to this Lease shall be in writing and shall be sent to the following addresses:

**If to Tenant:**   **SANA HEALTHCARE CARROLLTON, LLC**

c/o The Piera Group
544 East Rustic Road
Santa Monica, CA 90402
kp@kpmd.biz
(_____)_____ Telephone
Attn: Krishna P. Surapaneni, M.D., President

**With copy to:**   Savitala-Law
115 W. California Boulevard, Suite 9075
Pasadena, CA 91105
Attn: Radha Savitala

**Landlord:**   Metrocrest Hospital Authority
4325 North Josey Lane
Carrollton, Texas 75010
Attn: Charles B. Heath, Chief Executive Officer

**with copies to:**   Michael J. Collins
The Collins Law Group
8350 N. Central Expwy., Suite 950
Dallas, TX 75206
mcollins@cblegal.com
(214) 379-0950 Telephone

or to such other addresses as may from time to time be furnished to the parties, effective upon the receipt of notice thereof given as set forth above. Each of the above agrees that it shall send a duplicate copy or executed copy of all certificates, notices, correspondence or other data and materials sent to any of the above pursuant to this Lease to both other parties.

      27.8.   **Counterparts**.  The Lease may be executed in multiple counterparts, each of which shall be regarded for all purposes as an original, and such counterparts shall constitute but one and the same instruments.

      27.9.   **Headings**.  Headings are for convenience of reference only and shall not affect the interpretation of this Lease.



**27.10.**    **Name of the Leased Premises**.  Any future change of name for the Carrollton Hospital shall be subject to the mutual agreement of Landlord and Tenant.

**27.11.**    **Statutory References**.  All references to any statutes, rules or regulations contained in this Lease shall include a reference to all amendments and replacements thereto or successors thereof, where the context requires.

**27.12.**    **Public Purpose Sole Reason for This Transaction**.  The public purpose under the laws of the State of Texas for which Landlord has entered into the transaction represented by this Lease, is to continue to assure that the people of the State of Texas will have access to adequate medical care and health facilities and to assist in the development and maintenance of the public health.  To assure that such continuing public purpose will be effectuated, Tenant covenants and agrees that during the Lease Term it will continue to operate the Leased Premises as a provider of health care services in accordance with the terms and conditions hereof. Landlord finds and determines that the covenants contained in this Lease reasonably assure the carrying out of the continuing public purpose under the laws of the State of Texas sought to be achieved by Landlord in this transaction and that the accomplishment of such continuing public purpose is the sole reason for this transaction.

**27.13.**    **Exhibits**.  The following Exhibits are attached to this Lease and are incorporated herein for all purposes:

| | |
|---|---|
| **Exhibit "A"** | Parking Agreement |
| **Exhibit "B"** | Permitted Exceptions |
| **Exhibit "C"** | Tract A, Tract B and Tract C - Legal Description |
| **Exhibit "D"** | Engineers Report on Repairs |
| **Exhibit "E"** | Guarantee |
| **Exhibit "F"** | Purchase Option Agreement |

# *[Signature page follows]*



**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Amended and Restated Lease Agreement, all as of the day and year first above written.

**METROCREST HOSPITAL AUTHORITY**

By: _____

**CHARLES B. HEATH**
Metrocrest Hospital Authority
4325 North Josey, Suite 107
Carrollton, Texas 75010
972-247-8023 Telephone
972-247-8095 Facsimile

Its:    Chief Executive Officer

Dated: the _19th_ day of __November__, 2019.

**SANA HEALTHCARE CARROLLTON, LLC**

By: _____

**KRISHNA P. SURAPANENI**
112 E. Amerige Avenue, Suite 205
Fullerton, California 92832

Its:    Managing Director

Dated: the ___ day of _____, 2019.